Case 2:07-cv-02002-MCE-KJM   Document 131-1   Filed 10/15/07   Page 1 of 70









OAKLAND POLICE ACADEMY
Basic Police Training Class 82-2
10 1982



**DEPARTMENT OF
POLICE**

# CITY OF SACRAMENTO
CALIFORNIA

October 13, 1992
Ref:  10-43

HALL OF JUSTICE
813 SIXTH STREET
SACRAMENTO, CA
95814-2495

PH 916-264-5121

JERRY V. FINNEY
INTERIM CHIEF
OF POLICE

Richard H. Ross
Special Agent in Charge
Federal Bureau of Investigation
P. O. Box 13130
Sacramento, CA 95813

Dear Mr. Ross:

Recently we had the good fortune to work with two of your agents
in the investigation of a difficult gambling case.

Agent Lok Lau was able to use his bilingual skills and his training
to enter an illegal gambling den operated by Chinese speaking
Vietnamese.  He obtained the necessary information to arrest the
operators.

Agent ▮▮▮▮▮▮▮ provided an additional officer safety factor by
monitoring the transmissions from Agent Lau for threats in
Vietnamese.

Agent Lau's ability to penetrate the gambling operation on his
first attempt assisted the Sacramento Police Department in closing
down the operation and returning the neighborhood to the people who
live there.  The illegal gambling operation had resulted in loan
sharking, extortions, gang activities and assaults.

It is without reservation that I commend Agents Lau and Pham for
their assistance in the investigation of this case.  I look forward
to the continued good relations between our two agencies.

Sincerely,

*Jerry V. Finney*

Jerry V. Finney
Interim Chief of Police

Exhibit 2

JVF:kf

cc

SEARCHED _____ INDEXED _____
SERIALIZED _____ FILED _____
OCT 1 9 1992
FBI — SACRAMENTO

National Drug Intelligence Center

Johnstown, PA 15901-1622

December 7, 1995

SAC Richard Ross
Federal Bureau of Investigation
2800 Cottage Way
Federal Office Building
Sacramento, CA 95825

Dear SAC Ross,

      I would like to take this opportunity to thank you for permitting SA Lok Lau to brief a group of interested individuals at the National Drug Intelligence Center on December 4, 1995. NDIC Intelligence Research Specialists, agent personnel, analysts from the CIA's Crime and Narcotics Center, and an analyst from the Naval Investigative Service at the National Maritime Intelligence Center were all present at Mr. Lau's lecture. Comments made by analysts indicated that they were very pleased with the briefing and came away with a better understanding of Chinese alien smuggling, Asian Organized Crime, and Asian cultural issues in general. This information will aid NDIC personnel in the research and analysis of Asian matters at the center.

      Again, thank you for your support in this center's endeavor to enhance the understanding of its personnel regarding the analysis of Asian strategic organizational drug intelligence.

Sincerely,

James A. Cunfer
Unit Chief
Eurasian Unit

Exhibit 4

Aa Lau

67-HD-864417-73

CITY of SAN DIEGO
MEMORANDUM

FILE NO.:        391

DATE:            8-28-96

TO:               Special Agent In Charge

FROM:          Detective Paul E. Olson

SUBJECT:     Letter of Appreciation

---

In November 1995 Detective Richard Allen and I traveled to Sacramento, California on an investigation regarding a ▮▮▮▮▮▮▮▮  At the time we did not know if ▮▮▮▮▮▮▮▮ was a victim or a suspect in a case that is being investigated by the San Diego FBI office and the San Diego Police Department.  The subject of our investigation is still being pursued.

While in Sacramento, we had occasion to meet with and request the assistance of one of your Special Agents George Lau.  Agent Lau was tasked with helping us locate ▮▮▮▮▮▮▮▮ who lived in ▮▮▮▮▮▮▮▮  Agent Lau was very helpful in our case because he had a Confidential Informant who knew of ▮▮▮▮▮▮▮▮  Agent Lau worked with the informant in attempting to locate ▮▮▮▮▮▮▮▮

In July, 1996, ▮▮▮▮▮▮▮▮ was finally located through a family member and was subsequently interviewed by myself and Agent George Fox of the San Diego FBI office.  It was determined that ▮▮▮▮▮▮▮▮ was in fact a victim of a major fraud scheme by the suspect under investigation.

I would like to express my thanks to your agency and to Agent Lau for his assistance in this case.  If our agency can ever be of assistance to you or your office in any way please feel free to contact me personally.

Sincerely,

*Paul E Olson*

Paul E. Olson
Detective
San Diego Police Department
Criminal Intelligence Unit

THE CITY OF
**SAN DIEGO**
SAN DIEGO POLICE DEPARTMENT
1401 Broadway
San Diego, California 92101 – 5729

Phone: (619) 531-2483
        (619) 531-2518
 : (619) 232-2748 #4057
♻ Printed on recycled paper

PAUL E. OLSON
Detective
Criminal Intelligence Unit

Exhibit 5.

67-HQ-864417-80

SEARCHED _____ INDEXED _____
SERIALIZED _____ FILED _____

SEP 9 1996

FBI - SACRAMENTO

1       UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON

3           AT SEATTLE

4

5   UNITED STATES OF AMERICA,      )
                                   )
6          Plaintiff,              )
                                   )
7   vs.                            )    Case CR95-732Z
                                   )
8   HUEY LIN, a/k/a Ching Lin;     )
    ZHEN XING CHEN, a/k/a Tien     )
9   Sin Jiang, JIAN LI LIN;        )
    XUE FEI LIN; MIN SHUN HU,      )    COPY
10                                 )
           Defendants.             )
11   _____)

12       EXCERPT FROM SUPPRESSION HEARING - VOLUME III

13           TESTIMONY OF LOK LAU

14   on February 28, 1996, before the Honorable Thomas S. Zilly,

15   United States District Judge, at the United States Courthouse,

16   Seattle, Washington.

17

18

19   Appearances of Counsel:
     On Behalf of Plaintiff:          JOANNE MAIDA
20                                     ANDREW HAMILTON
                                       Assistant U.S.-Attorneys
21   On Behalf of Defendants:         MICHAEL FILIPOVIC
                                       JO ANN OLIVER
22                                     BRUCE ERICKSON
                                       JAMES VONASCH
23                                     PETER CAMIEL
                                       JON ZULAUF
24                                     Attorneys at Law
     Sue Palmerton
25   Official Court Reporter
     (206) 553-1899

Exhibit 6.

1    THE COURT:  Well, I'm going to ask counsel to find out.

2  All right, you want to step forward, sir.

3  LOK LAU            being sworn, testified as follows:

4    THE CLERK:  Will you state your name for the record and

5  spell your last name.

6    THE WITNESS:  Yes.  Lok Lau.  Last name spelled L-A-U.

7    THE COURT:  Want to spell your first name, sir.

8    THE WITNESS:  L-O-K.

9    THE COURT:  Thank you.  Go ahead.

10    MR. CAMIEL:  Thank you, Your Honor.

11                    DIRECT EXAMINATION

12  BY MR. CAMIEL:

13  Q.  Sir, my name is Peter Camiel and I represent one of the

14  defendants, Lin Xue Fei.  How are you employed?

15  A.  I'm a Special Agent of the FBI.

16  Q.  And how long have you been employed with the FBI?

17  A.  Approximately ten years.

18  Q.  Are you stationed here in Seattle?

19  A.  No.  In Sacramento.

20  Q.  When did you first become involved in the case that is here

21  today?

22  A.  I would say September the 4th, 1995.

23    THE COURT:  I didn't hear the date, September what?

24  A.  4th --

25    THE COURT:  4th, thank you.

1  A.  -- is when I arrived.

2  Q.  (By Mr. Camiel)  And why was it that you became involved in

3  this case?

4  A.  I believe because I'm a language -- Asian fluent in the

5  Cantonese and Mandarin dialects.

6  Q.  What was your first involvement in this case?

7  A.  Well, like I say, I arrived on the 4th of September to be

8  translating agent.

9  Q.  And upon your arrival, did there come a point in time where

10  you had contact with any of the victims in this case?

11  A.  Yes, I do.

12  Q.  Do you know when that first was?

13  A.  I believe it's September the 6th.

14  Q.  And was that the first time you had any contact with any of

15  the victims in this case?

16  A.  That's correct.

17  Q.  Where did that contact take place?

18  A.  It took place at the INS facility near downtown Seattle.

19  Q.  Which of the victims did you meet with first?

20  A.  It was John Doe number 1.

21  Q.  Do you know about what time it was that you first were

22  introduced to John Doe number 1?

23  A.  I would say perhaps late in the morning, early afternoon.

24  Q.  Were you with any other agents when you first met with John

25  Doe number 1?

1   A.   Yes.  Agent Norie Hamilton.

2   Q.   What was the purpose of meeting with John Doe number 1 on

3   that occasion?

4   A.   Well, I was basically the translating agent.  I do not know

5   the main thrust of the purpose of the meeting.  I just translate

6   because of my language skill.

7   Q.   Prior to meeting with John Doe number 1, did you have

8   discussion with Special Agent Hamilton about what you were going

9   to be trying to accomplish when you met with John Doe number 1?

10  A.   No, sir.

11  Q.   Was there any discussion about the use of any photographs

12  with John Doe number 1 before you met with him?

13  A.   Not really.  Like I say, I was just the translating agent.

14  Whatever they want to ask and whatever was said to me, I just

15  translate.

16  Q.   Well, were you given any indication that Special Agent

17  Hamilton was going to be showing any photographs to John Doe

18  number 1?

19  A.   Yes.  Just prior to the showing of the photographs.

20  Q.   Did she show you the photographs before you met with John Doe

21  number 1?

22  A.   I don't believe so.

23  Q.   Did she tell you anything about the photographs?

24  A.   No.

25  Q.   When you met with John Doe number 1, this is at the INS

1    building?

2    A.   That's correct.

3    Q.   Other than you and Special Agent Hamilton, was anyone else

4    present?

5    A.   No, sir.

6    Q.   Describe what occurred when you first met with John Doe

7    number 1.

8    A.   Well, there was the usual exchange of pleasantries and that

9    was the extent of it.

10   Q.   Was there any introduction as to why you were there to see

11   John Doe number 1?

12   A.   Yes.   I was introduced as the agent that could speak the

13   dialect.

14   Q.   You spoke to John Doe number 1 in Mandarin?

15   A.   Yes, sir.

16   Q.   Describe -- well, let me back up for a moment.   At the point

17   in time that you met with John Doe number 1, did you know that

18   five individuals had been arrested with regard to this case?

19   A.   I know there was various individuals arrested, but I didn't

20   know the exact number.

21   Q.   Had you seen any photographs of the individuals that had been

22   arrested?

23   A.   I might have.   There were a lot of photographs.   I don't

24   recall specifically which ones.

25   Q.   Were you shown any loose photographs of any individuals

1  involved in this case?

2  A.  No, sir.

3  Q.  When you met with John Doe number 1, were you aware that he

4  had previously been shown a photographic montage?

5  A.  No, sir.

6  Q.  Describe the course of the conversation with John Doe number

7  1.

8  A.  At what point?

9  Q.  Well, you walked into the room and you indicated that you

10  introduced yourself and there were some pleasantries.  What was

11  said after that?

12  A.  Shortly afterwards, I -- to the best of my recollection, he

13  told me something to the effect that he hasn't been telling us

14  the complete truth about the matter.  Something to the effect.

15  Q.  How did this statement by John Doe number 1 come up?  Was

16  there anything that elicited that statement?

17  A.  No, sir.  It was -- to the best of my recollection, it was a

18  voluntary statement.

19  Q.  Wasn't -- wasn't in response to questions?

20  A.  No.

21  Q.  How long into the interview did he make this statement?

22  A.  I would say couple minutes.  It was very briefly after we

23  met.

24  Q.  After he indicated that he hasn't been completely truthful,

25  what was said?

490

1   A.  He stated that he was fearing for his life and the life of

2   his family members.  And that he is willing to tell the truth

3   now.

4   Q.  Did he indicate whether he had had any discussions with John

5   Doe number 2 before deciding to come forward and tell the truth?

6   A.  Yes.  He stated that they both talk about the fact that they

7   will not cooperate with the U.S. authorities because they're

8   afraid of what might happen to themselves as well as their family

9   members.  They were really afraid.

10  Q.  Did he indicate whether he had talked to John Doe number 2

11  about the decision to cooperate?

12  A.  I don't recall that.

13  Q.  When John Doe number 1 expressed the fact that he was

14  fearful, was he told that people that were believed to be

15  involved in this case had been arrested and were in custody?

16  A.  No.  He did not specifically say that.

17  Q.  Was he told that by anyone?

18  A.  I don't know.

19  Q.  As far as you recall, did he have an awareness that

20  individuals had been arrested in the case?

21  A.  I don't recall that.  In my mind I knew there was some

22  arrests, but I don't recall him saying that there were some

23  arrested.

24  Q.  All right.  After he indicated that he was going to be more

25  forthcoming, what occurred?

1   A.  Well, I just translated whatever he said.

2   Q.  What was said?

3   A.  I don't quite recall because there was such a lengthy

4   interview and, like I say, I was just the translating agent.

5   Q.  Did you prepare any 302 reports with regard to this

6   interview?

7   A.  No.

8   Q.  Did you take notes during the interview?

9   A.  No, sir.

10  Q.  At some point in time during this interview with John Doe

11  number 1, was he asked to look at a photo montage?

12  A.  Yes.

13  Q.  How long into the interview did that occur?

14  A.  It must have been some time.  I don't recall the exact time

15  because, like I say, I was doing all the translation back and

16  forth for Agent Hamilton and for John Doe number 1.

17  Q.  I take it that Special Agent Hamilton was the one who had the

18  photographs with her?

19  A.  Yes.

20  Q.  Describe for me what she said to John Doe number 1 when she

21  first took out the photographs.

22  A.  I don't recall the exact statements or words.  But it was to

23  the effect like, you know, who were the subjects or suspects.

24  Q.  Did she -- the photographs, do you recall the montage and how

25  it was put together?

1  A.  Yeah.  It was on a piece of cardboard and there were only

2  numbers on top of it.  It was well mounted on a piece of paper.

3  It was all just, you know, numbers, bunch of numbers and a bunch

4  of photographs.

5  Q.  Do you know how many photographs there were?

6  A.  I don't recall.  I know there was quite a few.

7  Q.  Were they on more than one backing?

8  A.  Yes.  I believe so.

9          MR. CAMIEL:  Your Honor, I would ask if the clerk could

10  hand the witness exhibits 9-A and 9-B.

11  Q.  Do exhibits 9-A and 9-B appear to be the -- a copy of the

12  montage that was shown to John Doe number 1?

13  A.  Yes.

14  Q.  Were both pages laid out at the same time in front of John

15  Doe number 1 as they are now in front of you?

16  A.  Yes.

17  Q.  If I understand your answer a few moments ago, you indicated

18  that Special Agent Anderson -- excuse me, Hamilton asked John Doe

19  number 1 who are the suspects?

20  A.  Yes.

21  Q.  And did she use the plural, suspects, when she showed him the

22  photographs?

23  A.  I don't recall.  Like I say, I just do the translation,

24  whatever was asked at that time.  You have to understand, it's

25  been quite a few months since I did this.

1  Q.  What was John Doe number 1's response when the photos were

2  put in front of him?

3  A.  I believe he just mentioned the numbers to me and I

4  translated back to Agent Hamilton like whatever the numbers

5  were.  It was verbatim like, you know, whatever the numbers were

6  and I just did --

7  Q.  Do you know how many of the photos he identified or gave a

8  number for?

9  A.  I don't recall.  There was quite a few.

10  Q.  Before he was shown the photographs, do you recall whether he

11  was asked to give any descriptions of the people that were

12  involved in detaining him?

13  A.  How do you mean by descriptions?

14  Q.  Was he asked to describe any of the individuals, the height,

15  hair color, weight, et cetera?

16  A.  I think it was just like which photos could you recognize.  I

17  don't think there was such a detailed description was asked.  It

18  was on these two pieces of cardboard and it was just identify

19  which photo it was.

20  Q.  When the photos were put in front of John Doe number 1, was

21  there any discussion with him about the fact that he had not

22  identified people from the montage previously?

23  A.  I don't recall that.

24  Q.  Was there any discussion about the fact that he had seen this

25  photo montage before?

1  A.  I don't recall that.

2        THE COURT:  Is this a good place to take our morning

3  break, counsel?

4        MR. CAMIEL:  Yes, Your Honor.

5        THE COURT:  We'll take our morning recess, 15 minutes.

6     (Morning recess.)

7        THE COURT:  Please be seated.

8  Q.  (By Mr. Camiel)  Sir, when John Doe number 1 was examining

9  the photos on the photographic montage, did he pick up the

10 photographs and look at them closely?

11 A.  I don't recall.  But I believe so.

12 Q.  Do you recall whether or not he lifted any of the photos to

13 look at the back of them?

14 A.  No.

15       THE COURT:  Would you explain your answer.  You don't

16 remember or he didn't do that?

17       THE WITNESS:  He didn't do that.

18       THE COURT:  All right.  Thank you.

19 Q.  (By Mr. Camiel)  After John Doe number 1 had pointed to

20 various photographs and you translated the numbers for Special

21 Agent Hamilton, was John Doe number 1 asked questions about the

22 photos that he pointed to?

23 A.  I don't recall.

24 Q.  Was there a discussion about the photos that he pointed to?

25 A.  I don't recall.

1  Q.  Was John Doe number 1 told whether or not any of the people

2  in the photographs that he had pointed to were in custody?

3  A.  Can you repeat the question again.

4  Q.  Yes.  Was John Doe number 1 told that any of the people

5  depicted in the photographs were in custody?

6  A.  I don't recall.

7  Q.  Do you recall whether he asked any questions about whether

8  anyone had been arrested?

9  A.  Yes.

10  Q.  And in response to his question, what was he told?

11  A.  I don't recall.

12  Q.  How long were the photographs in front of John Doe number 1?

13  A.  Not very long.

14  Q.  Five minutes, ten minutes?

15  A.  I'd say less than that.

16  Q.  Okay.  Other than exhibit number 9-A and 9-B, do you recall

17  whether any other photographs were shown to John Doe number 1?

18  A.  No.

19       THE COURT:  Again, would you explain.  You don't

20  remember or none were shown?

21       THE WITNESS:  None were shown.

22       THE COURT:  Thank you.

23  Q.  (By Mr. Camiel)  Did you meet with John Doe number 2

24  immediately after meeting with John Doe number 1?

25  A.  Not immediately, but I would say a few minutes later.

1   Q.  After you met with John Doe number 1, what happened to him?

2   Where did he go?

3   A.  He was escorted back to his cell.

4   Q.  Do you know whether or not John Doe number 1 had a chance to

5   talk to John Doe number 2 before John Doe number 2 was brought in

6   to meet with you?

7   A.  I don't know.

8   Q.  You indicated there was a few minutes between interviews?

9   A.  Yes.

10  Q.  When John Doe number 2 was brought into the room -- was this

11  in the same room where you interviewed John Doe number 1?

12  A.  Yes.

13  Q.  When he was first brought into the room, were the photographs

14  still out?

15  A.  I -- I don't recall.  But I don't believe so.

16  Q.  When John Doe number 1 -- I want to go back for a minute,

17  when he was looking at the photographs, was he asked to mark the

18  photographs that he identified in any manner?

19  A.  For John Doe number 1?

20  Q.  Yes.

21  A.  No.

22  Q.  When John Doe number 2 was brought into the room, what was he

23  told?

24  A.  He was told the reason I was there was I was a translating

25  agent and that was it.

1   Q.  What did Special Agent Hamilton tell John Doe number 2 about

2   the reason why she was there to talk to him?

3   A.  I don't recall.

4   Q.  Did she indicate that she wanted to show him some

5   photographs?

6   A.  It was not until at a later point during that interview.

7   Q.  Well, tell me what was discussed during the interview before

8   the photographs were taken out?

9   A.  I don't recall.

10          MR. HAMILTON:  Your Honor, I'm going to object because I

11  think the witness has consistently stated he doesn't recall the

12  details.  He was merely the translator.  He didn't take notes.

13  The passage of time has been almost five months.  Special Agent

14  Hamilton has already testified as to --

15          THE COURT:  Don't make a speaking objection, please.

16          MR. HAMILTON:  I object because the witness has already

17  stated that he does not recall the independent facts of what was

18  stated.

19          THE COURT:  Overruled.  The answer will stand.

20  Q.  (By Mr. Camiel)  You indicated that there was a period of

21  time before the photos were taken out and shown to John Doe

22  number 2?

23  A.  Yes.

24  Q.  Do you know how much time passed?

25  A.  I don't.

1  Q.  Was John Doe number 2 asked to give any descriptions of the

2  people involved in detaining him before the photos were taken

3  out?

4  A.  I don't recall.

5  Q.  What was -- what do you recall being discussed before the

6  photos were taken out?

7  A.  I said it's -- I am merely a translating agent.  For the last

8  year, I was out of my division seven months of 12 months.  I do a

9  lot of translation work for the bureau and I do not recall every

10  single meeting and it's all very fuzzy to me.

11  Q.  I understand and I'm simply asking you what you do recall.

12  A.  I don't recall unless you ask me specific questions, I would

13  not be able to answer that.

14  Q.  When John Doe number 2 was being interviewed, do you recall

15  whether he was told or there was any discussion about the fact

16  that some people had been arrested who were suspects in the case?

17  A.  I don't recall.

18  Q.  Was John Doe number 2 told that John Doe number 1 had been

19  asked to look at some photographs?

20  A.  I don't recall.

21  Q.  Were you aware that John Doe number 2 had previously been

22  shown the photo montage?

23  A.  I was not aware of that.

24  Q.  What was John Doe number 2 told when the photographs were

25  brought out?

1    A.  To pick up (sic) the suspect that were involved in this

2    case.

3    Q.  To pick the suspects that were involved in this case?

4    A.  Yes.

5         THE COURT:  Well, the first time you said suspect and in

6    the question that was just asked you, it was worded in the

7    plural.  Do you remember one way or another what was said?

8         THE WITNESS:  I don't recall whether it was plurual or

9    singular, Your Honor.

10         THE COURT:  All right.

11   Q.  (By Mr. Camiel)  Before he was shown the photographs, do you

12   recall whether there was any discussion about the photographs?

13   A.  Can you repeat the question.

14   Q.  Yes.  Before John Doe number 2 was shown the photo montage,

15   was there any discussion about those photographs?

16   A.  No.

17   Q.  Did Special Agent Hamilton pull them out without saying

18   anything about them?

19   A.  I think he said that these are the -- this is the photo

20   montage and pick out the suspect or suspects involved.

21   Q.  When she made that statement, what was John Doe number 2's

22   response?

23   A.  He looked at it and he called out the numbers.

24   Q.  Was he asked to mark the photographs that he identified in

25   any way?

1  A.   No.

2  Q.   Now, with John Doe number 1, you indicated that he made a

3  statement.   You recalled him making a statement about not being

4  completely forthright at the beginning of the interview with John

5  Doe number 1?

6  A.   Yes.

7  Q.   Do you recall any similar statement with John Doe number 2?

8  A.   I don't.

9  Q.   When John Doe number 2 was pointing to the various

10 photographs, did he give any description about the people that he

11 was identifying?

12 A.   I don't recall.

13 Q.   Do you recall whether he was told whether any of the pictures

14 he was pointing to were of people that were in custody?

15 A.   I don't recall.

16 Q.   Do you know how long the photos were in front of John Doe

17 number 2?

18 A.   It was briefly presented.

19 Q.   Did he express any fear to you when he was pointing out the

20 photographs of identifying anyone?

21 A.   I don't recall during the particular instant that he

22 expressed fear, but I -- I do recall that during the entire

23 interview that he was very fearful of what might happen to him

24 and his family members.

25 Q.   Was he given any assurance that the people that he was

1  concerned about were in custody?

2  A.  I don't recall.

3  Q.  Did you meet with Jane Doe on September 6th?

4  A.  I don't recall the exact date.  But I know I did meet with

5  her.

6  Q.  Do you know if you met with her the same day that you met

7  with John Doe 1 and John Doe 2?

8  A.  I don't recall the dates.

9       THE COURT:  Did you meet with her more than once?

10      THE WITNESS:  Yes.

11 Q.  (By Mr. Camiel)  I'm sorry, did you meet with John Doe 1 and

12 John Doe 2 more than once?

13 A.  On which particular date?

14 Q.  Well, did you have more than one meeting with each of those

15 boys?

16 A.  Throughout my stay in Seattle, during that time?

17 Q.  Yes.

18 A.  Yes.

19 Q.  Now, we've talked about September 6th.  Were John Doe number

20 1 or John Doe number 2 shown photographs on any other occasions

21 where you were present?

22      MR. HAMILTON:  Objection.

23 A.  I don't recall.

24      THE COURT:  What is the nature of the objection?

25      MR. HAMILTON:  This goes beyond the scope.  The inquiry

1   is what happened when the photo montage was presented.

2         THE COURT:  It doesn't go beyond the motion to

3   suppress.  The objection is overruled.  If the victims were shown

4   these photo montages on other occasions that haven't been

5   disclosed, wouldn't that be relevant?

6         MR. HAMILTON:  Your Honor, we've talked about this

7   before.  If I can articulate to the Court.  The victims don't

8   know the names of the suspects and the way that they would

9   indicate to agents by pointing to a picture and indicating this

10  person did this, this person did that.  There was only one

11  presentation of a montage involving this witness and that is what

12  he has testified about.

13        THE COURT:  Well, I'll sustain the objection, then.  But

14  I will permit you to ask him whether he was ever present when the

15  montage was shown to the -- to any victim and they were asked to

16  identify victims -- or defendants or suspects.

17  Q.  (By Mr. Camiel)  Were you present when the victims were

18  shown -- and let's stick with John Doe number 1 and No. 2 right

19  now. You've already described the September 6th viewing of the

20  montage.  Were you present when these boys were shown the montage

21  at any other time?

22  A.  I don't recall.

23  Q.  Did you meet with Jane Doe at some point?

24  A.  Yes.

25  Q.  You've already indicated you don't know whether it was the

```
 1  same day that you met with the two boys?

 2  A.   That's correct.

 3  Q.   Where did you meet with Jane Doe?

 4  A.   At the INS facility.

 5  Q.   Who were you with?

 6  A.   I don't recall.

 7  Q.   Were you with another FBI agent?

 8  A.   Yes.

 9  Q.   You don't recall who that was?

10  A.   No.

11  Q.   With regard to your meeting with Jane Doe, did you take any

12  notes?

13  A.   No.

14  Q.   Did you prepare a 302 report?

15  A.   No.

16  Q.   Do you know what the purpose was of meeting with Jane Doe?

17  A.   To translate the questions that were put to her.

18  Q.   Do you know what the reason was that she was being met with

19  by the agent that you were translating for?

20  A.   No.

21  Q.   Was there any discussion about showing her a photo montage

22  before you met with her?

23  A.   I don't recall.

24  Q.   Did you meet -- you met with Jane Doe at the INS building?

25  A.   Yes.
```

1  Q.  Did you meet with her in the same room where you had met the

2  boys?

3  A.  Yes.

4  Q.  When she was first brought into the room, what was said?

5  A.  I don't recall.

6  Q.  At some point during the meeting, was she shown the photo

7  montage?

8  A.  To identify the suspect or suspects.

9  Q.  She was shown the photo montage?

10  A.  You asked me if the question was such, I say yes.

11  Q.  How long into the meeting was it before the montage was

12  displayed to her?

13  A.  I don't recall.

14  Q.  Do you recall what she was told as the photographs were being

15  taken and put in front of her?

16  A.  Like I say, to point at the suspect or suspects in this case.

17  Q.  Do you know whether or not she had been told that anyone had

18  been arrested who was suspected of being involved in this case?

19  A.  I don't recall.

20  Q.  Were you aware of whether or not she had been shown the

21  montage previously?

22  A.  I have no clue at all.

23  Q.  Was the montage in the same form as it had been when it was

24  shown to the boys when it was put in front of Jane Doe?

25  A.  Yes.

1  Q.  When it was in front of her, what occurred?

2  A.  What occurred?

3  Q.  Yes.

4  A.  She called out the number and I translated as usual.

5  Q.  How long did she look at the montage before she started

6  calling out the numbers?

7  A.  Very briefly.

8  Q.  Did she pick up the pages and look at them?

9  A.  I don't recall.

10  Q.  Did she ask any questions about any of the photographs?

11  A.  I don't recall.

12  Q.  Other than pointing to a picture and your calling out the

13  number, did she say anything about the photos?

14  A.  I didn't call out the numbers.  I translated what she said.

15  I didn't call out the numbers.

16  Q.  She was the one who stated numbers?

17  A.  Yes.

18  Q.  When she pointed to the picture and stated the number, did

19  she indicate that this was a photograph of a person that was

20  involved in kidnapping her?

21  A.  I don't recall.

22  Q.  What did she say about the photo that she was pointing to?

23  A.  The question was put to me by the agent who accompanies me

24  usually and I translate to the victims.  And the victims would

25  reply and I'd translate back to the agent.

1  Q.  Okay.  If I understand your testimony, she would point to a

2  photograph and call out the number?

3  A.  Who is "she"?

4  Q.  Jane Doe.

5  A.  Yes.

6  Q.  Did she say anything else when she pointed to that

7  photograph?

8  A.  I don't recall.

9  Q.  When she pointed to the photograph, did the agent respond

10  with any question?

11  A.  I don't recall.

12  Q.  After the meeting with Jane Doe, did you ever meet with her

13  again?

14  A.  Yes.

15  Q.  And how many times did you meet with her after the first

16  meeting?

17  A.  I don't recall the number of times.

18  Q.  Was it always at the INS building?

19  A.  Usually, yes.

20  Q.  Do you recall meeting with her at any other location?

21  A.  Yes.

22  Q.  Where?

23       MR. HAMILTON:  Your Honor, I'm going to object.

24       THE COURT:  Sustained.

25  Q.  (By Mr. Camiel)  During any of the additional meetings with

1  Jane Doe, was she shown the photo montage?

2  A.   I don't recall.

3         MR. CAMIEL:   I have nothing further.

4                       DIRECT EXAMINATION

5  MS. OLIVER:

6  Q.   Good morning, Agent Lau, my name is Jo Ann Oliver, I

7  represent Ching Lin.

8  A.   You represent who?

9  Q.   Ching Lin.  Huey Lin.  Agent Lau, have you been involved in

10 any other identification procedures with these victims outside

11 the state of Washington?

12 A.   No.

13 Q.   Did you review the notes or the 302s of Norie Hamilton to

14 assure for accuracy?

15 A.   I remember reviewing the 302s.

16 Q.   Did you review them again to prepare for this hearing?

17 A.   Yes.

18 Q.   When was your last involvement with this case?

19 A.   Prior to coming here this time?  I was here last week.

20 Q.   What was the purpose of that?

21 A.   I guess for this suppression hearing that didn't take place.

22 Q.   Did you have any meetings or work on the case on the day

23 between your interview of John Does 1 and 2 and Jane Doe?

24 A.   Can you repeat the question, please.

25 Q.   Yes.  When you were up in early September and you translated

1    during the showing of the photo montage, did you do any work on

2    this case between those meetings that you had with John Does 1

3    and 2 and then with Jane Doe?

4    A.   What do you mean by "doing some work"?

5    Q.   Did you do any work on the case?

6    A.   No.   I was strictly the translating agent.

7    Q.   And again, to your recollection -- or you're saying you do

8    not recall during the identification interviews whether or not

9    any descriptions of the kidnappers were given?

10   A.   I don't recall.

11          MS. OLIVER:   I have no other questions.   Thank you, Your

12   Honor.

13                       DIRECT EXAMINATION

14   BY MR. VONASCH:

15   Q.   Mr. Lau, I'm Jim Vonasch and I represent, as you know, Mr.

16   Lin Jian Li.   And I thank you for meeting with me during the

17   break.   And on the record, we went -- for the record, we went

18   over your notes of three contacts you had with my client.   Is

19   that correct?

20   A.   The notes, you mean the 302s?

21   Q.   Yes.   The 302s in order to expedite this.

22   A.   Yes.

23   Q.   And please, if you need to see these in order to refresh your

24   memory, ask me.   Your first contact with my client was on

25   September 8th at the Kent Correctional Facility.   Is that

1   correct?

2   A.   Yes.

3   Q.   And you went there with Agent William Anderson?   Do you

4   recall that?

5   A.   Yes.

6   Q.   And Mr. Lin was given Miranda warnings but he refused to sign

7   them.   Isn't that correct?

8   A.   I don't recall.

9   Q.   Would it help to refresh your memory?

10   A.   Yes, it would.

11        MR. VONASCH:   May I approach the clerk, Your Honor?

12        THE COURT:   You may.

13   Q.   (By Mr. Vonasch)   Do you recall now?

14   A.   Yes.

15   Q.   And what do you recall about that?

16   A.   What is stated here, that the meeting did take place.

17   Q.   And that he was advised of his rights and he refused to sign

18   the waiver form.   Is that correct?

19   A.   Yes.

20   Q.   And he asked when he would be going to court?

21        THE COURT:   Is that a question?

22        MR. VONASCH:   Yes.

23   Q.   Is that correct?

24   A.   I don't recall.

25   Q.   Could you look at the top of the third paragraph there,

1  please.

2  A.   Yes.

3  Q.   Is that correct?

4  A.   Right.

5  Q.   He did ask when he would be going to court.  Is that correct?

6  A.   Yes.

7  Q.   And he also was told later in that paragraph, if you would,

8  that the United States Attorney was pleased that he was

9  cooperating with the FBI?

10  A.   Yes.

11  Q.   All right.  Then on September 11th, you again went out to the

12  Kent facility with Agent Anderson and also with some detectives

13  from the New York Police Department.  Do you recall that?

14  A.   Yes.

15  Q.   And again, Mr. Lin would not sign the form waiving his

16  rights.  Do you recall that?

17  A.   Yes.

18  Q.   And in fact, when Mr. Lin left the interview room -- when you

19  left the interview room, he told you that he had hired an

20  attorney.  Do you recall that?

21  A.   Yes.

22  Q.   And then your next contact was on the next day, September

23  12th, with Mr. Lin.  Do you recall that?

24  A.   No.

25  Q.   That would have been at the marshal's lockup?

1   A.   Yes.

2   Q.   And Mr. Lin was not advised of his rights at any time during

3   that interview on September 12th of 1995.  Isn't that correct?

4   A.   I don't recall.

5   Q.   Would it help to have your notes about this?

6   A.   Yes.

7   Q.   Your 302?  May I, Your Honor?

8        THE COURT:  Certainly.

9   Q.   (By Mr. Vonasch)  Is it correct that he was not advised of

10  his rights?

11  A.   I don't recall.

12  Q.   It's not stated in your notes that he was.  Isn't that

13  correct?

14  A.   Yes.

15  Q.   Would it be your normal procedure to put that in your 302 had

16  he been, in fact, advised of his rights?

17  A.   It depends.

18  Q.   Wouldn't that be an important part of an interview with

19  someone?

20       THE COURT:  Well, is there any dispute on this subject?

21  I don't think the government contends he was advised of his

22  rights on the 12th.  This was at the booking at the marshal's

23  office.  So, let's move forward.

24       MR. VONASCH:  The parties will stipulate that it -- that

25  he was not, Your Honor.

1        THE COURT:  I haven't heard the government say.  But

2   there is no suggestion he was advised of his rights?

3        MR. HAMILTON:  No suggestion.

4        MR. VONASCH:  All right.  Thank you.

5   Q.  (By Mr. Vonasch)  Now, in the form it indicates that he was

6   asked questions.  Do you recall how long that interview was on

7   the 12th?

8   A.  Well, it was not too long, not too brief.  I was there to

9   assist the U.S. marshal in filling out the biological (sic) data

10  prior to the appearance before the federal judge.

11  Q.  And one of the questions was who was your employer.  Is that

12  correct?

13  A.  If that is, in fact, what is on the form.  I just translate

14  verbatim.

15  Q.  Now, do you remember from your own memory what the responses

16  were to the questions or do you need your notes to remember?

17  A.  I remember distinctly that the word "snake head" was used.

18  Q.  All right.  Do you remember anything else about what was said

19  by Mr. Lin?

20  A.  He repeatedly said "snake head" because I wasn't quite sure

21  what I heard initially, but I asked him repeatedly and he did --

22  he said "snake head."

23  Q.  All right.  But you can't now remember exactly what the

24  question was that the answer was related to?

25  A.  No.  I said I could not remember what exactly was on the

1  form, whether he worked for somebody or he is the snake head.

2  You know, whatever the form, you know, that he needs to fill out,

3  the biological data is what I asked him specifically.

4  Q.  All right.  So, you don't remember if it was that or whether

5  he owed the snake heads money.  That may have been the question,

6  whatever was on the form?

7  A.  Right.

8          THE COURT:  Do we have a copy of the form present?

9          MR. HAMILTON:  It's a financial affidavit, Your Honor.

10  I think that goes to the court.  We don't get a copy of that.

11          MR. VONASCH:  I don't think I have it.

12          THE COURT:  I take it it may be an exhibit at some

13  point.  You don't have a copy?

14          MR. HAMILTON:  It went to the court.

15          THE COURT:  Did he sign such a form?

16          MR. HAMILTON:  Yes.  He signed it in order to get

17  appointed counsel.

18          THE COURT:  And that was on the 12th?

19          MR. HAMILTON:  Correct.

20          THE COURT:  Let's see if we can find it.  And you were

21  just going down the form asking him questions?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  And then if he gave you an answer, did you

24  write the answer?  Who would fill out the form?

25          THE WITNESS:  I filled it out.

1    THE COURT:  So, it's in your handwriting?

2    THE WITNESS:  Yes, sir.

3    THE COURT:  All right.  We should look at it.

4    THE WITNESS:  I just went down the list that it comes

5  the biological (sic) data like name, date of birth, so on and so

6  forth.

7  Q.  (By Mr. Vonasch)  Now, when you filled it out, do you recall

8  what you did after that?

9  A.  You mean for the rest of the day?

10  Q.  I mean during that interview.

11  A.  Oh.

12  Q.  I really don't care about the rest.

13  A.  I don't.  Like I say, I just went down the list and when it's

14  done I said, you know, next person, please.  You know, that is

15  what my job was there that day.

16  Q.  So, you were processing several people that same day?

17  A.  Yes.

18  Q.  After you filled it out, did you ask Mr. Lin to sign it?

19  A.  I believe so.

20  Q.  Now, were you in a hurry, then, to process a bunch of

21  people?  Is that what happened?

22  A.  No.  I just -- I was there to do my job and I did it.  It was

23  not hurried.  I just was eager to get it all done.

24    THE COURT:  Would you describe your function on that day

25  as being not an interpreter but someone who was asking the

1  questions and transcribing the answers?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  All right.  So, a little different function

4  than you had before?

5          THE WITNESS:  Right.

6          THE COURT:  Thank you.

7          MR. VONASCH:  Thank you, Your Honor.

8  Q.   I have a few questions about your language.  Did you grow up

9  using either Mandarin or Cantonese?

10 A.   Yes.

11 Q.   Both or --

12 A.   Both.

13 Q.   And where did you grow up?

14 A.   I grow up in Singapore.

15 Q.   Did you have any other native languages?

16 A.   Yeah.  I speak some Malaysian.

17 Q.   Malaysia is very close to Singapore?

18 A.   Yes.  Next-door neighbor.

19 Q.   When did you learn your English?

20 A.   When I went to school, elementary school, kindergarten.

21 Q.   Was that in the United States?

22 A.   No.  It was in Singapore.

23 Q.   Singapore.  Other than what is in your 302 related to the

24 September 12th incident, do you recall any other answers that

25 were given by Mr. Lin?

516

1   A.   I don't.

2            MR. VONASCH:   Thank you.

3            MR. ZULAUF:   No questions.

4            MR. VONASCH:   May I have my 302 back, Your Honor?

5            MR. HAMILTON:   Your Honor, I may ask questions, he may

6   need to refer.   May he keep those until he's done as a witness?

7            MR. VONASCH:   Certainly.

8                          DIRECT EXAMINATION

9   BY MR. ERICKSON:

10  Q.   Agent, my name is Bruce Erickson.   I represent Tien Sin

11  Jiang.   Directing your attention again to the interview with the

12  two victims identified as John Doe 1 and John Doe 2.   Do you --

13  you've previously testified that you reviewed the 302s that were

14  prepared by Agent Hamilton with regard to those interviews?

15  A.   That's correct.

16  Q.   Do you have a copy of that 302 before you now?

17  A.   Before me now, no.

18            MR. ERICKSON:   Your Honor, may I approach?

19            THE COURT:   You may.

20  Q.   (By Mr. Erickson)   Have you now received a copy of the 302

21  which has a date of transcription of 9/8/95 pertaining to an

22  investigation on 9/6/95?

23  A.   Yes.

24  Q.   And it indicates at the bottom by S.A. Norie Hamilton and

25  S.A. Lok Lau?

1   A.  Yes.

2   Q.  Directing -- first of all, this is a 302 pertaining to an

3   interview with whom?

4   A.  [ ].

5   Q.  Do you recall as you sit there whether that is John Doe 1 or

6   John Doe 2?

7   A.  Two.

8   Q.  All right.  And directing your attention to paragraph 4 of

9   that 302 which is before you, would you review that, please.

10  Have you reviewed it?

11  A.  Yes.

12  Q.  Does that -- is that an accurate statement as to the -- as to

13  what is contained therein?

14  A.  Yes.

15  Q.  And just for the edification of the Court, then.  At that

16  time the victim who has been alleged or who has been referred to

17  as John Doe 2 during the course of that investigation interview

18  on 9/6/95 stated he wants to tell the truth so that his

19  kidnappers are put in jail and so that he, [ ], is free to walk

20  the streets without fear and build a life in America?

21  A.  Yes.

22  Q.  And after Mr. [ ], who has been referred to as John Doe 2,

23  made that statement did either Agent Hamilton or yourself advise

24  him that he was an illegal alien in terms of his status in this

25  country?

1  A.  I don't recall.

2  Q.  Do you recall whether or not Special Agent Hamilton advised

3  him that providing this identification would not necessarily mean

4  that he would be building a life in America?

5            MR. HAMILTON:  Objection.

6            THE COURT:  Sustained.

7            MR. ERICKSON:  Your Honor, I think this -- I'm offering

8  this as evidence on the issue of whether or not it might suggest

9  that there was impermissible use by the FBI agents at that time

10 of a belief that he would receive some reward for providing an

11 identification.  This is during the identification procedures.

12 And the issue is whether or not there was anything --

13           THE COURT:  Why don't you ask another question that is a

14 little more direct.  The reason I sustained is that the previous

15 question, he said he didn't know and it was essentially the same

16 question that you asked again.

17           MR. ERICKSON:  I'm sorry.  I guess I -- let's see if we

18 can start over.

19 Q.  After Mr. [ ], who has been identified also as John Doe 2,

20 made this statement that he wanted to tell the truth so he was

21 free to build a life in America, do you recall yourself or

22 Special Agent Hamilton making any statement to him that he would

23 not necessarily be free to build a life in America?

24           MR. HAMILTON:  Your Honor, I have an objection.  And my

25 objection is this has nothing to do with the identification

1  procedure.  This is a question concerning the motivations of John

2  Doe number 2.

3      That has nothing to do with a challenge to the identification

4  procedures used by the FBI.  What his motivation was had nothing

5  to do with his ability to pick the photographs he picked.

6          THE COURT:  Overruled.  The witness will be entitled to

7  answer the question.

8  A.  It was never suggested.

9  Q.  (By Mr. Erickson)  But my question is after Mr. -- it was

10  never suggested in your presence, is what you're testifying to.

11  Is that correct, Agent?

12  A.  That I'm aware of.

13  Q.  All right.  But after Mr. [ ], who is referred to as John Doe

14  2, made that statement that he was -- he now wanted to tell the

15  truth and be able to build a life in America, now my question is

16  did you or Special Agent Hamilton say anything to Mr. [ ], called

17  John Doe 2, to the effect that he wouldn't necessarily be able to

18  build a life in America?

19          MR. HAMILTON:  I think this has been asked and answered.

20          THE COURT:  It has.  It will be sustained.  And I would

21  ask you, counsel, to just use the John Does 1 and 2 because the

22  record -- that is what we've used throughout the hearing.

23          MR. ERICKSON:  Very well.  The reason I asked the

24  question again, Your Honor, is because I wasn't sure that it had

25  been answered because I thought the witness said it was never

1 suggested.  And I wanted a clear answer on the record as to

2 whether or not either he or Agent Hamilton at that time after --

3      THE COURT:  You could ask the question a hundred

4 different ways, but the same result would be there.  He's

5 answered the question in substance.  So, let's move on.

6      MR. ERICKSON:  All right.  If the Court is satisfied

7 that he has answered the question.  Very well.  Thank you, Your

8 Honor.

9      THE COURT:  Mr. Camiel?  I guess maybe you started.

10      MR. CAMIEL:  I did, Your Honor.

11      THE COURT:  Let's hear from the government.

12                     CROSS-EXAMINATION

13 BY MR. HAMILTON:

14 Q.  Special Agent Lau, you were questioned about a contact with

15 Lin Jian Li on September 8th at the Kent Correctional Facility.

16 I believe you were questioned that Mr. Lin refused to sign a

17 written waiver of his Miranda rights.

18     Did he indicate whether or not he was willing to talk to you

19 on that day?  If you need to refer to your 302 to refresh your

20 recollection, please do that.

21 A.  Yes.

22 Q.  Did you have a chance to review your 302?

23 A.  Yes.

24 Q.  Did that refresh your recollection?

25 A.  Yes.

1  Q.  Did Lin Jian Li indicate whether or not he was willing to

2  talk to you on that day?

3  A.  He said that he will answer those questions he's willing to

4  answer but will not answer those questions he's not willing to

5  answer.

6  Q.  Similarly, on September 11th when you met with Lin Jian Li at

7  the Kent Correctional Facility, again, did you ask if he was

8  willing to talk with you on that day?

9  A.  I don't recall.

10  Q.  Would you please take a chance -- take the opportunity to

11  review the 302.

12  A.  This is September the 11th?

13  Q.  Yes.

14  A.  I don't believe I have a copy of that.

15       MR. HAMILTON:  Could I approach the clerk of the court,

16  Your Honor?

17       THE COURT:  You may.  Mr. Hamilton, perhaps you could

18  assist the Court.  I'm looking at the government's response.  I

19  asked you at the end of the day yesterday to make a list of all

20  of the issues so that could I get them clearly in focus.  I

21  haven't seen that.  Was it prepared?

22       MS. MAIDA:  I have a list of all of the defendants'

23  statements, Your Honor.

24       THE COURT:  Well, let me just ask.  As I understand with

25  respect to the defendant Lin Jian Li, he was interviewed on

1   September 3 and signed a consent.

2        MS. MAIDA:  Yes, and we're not talking about that in

3   this testimony.  And I don't think he was asked about it.  There

4   are subsequent contacts.

5        THE COURT:  Well, I understand and I'm trying to -- but

6   the only discussion in your brief, which I was using as an

7   outline in the absence of another outline, was the September 12

8   issue where he mentions the word "snake head."

9        MS. MAIDA:  Yes.

10        THE COURT:  Now, is the government proposing or

11   contending that he made any other statements --

12        MR. HAMILTON:  No.

13        THE COURT:   -- After September 3 and prior to

14   September 12?

15        MR. HAMILTON:  No, Your Honor.  What we're getting to is

16   a couple of issues, if I could address the Court.  As we've

17   indicated, we don't intend to introduce the statement he made to

18   law enforcement as indicated in our brief.

19        THE COURT:  On what day?

20        MR. HAMILTON:  Pardon?

21        THE COURT:  On what day?

22        MR. HAMILTON:  September 3rd.

23        THE COURT:  All right.

24        MR. HAMILTON:  The reason we're going into the

25   willingness to talk is it deals with the issue of voluntariness.

1  And that is something that we want to establish now so it will be

2  established later at trial if the need comes up.

3        THE COURT:  All right.  Go ahead.

4  Q.  (By Mr. Hamilton)  On September 11th, did Mr. Lin Jian Li

5  indicate whether or not he was willing to talk to you?

6  A.  Yes.  He did indicate he was willing to.

7  Q.  Now, you were questioned about comments made on September

8  12th when you were assisting marshals in processing Lin Jian Li.

9  Is that correct?

10  A.  Yes.

11  Q.  Do you have a 302 prepared for that date, September 12th,

12  1995?

13  A.  Yes.

14  Q.  My question is did -- on that day, did Lin Jian Li indicate

15  he was a snake head or he worked for snake heads?

16  A.  He works for the snake head, according to my 302 that I have

17  in front of me now.

18  Q.  Now, you've testified that you also prepared biographical

19  data forms for other defendants as well?

20  A.  Yes.

21  Q.  Was that for all the defendants in this case?

22  A.  Yes.

23  Q.  Did you have occasion to process an individual named Hu Min

24  Shun?

25  A.  Yes.

1  Q.  And during that processing, did Hu Min Shun make a statement

2  to you?

3  A.  Yes.

4          THE COURT:  Is this the same day, September 12th?

5          MR. HAMILTON:  September 12th.

6  Q.  What was the statement that was made?

7  A.  I don't have the 302s in front of me.

8          MR. HAMILTON:  May I approach the clerk, Your Honor?

9          THE COURT:  You may.  And once again, I don't believe

10  this statement is referred to in the government's responsive

11  brief.

12          MS. MAIDA:  I believe it is, Your Honor.

13          THE COURT:  Would you help me with the page and line.

14          MS. MAIDA:  I could help you with that.  Page 6, line

15  13.

16          THE COURT:  Give me the line again.

17          MS. MAIDA:  Line 13.

18          THE COURT:  All right, go ahead.

19  Q.  (By Mr. Hamilton)  Special Agent Lau, what did Hu Min Shun

20  say to you on that day?

21  A.  He stated that he knows who is running this thing.

22  Q.  I'm sorry, I didn't hear the last part.

23  A.  That "who is running this thing," quote-unquote.

24  Q.  Did you ask any questions to elicit this response?

25  A.  No.  In fact, I recall that I -- that he should seek an

1    attorney, you know, to advise him before making further

2    statements.

3         MR. HAMILTON:  Thank you, sir.  Nothing further.

4         THE COURT:  Could you say your answer again.  I didn't

5    understand it.

6         THE WITNESS:  Yes.

7         THE COURT:  Go ahead and answer it again.

8         THE WITNESS:  That I did not in any way, shape or form

9    ask him, you know, for this -- anything that I said would have

10   solicited such an answer.  As far as him coming up to me and say

11   he knows "who is running this thing," quote-unquote.

12        And then right after he said that, the subject said that, I

13   told him to seek counsel before he make further statement to the

14   above statement when he said that "I know who is running this

15   thing."

16        THE COURT:  What was the context?  What were you talking

17   to him about or asking him about prior to the statement being

18   made?

19        THE WITNESS:  I was just asking him for the biographical

20   data.

21        THE COURT:  Is this the same financial information?

22        THE WITNESS:  Yes.  It was the same form that I was

23   helping the U.S. marshal process.

24        THE COURT:  And do you remember where in the process of

25   going through the questions it was that he volunteered or stated

1  this?

2          THE WITNESS:  I don't recall, Your Honor.

3          THE COURT:  Was it in response to any question that you

4  asked him from the form?

5          THE WITNESS:  No.

6          THE COURT:  All right.  Are you finished?

7          MR. HAMILTON:  Yes.

8          THE COURT:  All right.  Further questions of this

9  witness?

10          MR. CAMIEL:  No questions.

11          MR. VONASCH:  Just briefly.

12                    REDIRECT EXAMINATION

13  BY MR. VONASCH:

14  Q.  The question that you asked Mr. Lin Jian Li -- the answer he

15  gave you was in response to some kind of question, but you don't

16  recall which question.  Is that right?

17  A.  No, I did not ask him anything that would have solicited such

18  an answer.  That is what I say.

19  Q.  You're talking about Mr. Hu Min Shun.  I'm asking you about

20  Mr. Lin Jian Li.

21  A.  What about him?

22  Q.  Well, I'm just asking when he was talking to you, you were

23  trying to go through the form when you were asking him questions?

24  A.  Right.

25  Q.  Do you recall after all the questions were asked whether you

1  went back over the form with him before he signed it?

2  A.  No, I did not.

3  Q.  So, you just wrote down the answers then --

4  A.  When he gave the answer about the snake head, it was -- like

5  I say, it would help if I have the form in front of me.  But I

6  believe it was like, you know, what I asked him from the form and

7  his answer was strictly that, nothing else.

8  Q.  All right.  And then after you went through and filled out

9  the form, you asked him to sign it?

10  A.  Right.

11         MR. VONASCH:  I'd have nothing else.

12         MS. OLIVER:  One question, Your Honor.

13                       REDIRECT EXAMINATION

14  BY MS. OLIVER:

15  Q.  Agent Lau, my client, Ching Lin, is seated next to the

16  interpreter.  Did you ever have contact with him?

17  A.  Can he stand up.  Yes.

18  Q.  When was that?

19  A.  I don't recall.

20  Q.  Do you know what circumstances?

21         MR. HAMILTON:  Objection.  I think we're outside the

22  scope.

23         THE COURT:  I don't know if we are or not.  I don't know

24  what the subject was, so how can I answer that?

25         MR. HAMILTON:  I think the question is the circumstances

1    of any contact between this witness and Ms. Oliver's client.

2    That is outside the scope of the government's cross.

3         THE COURT:  Haven't you already disclosed to the defense

4    counsel when agents had contact with their clients?

5         MR. HAMILTON:  Certainly, but I'm saying --

6         THE COURT:  Well, and apparently they don't know about

7    this contact.  What is the problem?  What is the secret?  I mean,

8    if there was contact, aren't they entitled to know about it?

9         MR. HAMILTON:  Your Honor, I can indicate what I think

10   happened.  I think he processed other defendants and that is what

11   he's talking about.

12        THE COURT:  Well, let's find out.

13        MR. HAMILTON:  And I guess my objection is this is

14   outside the scope.  It's beyond the scope of the government's

15   cross.

16        THE COURT:  Overruled.

17   Q.  (By Ms. Oliver)  Agent Lau, did you ever have contact with my

18   client which involved statements made by him?

19   A.  I don't recall.

20   Q.  Do you recall if it was in the marshal's lockup that you had

21   contact with him?

22   A.  I really don't recall.

23        MS. OLIVER:  No other questions, Your Honor.

24                      DIRECT EXAMINATION

25   BY MR. ZULAUF:

1  Q.  Good morning, Agent Lau.   I'm Jon Zulauf.   I represent Min

2  Shun Hu.   As I understand it, you interviewed Min Shun Hu on at

3  least one occasion.   Is that right?

4  A.  I really cannot put your name to the face that you talk

5  about.   I really don't recollect.

6           MR. ZULAUF:   Min, would you stand.

7  Q.  Do you have any recollection of talking to this man who I'm

8  pointing to as Min Shun Hu?

9  A.  Min Shun Hu?   How do you spell his name because maybe the

10  pronunciation might be slightly off.

11  Q.  Min is M-I-N.   Shun is S-H-U-N.   And Hu is H-U.

12  A.  Is Hu his last name.

13  Q.  Right.

14  A.  Yes, Hu Min Shun.

15  Q.  Okay.   Hu Min Shun.   You have a recollection of speaking with

16  him?

17  A.  Yes.

18  Q.  And just briefly where and when?

19  A.  I don't recall.   I know there was contact with him, but I

20  don't recall exactly where and when.

21  Q.  Do you have a recollection of whether he was in custody?

22  A.  No.

23  Q.  Do you have any recollection of whether you read him his

24  Miranda rights?

25  A.  No.

1   Q.   On a regular basis are you asked to obtain biographical data

2   from defendants who are in lockup?   Does that happen with some

3   frequency?

4   A.   Yes.

5   Q.   And in the course of doing that, do you have -- does it

6   happen often that people volunteer statements about the case

7   while you're asking them about biographical data?

8   A.   Sometimes.

9   Q.   And is it your policy to advise them of Miranda warnings

10   before asking them questions about biographical data?

11   A.   I don't believe so.

12   Q.   And that is in spite of the fact that you know that they

13   regularly provide you with information about the case.   Is that

14   right?

15   A.   Can you repeat the question?

16   Q.   Okay.   People that you talk to about biographical data on

17   a -- with some frequency volunteer information to you about the

18   case?

19   A.   Yes.

20   Q.   Okay.   And yet, you make the decision not to advise them of

21   Miranda rights, don't you?

22   A.   It all depends on the situation.   It's hard --

23          MR. ZULAUF:   I don't have any other questions.   Thank

24   you.

25          MR. ERICKSON:   No questions, Your Honor.

1      THE COURT:  Anything further?

2      MR. HAMILTON:  No questions.

3      THE COURT:  Just a moment.  Let me show you three of

4  these vouchers that we have been able to find, the financial

5  affidavit.

6      THE WITNESS:  Yes, Your Honor.

7      THE COURT:  This is for Mr. -- well, let me ask you

8  which defendant this is for.  Perhaps you could pronounce his

9  name.

10      THE WITNESS:  Lin Fei Xue.

11      THE COURT:  For the record this, is docket number 20.

12  Now, is this a form that you filled out?

13      THE WITNESS:  Can I stand up to see?

14      THE COURT:  You certainly may.

15      THE WITNESS:  Yes.

16      THE COURT:  Speak up so everybody can hear you.  Is this

17  your handwriting, any portion of it?

18      THE WITNESS:  No.  This is not my handwriting.

19      THE COURT:  Let's go to the next one.  And this is Mr.

20  Huey Lin, docket number 4.  Is this your handwriting?

21      THE WITNESS:  No, Your Honor.

22      THE COURT:  Nothing on there?

23      THE WITNESS:  No, sir.

24      THE COURT:  All right.  And this defendant, perhaps

25  could you tell us his name?  This is docket number 6.

1          THE WITNESS:  Chen Zhen Xing.

2          THE COURT:  Anything on here that is your handwriting?

3          THE WITNESS:  No, Your Honor.

4          THE COURT:  Now, is this the form you used with the

5    defendant that made the statement while you were asking questions

6    about employment?

7          THE WITNESS:  Yes.  I believe so.  It looks familiar.

8          THE COURT:  Is this a financial affidavit form?

9          THE WITNESS:  Yes, I believe so.  I'm not a hundred

10   percent sure.

11         THE COURT:  Look at the employment questions

12   specifically.  Do they appear to be the questions that you were

13   asking at the time?

14         THE WITNESS:  Yes.

15         THE COURT:  Are you able now after reviewing it to say

16   this is the form you were using?

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  And it was in response to your --

19         THE WITNESS:  Right, that particular biographical data

20   that says name and address of employer is where the word "snake

21   head" was used.  And I repeatedly asked him so I was certain what

22   I hear.

23         THE COURT:  Unfortunately, we're not able to locate the

24   financial affidavit of that defendant.  At least, not at

25   present.  Do you recall filling out in your own handwriting the

1    responses to the questions?

2            THE WITNESS:  Yes.

3            THE COURT:  And what did you put in under the block

4    involving employment?

5            THE WITNESS:  For-- the answers said.

6            THE COURT:  Well, if one defendant said snake head or

7    something to that import, did you write that down?

8            THE WITNESS:  Right.  I believe so, yes.

9            THE COURT:  On the affidavit?

10           THE WITNESS:  I believe so, yes.

11           THE COURT:  Did the defendant sign the affidavit?

12           THE WITNESS:  Yes, yes, Your Honor.

13           THE COURT:  All right.  That is all the questions I have

14   on that issue.  Let me -- and we'll do everything in our power to

15   try and find that affidavit, and I would encourage the lawyers to

16   try and see if they can locate a copy.

17           MS. MAIDA:  We don't have access to that information,

18   Your Honor.

19           THE COURT:  All right.  Well, sounds like an important

20   document.  It's normally filed, not under seal.  But we'll

21   endeavor to locate the original.  Seems to me it might be an

22   important document.

23       I wanted to ask you one more question.  When you were

24   referring to the photo montage first shown to John Doe 1.

25           THE WITNESS:  Yes, Your Honor.

1   THE COURT:  On September -- the first time.  I think it

2   was the 6th.  You described the photos as being attached to some

3   sort of cardboard backing.  Is that your recollection?

4   THE WITNESS:  Or paper, you know.  It was, yes.  It was

5   on a larger piece of paper.

6   THE COURT:  Let me show you a document which is -- if

7   you'd just leave it sit there.

8   THE WITNESS: Yes, Your Honor.

9   THE COURT:  Can you identify these two pieces of paper,

10  which have been previously marked and admitted for this hearing

11  as exhibits 9-A and 9-B?

12  THE WITNESS:  I think it was these two copies.

13  THE COURT:  Do they appear to be in the same form they

14  were in when you saw them?

15  THE WITNESS:  Yes.  Yes, Your Honor.

16  THE COURT:  And to the extent you may have suggested

17  that they were attached to some cardboard backing, are you --

18  THE WITNESS:  Some paper.  Let me correct that.

19  THE COURT:  So, this looks like the way you saw it?

20  THE WITNESS:  Yes, Your Honor.

21  THE COURT:  And do you recall whether the pictures were

22  stapled down on both sides?

23  THE WITNESS:  Yeah, it was done in a very -- I would say

24  not the most professional form it could have been done, you know.

25  THE COURT:  Why do you say it was not done in the most

1   professional form?

2        THE WITNESS:  Well, because of the way it looks, Your

3   Honor.  I would say neatly --

4        THE COURT:  When you say, "the way it looks," describe

5   in words how it looks that makes you arrive at the opinion it was

6   not done in the most professional form.

7        THE WITNESS:  Well, I am a photographer.  I would have

8   maybe laminated it or done something like that, you know.

9   Whatever.

10        THE COURT:  All right.

11        THE WITNESS:  It was just my --

12        THE COURT:  Is there anything about the size of the

13   pictures or the cropping of the pictures that in any way would,

14   in your opinion, not be professional?

15        THE WITNESS:  Not -- not really.  I guess -- I guess

16   sometimes I'd say that we don't have the best of equipment to do

17   the job.

18        THE COURT:  When John Doe 1 and 2 looked at these photo

19   montages, were they able to lift the photos up and see what was

20   on the back side?

21        THE WITNESS:  I don't recall that, Your Honor.  No.

22   That would -- to me that would be --

23        THE COURT:  Would you have remembered that?

24        THE WITNESS:  Yes.  That would be highly unusual, Your

25   Honor.

1    THE COURT:  Was there any writing that they were able to

2 see when the photo was put -- other than the numbers?

3    THE WITNESS:  No.  Other than the numbers, no.

4    THE COURT:  All right.  I don't have any further

5 questions of the witness.  Anybody got any questions as a result

6 of my questions?

7    MR. HAMILTON:  No.

8    MR. FILIPOVIC:  No, Your Honor.

9    MR. VONASCH:  No, Your Honor.

10    MR. ZULAUF:  No.  No.

11    MR. ERICKSON:  No, Your Honor.

12    MR. CAMIEL:  No.

13    THE COURT:  Thank you, sir.  You may step down.  You're

14 excused.

15    MR. HAMILTON:  May I bring a matter up to the attention

16 of the Court?  The next witness is Kevin Wang, who is out in the

17 hall.  Because of the lateness of the hour, I just wanted to make

18 a proffer to the Court.

19 He is prepared to testify under oath that he was brought to

20 Harborview Hospital the evening of September 2nd by the

21 hospital.  That he acted as an interpreter.  He was there for, I

22 think, four hours.

23 That when the process was done with the medical people, he

24 assisted the FBI in questioning the victims.  But at no time was

25 he involved in a photographic montage.  He had nothing to do with

651

1    See you in the morning.  Have a pleasant night.  We're in

2  recess.

3        (At 4:40, court was in recess.)

4                           CERTIFICATE

5

6

7

8      I, Susan Palmerton, court reporter for the United States

9  District Court in the Western District of Washington at

10  Seattle, was present in court during the foregoing matter and

11  reported said proceedings stenographically.

12

13      I futher certify that thereafter, I, Susan Palmerton, have

14  caused said stenographic notes to be transcribed via computer,

15  and that the foregoing pages are a true and accurate

16  transcription to the best of my abillity.

17

18      Dated this 11th day of March, 1996.

19

20

21

22                          _____

23                          Susan Palmerton

24

25

0019   MRI 00380

RR RUCNFB FBISF FBISC

DE FBISE #0007 2731133

ZNR UUUUU

R 3006342 SEP 95

FM FBI SEATTLE (28)E-SE-74540) (P)

TO DIRECTOR FBI/ROUTINE/

FBI SAN FRANCISCO/ROUTINE/

FBI SACRAMENTO/ROUTINE/

BT

UNCLAS

CITE: //3840//

PASS:  SPECIAL AGENT TRANSFER UNIT, PERSONNEL DIVISION, FBIHQ;

SSA KINGMAN WONG, SAN FRANCISCO DIVISION; ASAC CHARLES C

KILEY, SACRAMENTO DIVISION.


SUBJECT:  UNSUBS;  ████████ AKA: ET AL; OC/DI - ALIEN

SMUGGLING; KIDNAPPING; EXTORTION; HOSTAGE TAKING; OO: SEATTLE.

     RE TELCALLS BETWEEN ASAC CHARLES E. MANDIGO, SEATTLE; SSA

KINGMAN WONG, SAN FRANCISCO; AND ASAC CHARLES C. KILEY,

SACRAMENTO; AND SEATTLE TELETYPE, CAPTIONED AS ABOVE, DATED

j2/b7c

Exhibit 7

67-HQ-864417-72

| SEARCHED ___ | INDEXED ___ |
|---|---|
| SERIALIZED ___ | FILED ___ |

SEP 19 1995

FBI - SACRAMENTO

P/F—SA LOK LAU

PAGE TWO DE FBISE 0007 UNCLAS

9/11/95.

SA LOK T. LAU, ASSIGNED TO THE SACRAMENTO DIVISION, HAS
BEEN TDY TO THE SEATTLE DIVISION TO ASSIST IN CAPTIONED MATTER
DUE TO THE UNAVAILABILITY OF A HIGHLY FLUENT MANDARIN CHINESE
SPEAKER.  CAPTIONED MATTER HAD PRIORITY INVESTIGATIVE DEMANDS
TO INCLUDE DEBRIEFING VICTIMS/WITNESSES, INTERVIEW OF SUBJECTS
AND PREPARATION OF GRAND JURY.  GRAND JURY TESTIMONY OF
VICTIM/WITNESSES HAS BEEN COMPLETED.  ADDITIONALLY, A VICTIM
COUNSELOR WHO IS FLUENT IN CHINESE IS NOW WORKING WITH THE
VICTIMS.  SA LAU HAS ASSISTED SEATTLE IN COMPLETING A CRITICAL
PHASE OF THE INVESTIGATION AND, AT THIS TIME, ALTHOUGH HIS
CONTINUING ASSISTANCE WOULD BE HELPFUL, IT IS NO LONGER
CRITICAL.

AS PER AGREEMENT WITH SAN FRANCISCO, WHERE SA LAU WAS
PREVIOUSLY ON TDY ASSIGNMENT TO ASSIST ON A TIII, IF SAN
FRANCISCO HAD A CONTINUING NEED FOR SA LAU, SEATTLE WOULD
ADVISE SAN FRANCISCO WHEN SA LAU WAS NO LONGER ESSENTIAL IN
CAPTIONED MATTER.  THEREFORE, BASED ON THE CONCURRENCE OF ASAC
SACRAMENTO, SA LAU WILL RETURN TO HIS PRIOR TDY ASSIGNMENT IN
SAN FRANCISCO.

SEATTLE APPRECIATES THE SUPPORT OF SACRAMENTO AND SAN

67-HQ-864417-72

RE - SA LOK LAU

PAGE THREE DE FB1SC 0007 UNCLAS

FRANCISCO IN THIS MATTER.

BT

#0007

4:33 pm    9/30/95

SJG

NNNN

67-HQ-264111-12

02/24/98          Detail Report By Stat Agent For Case ID              FAAPOA26
11:58:20                 SENSITIVE / UNCLASSIFIED

The Following Totals Are For : CASE ID: ████████████        F

Stat Agent. : LAU LOK T                    SOC : 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
Date Last Accomplishment. . . . . . . . . . . : 01/09/1997

Complaints . . . : 1       Recoveries. . . . . :              fiscal year
Information. . . :         Restitution . . . . . . : 8    32,000      1997
Indictments. . . : 4       PELP. . . . . . . . . :
Arrests. . . . . : 3       Fines . . . . . . . . :        (10/1/96 to 9/30/97)
Locates. . . . . : 1
Summons. . . . . :         Convictions. . . : 1
Hostages Rised . :         Sentences. . . . : 1
Child Locates. . :         Pretrials. . . . :
Debarments . . . :         Acquittals . . . :
Suspensions. . . :         Dismissals . . . :
Injunctions. . . :                        CLASSIFIED BY:
                  SENSITIVE / UNCLASSIFIED   DECLASSIFY ON:

-----------------------------------------------------------
-----------------------------------------------------------

PROCESSING RECORDS - PRESS ENTER TO CONTINUE
02/24/98          Detail Report By Stat Agent For Case ID              FAAPOA26
11:58:35                 SENSITIVE / UNCLASSIFIED

The Following Totals Are For : CASE ID: ████████████        F

Stat Agent. : ORTEGA RICHARD A              SOC : ████████████    07
Date Last Accomplishment. . . . . . . . . . . : 12/19/1996

Complaints . . . :         Recoveries. . . . . :
Information. . . :         Restitution . . . . . . :
Indictments. . . :         PELP. . . . . . . . . :
Arrests. . . . . : 1       Fines . . . . . . . . :
Locates. . . . . :
Summons. . . . . :         Convictions. . . :
Hostages Rised . :         Sentences. . . . :
Child Locates. . :         Pretrials. . . . :
Debarments . . . :         Acquittals . . . :
Suspensions. . . :         Dismissals . . . :
Injunctions. . . :                        CLASSIFIED BY:           Exhibit 8
                  SENSITIVE / UNCLASSIFIED   DECLASSIFY ON:

Attachment (C)

02/24/98          Detail Report By Stat Agent For Case ID          FAAPCA26
11:56:11                  SENSITIVE / UNCLASSIFIED

The Following Totals Are For :  CASE ID:  ████████

F

Stat Agent. :  LAU LOK T . . . . . . . . . .      SGC :  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
Date Last Accomplishment. . . . . . . . . . . . . :  01/30/1998

Complaints . . . : 2       Recoveries. . . . . . :
Information. . . :         Restitution . . . . . :
Indictments. . . : 7       PELP. . . . . . . . . :          fiscal year 1998
Arrests. . . . . : 3       Fines . . . . . . . . :          (10/1/97 – now)
Locates. . . . . :
Summons. . . . . :         Convictions . . . : 2
Hostages Rlsed . :         Sentences . . . . :
Child Locates. . :         Pretrials . . . . :
Detainments . . . :        Acquittals . . . :
Suspensions. . . :         Dismissals . . . :
Injunctions. . . :                             CLASSIFIED BY:
                  SENSITIVE / UNCLASSIFIED      DECLASSIFY ON:

-----------------------------------------------------------------
-----------------------------------------------------------------

PROCESSING RECORDS - PRESS ENTER TO CONTINUE

Case 2:03-cv-02682-MCE-KJM   Document 131-1   Filed 10/15/07   Page 69 of 70

Date Range                 :       10 / 01 / 1996 through 09 / 30 / 1997
The Following Totals Are For:       CASE ID:
Last Date of Accomplishment :       01 / 09 / 1997

F

| | Prelim | Jud Process | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Cmplnt | Infrm | Indct | Arrst | Locate | Convic | Senten | PTD | Aqtl | Dsmsl |
| Fed | 1 | | 4 | 4 | 1 | | | | | |
| Local | | | | | | 1 | 1 | | | |
| Int | | | | | | | | | | |
| TOTAL | 1 | | 4 | 4 | 1 | 1 | 1 | | | |

CLASSIFIED BY:
SENSITIVE / UNCLASSIFIED     DECLASSIFY ON:

----------------------------------------------------------------
----------------------------------------------------------------

Date Range                 :       10 / 01 / 1996 through  09 / 30 / 1997
The Following Totals Are For:       CASE ID:
Last Date of Accomplishment :       01 / 09 / 1997

| | Recoveries | Restitutions | PELP | Fines |
|---|---|---|---|---|
| Fed | | | | |
| Local | | 32,000 | | |
| Int | | | | |
| TOTAL | | 32,000 | | |

F

CLASSIFIED BY:
SENSITIVE / UNCLASSIFIED     DECLASSIFY ON:

Exhibit 9

The Following Totals Are For :   CASE ID: �switch█████████

Stat Agent. :  LAU LOK T                              SOC :   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
Date Last Accomplishment. . . . . . . . . . . . . :   01/09/1997

Complaints . . . :  1        Recoveries. . . . . . . :
Information. . . :           Restitution . . . . . . :  $        32,000
Indictments. . . :  4        PELP. . . . . . . . . . :
Arrests. . . . . :  3        Fines . . . . . . . . . :
Locates. . . . . :  1
Summons. . . . . :           Convictions. . . . :  1
Hostages Rlsed . :           Sentences. . . . . :  1
Child Locates. . :           Pretrials. . . . . :
Debarments . . . :           Acquittals . . . . :
Suspensions. . . :           Dismissals . . . . :
Injunctions. . . :                                      CLASSIFIED BY:
                             SENSITIVE / UNCLASSIFIED   DECLASSIFY ON:

----------------------------------------------------------------------------
----------------------------------------------------------------------------

PROCESSING RECORDS - PRESS ENTER TO CONTINUE
05/15/98                    Detail Report By Stat Agent For Case ID          FAAPOA26
11:19:58                         SENSITIVE / UNCLASSIFIED

The Following Totals Are For :   CASE ID: █████████              F

                                                                     O-1
Stat Agent. :  ORTEGA RICHARD A                       SOC :  █████████
Date Last Accomplishment. . . . . . . . . . . . . :   12/18/1996

Complaints . . . :           Recoveries. . . . . . . :
Information. . . :           Restitution . . . . . . :
Indictments. . . :           PELP. . . . . . . . . . :
Arrests. . . . . :  1        Fines . . . . . . . . . :
Locates. . . . . :
Summons. . . . . :           Convictions. . . . :
Hostages Rlsed . :           Sentences. . . . . :
Child Locates. . :           Pretrials. . . . . :
Debarments . . . :           Acquittals . . . . :
Suspensions. . . :           Dismissals . . . . :
Injunctions. . . :                                      CLASSIFIED BY:
                             SENSITIVE / UNCLASSIFIED   DECLASSIFY ON: