Case 2:03-cv-02682-MCE-KJM   Document 131-2   Filed 10/15/07   Page 1 of 70

Date Range                  :     10 / 01 / 1997 through 05 / 15 / 1998
The Following Totals Are For:     CASE ID: ███████████
Last Date of Accomplishment :     04 / 09 / 1998

F

```
              Prelim Jud Process
          Cmplnt  Infrm  Indct   Arrst Locate Convic Senten   PTD   Aqtl  Dsmsl

   Fed      2              9       3
   Local                                          2
   Int
          ------------------------------------------------------------------------
   TOTAL    2              9       3              2
```

CLASSIFIED BY:

SENSITIVE / UNCLASSIFIED          DECLASSIFY ON:

-----------------------------------------------------------------------------
-----------------------------------------------------------------------------

05/15/98                    Summary Report For Case ID             FAAPOAC7
11:20:43                    SENSITIVE / UNCLASSIFIED             Page 2. of 2

Date Range                  :     10 / 01 / 1997 through  05 / 15 / 1998
The Following Totals Are For:     CASE ID: ███████████
Last Date of Accomplishment :     04 / 09 / 1998

```
              Recoveries        Restitutions           PELP              Fines

   Fed
   Local                                                        F
   Int
          ------------------------------------------------------------------------
   TOTAL
```

CLASSIFIED BY:

SENSITIVE / UNCLASSIFIED          DECLASSIFY ON:

Exhibit 10

The Following Totals Are For :   CASE ID: ███████

F

Stat Agent. :  LAU LOK T                        SOC :  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
Date Last Accomplishment. . . . . . . . . . . . . :  04/09/1998


Complaints . . . :  2        Recoveries. . . . . . . :
Information. . . :           Restitution . . . . . . :
Indictments. . . :  9        PELP. . . . . . . . . . :
Arrests. . . . . :  3        Fines . . . . . . . . . :
Locates. . . . . :
Summons. . . . . :           Convictions. . . :  2
Hostages Rlsed . :           Sentences. . . . :
Child Locates. . :           Pretrials. . . . :
Debarments . . . :           Acquittals . . . :
Suspensions. . . :           Dismissals . . . :
Injunctions. . . :                                         CLASSIFIED BY:
                        SENSITIVE / UNCLASSIFIED           DECLASSIFY ON:


------------------------------------------------------------------------
------------------------------------------------------------------------


PROCESSING RECORDS - PRESS ENTER TO CONTINUE

(01/26/1998)

SECRET

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ROUTINE                                Date: 11/16/1999

To: National Security          Attn: Mr. Middleton
                                     Mr. Doherty
                                     Ms. Kelly

From: NSD
      ███████/Room 4155

Approved By: Kelly Dorothy E   DK/mm

Drafted By: Beum Melanie R:mrb

Case ID #: ███████████████ (Closed)
           ███████████████ (Closed)

ALL INFORMATION CONTAINED
HERE IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

Title: (X) ████████████████████

Synopsis: (X)  Review of captioned file has been completed
and this is to report results.

       (X)    ~~Derived From~~ ~~G-3~~
              ~~Declassify On:~~ ~~X1~~



10/31/02
CLASSIFIED BY: ████████/N
REASON: 1.5  (C D)
DECLASSIFY ON: X 1 6

02-138

SECRET

2

Exhibit 11

A

(S)  While awaiting appointment to the FBI and assignment to a New Agent class, SA Lau met and spoke in

SA Dun is currently assigned as ASAC

Omaha Division.

(S)

SA Lau received an appointment letter dated April 7, 1986, and he reported for New Agent's Training on April 20, 1986.  Upon his graduation on August 5, 1986, SA Lau

(S)

A

and he was put in for incentive awards on several occasions.  In June, 1991, SA Lau reported to Quantico for two weeks refresher training and on July 22, 1991, he reported to his new office of assignment, the Sacramento Division.



SECRET

3

To: National Security   From: NSD
Re: ✗)          (FBIHQ), 11/16/1999
    (S)

(A)

✗  On 10/26/99, SA William Stark was contacted
telephonically regarding SA Lau's knowledge of the above

SECRET

4

To:  National Security  From:  NSD
Re:  (S)                (FBIHQ), 11/16/1999

(S)      SA Stark also advised that there was a good
possibility that SA La



1683

Washington, D.C. 20530

December 13, 2000

MEMORANDUM FOR EDWARD SHUBERT
                          Security Programs Manager
                          Federal Bureau of Investigation

FROM:           JOHN C. VAIL
                     Chair, Access Review Committee

SUBJECT:      Appeal of Lok T. Lau (00-04)

The Access Review Committee (ARC) met on July 27, 2000, to afford Lok T. Lau the opportunity to provide additional information in support of his appeal of the Federal Bureau of Investigation's (FBI) denial of his "Top Secret" (TS) clearance.   Although Mr. Lau designated Antonio Silva as his legal representative, he chose to appear before the ARC without his attorney in attendance.  For the reasons set out below, the ARC has unanimously determined that Mr. Lau's access to classified information is not "clearly consistent with the national security interests of the United States."  Exec. Order No. 12968  § 3.1. (b).  We therefore affirm the FBI's revocation of Mr. Lau's clearance.  This memorandum sets out the ARC's reasons.

1.     Background

      Mr. Lau was employed by the FBI for approximately fourteen years.  His position as a Special Agent with the Federal Bureau of Investigation (FBI) required a Top Secret security clearance.

      On December 8, 1996, Mr. Lau was arrested at a Raley grocery store for shoplifting.  He did not advise the FBI of the arrest.  The information regarding his arrest only came to the attention of the Sacramento Division when it ran a routine National Crime Information Center (NCIC) check in preparation for a formal request that SA Lau be examined to determine his fitness for duty.  Further investigation revealed the specific details regarding the arrest and the fact that there were two outstanding warrants for his arrest.  One warrant pertained to the original shoplifting charge and the other was for his failure to appear in court.  Subsequently, Mr. Lau was arrested within the Sacramento Division office on September 16, 1998.

      The FBI Office of Professional Responsibility (OPR) initiated an inquiry on September 23,

Exhibit 12

Memorandum from John C. Vail to Edward Shubert                                      Page 2
Subject: Appeal of Lok T. Lau (ARC-00-04)

1998. On October 2, 1998, the FBI ordered Mr. Lau to undergo a fitness-for-duty psychiatric examination, including a psychological assessment, on October 8, 1998, due to evidence of behavior or actions which could affect his safe and efficient performance of his duties. On October 14, 2000, Mr. Lau officially requested the results of the psychiatric exam performed by doctors Thomas Garrick and Shoba Shreenivasan. In a letter dated May 25, 1999, from the FBI's Administrative Services Division, the appellant was advised that the doctors who had performed the psychological exam concluded that he did not have a primary psychiatric disorder or major mental illness. However, they concluded that Mr. Lau did present with personality traits that impact his judgment. They stated their belief that those personality traits account for lapses in judgment and adversely impact appropriate and safe functioning rendering him unfit for duty as a Special Agent.

On November 5, 1998, Mr. Lau was interviewed by OPR at FBIHQ about the incident at the Raley store. Mr. Lau denied the allegation that he identified himself as a FBI agent. He also denied attempting to steal any items from the store. Investigators advised Mr. Lau that the Raley's store security cameras captured him taking toothpaste from the shelf, placing the items in his shopping cart, and later removing the toothpaste from the shopping cart and placing the items in his cargo pants pockets.

Mr. Lau advised that he eventually received a form in the mail instructing him to appear in court regarding the alleged shoplifting incident. He retained an attorney, Brian W. Varner, who advised him that his detention was unconstitutional and instructed him not to appear in court. The attorney also recommended that he not inform the Sacramento Division of the matter. Attorney Varner made several appearances on Mr. Lau's behalf in Sacramento Municipal Court to object to the Court's jurisdiction due to the illegality of the methods employed by the Court, the District Attorney's office and the Sacramento County Sheriff's Department.

In November, 1998, the OPR issued its findings. The Special Agent in Charge (SAC) of the Sacramento office found Mr. Lau to be in violation of the Director's "Bright Line" policy regarding lying, cheating and stealing. The SAC concluded that his actions created insurmountable credibility and security issues and recommended his dismissal from the rolls of the FBI.

On January 11, 1999, the Superior Court of the State of California, for the County of Sacramento, the District Attorney made a motion to dismiss the case against Mr. Lau for insufficient evidence. The Judge granted the motion to dismiss in the interest of justice.

On February 5, 1999, the FBI advised Mr. Lau by letter that it was proposing his removal from the rolls of the FBI. The reasons for the proposed action were as follows:

"Based upon the current record of this administrative inquiry, which included your signed, sworn statement you 1) engaged in shoplifting on December 8, 1996; 2) failed to report your contact with Department store security, and your summons to appear; 3) failed to appear as ordered by the municipal court in its summons; 4) misused your FBI position in an attempt to influence the store security not to contact the local authorities; 5) exercised poor judgement and unprofessional conduct by offering money to the Loss Prevention Officer if he would not report the shoplifting incident; and 6) lied under oath during this administrative inquiry."

On February 19, 1999, the Security Programs Manager (SPM) sent Mr. Lau a letter to advise him that his TS security clearance was being revoked effective upon receipt of the letter. The SPM concluded that a review of the OPR inquiry related to Lau's activities, behavior, and conduct raised several issues bearing on the regulatory standards for access to NSI. These issues were his criminal activity, lack of candor, poor judgement, and unwillingness to abide by regulations.

On January 27, 2000, the Security Clearance Review Panel met to reconsider the decision of the FBI to revoke the TS security clearance of Mr. Lau. The SCRP concurred with this decision based on Adjudicative Guidelines E, Personal Conduct, and Guideline J, Criminal Conduct. The Panel did not believe sufficient mitigating factors existed to change the SPM's decision to revoke Mr. Lau's TS security clearance

On February 8, 2000, the FBI advised Mr. Lau that he was being dismissed from the rolls of the FBI, effective immediately. The deciding official, Michael Defeo, stated that he reviewed the information provided by Mr. Lau's attorney during the May 26, 1999 oral hearing and concluded that there was a preponderance of evidence to substantiate the allegations that 1) Mr. Lau engaged in shoplifting on December 8, 1996; 2) failed to report contact with Department store security and summons to appear and failed to appear as ordered by the municipal court in its summons; 3) misused his FBI position in an attempt to influence the store security not to contact the local authorities; 4) exercised poor judgement and unprofessional conduct by offering money to the loss prevention officer if he would not report the shoplifting incident; and 5) lied under oath during an administrative inquiry.

On June 29, 2000, the Disciplinary Review Board voted to sustain Mr. Lau's dismissal from the FBI. The Board found that 1) the OPR charges were supported by a preponderance of the evidence; 2) disciplinary precedent was timely, relevant, and reasonably analogous to his case; 3) he failed to demonstrate causation between his purported illness and his misconduct (1996 shoplifting); and 4) his request for reinstatement was denied.

Memorandum from John Vail to Edward Shubert                                    Page 4
Subject: Appeal of Lok T. Lau (ARC-00-04)

## II.   Discussion

The Adjudicative Guidelines for Determining Eligibility for Access to Classified Information (Guidelines), issued under Executive Order 12968, set forth the standards to be applied in determining eligibility for access to classified information.  The Guidelines note that all "available, reliable information about the person, past and present, favorable and unfavorable, should be considered in reaching a determination."  Guidelines, ¶ 2 (a) .  The adjudicative process is an assessment of past behavior and current circumstances in an effort to predict whether an individual's having access to classified information would be clearly consistent with the national security.  Id., with "any doubt . . . resolved in favor of the national security."  Exec. Order 12968 § 3.1 (b).

The FBI relied in part upon Guideline E, Personal Conduct, which states:

Conduct involving questionable judgment, untrustworthiness, unreliability, lack of candor, dishonesty or unwillingness to comply with rules and regulations could indicate that the person may not properly safeguard classified information.

The FBI identified the following issues:

- Section 16 (c) – "deliberately providing false or misleading information concerning relevant and material matters to an investigator, security official, competent medical authority, or other official representative in connection with a personnel security or untrustworthiness determination;" and

- Section 16 (e) "a pattern of dishonesty or rule violations, including violation of any written or recorded agreement made between the individual and the agency."

In support of its claims, the FBI identified the following specific examples:

- The FBI found that Mr. Lau displayed a history or pattern of criminal activity which created doubt about his judgement, reliability, and trustworthiness.  He was arrested on two separate occasions for shoplifting and, in both instances, knowingly removed items from the stores without paying for them.

- Mr. Lau demonstrated lack of candor during the OPR investigation, and despite evidence contradicting his version of events, did not provide truthful answers during the OPR investigation.

- Mr. Lau lacked candor when he identified himself as an FBI agent and

offered the Loss Prevention Officer a bribe to not report the incident and then denied he did so to OPR investigators. He tried to use a bribe and his official position to convince the Loss Prevention Officer to let him leave the Raley's store without being charged.

- Mr. Lau demonstrated poor judgement and an unwillingness to abide by regulations by failing to advise the Sacramento Division or FBI headquarters about his arrest for shoplifting, despite his knowledge from previous experience that he was required to do so, which creates doubt about his reliability and trustworthiness. In addition, Mr. Lau failed to respond to a summons to appear in court for the shoplifting arrest.

The FBI's Security Programs Manager (SPM) found that the information gathered by OPR supported the conclusion that Lau "knew he was required to report the shoplifting request but consciously decided not to do so." The FBI concluded in its proposal to remove notice that he 1) engaged in shoplifting on December 8, 1996; 2) failed to report his contact with department store security, and his summons to appear in court; 3) failed to appear as ordered by the municipal court in its summons; 4) misused his FBI position in an attempt to influence store security not to contact the local authorities; 5) exercised poor judgement and unprofessional conduct by offering money to the Loss Prevention Officer if he would not report the shoplifting incident; and 6) lied under oath during the administrative inquiry.  The Discipline Review Board agreed with the proposing official and supported Mr. Lau's removal from the FBI.  The SCRP concurred with the findings of the FBI's SPM.

Appellant's Counsel, Antonio Silva provided a different perspective regarding Mr. Lau's actions for the ARC's consideration.  Mr. Silva claims that the mitigation provided by the FBI for the first shoplifting incident is relevant and applicable to the second.  The FBI took a Special Agent straight out of the academy and placed him in an extremely stressful situation, did not provide proper support or training, and did not provide proper debriefing or counseling to allow him to regain his equilibrium.  Attorney Silva proffered the conclusion that the OPR investigation wholly ignored the nature of the assignment given to SA Lau immediately out of the academy, the lack of support in the assignment, the lack of training for the assignment, the lack of psychological assessments, his aberrant behavior as a result of job stress, and his disabilities.

The ARC unanimously agrees with appellant's counsel that Mr. Lau did not receive appropriate support or psychological treatment despite his clear manifestation of inappropriate behavior.  The FBI acknowledges that information regarding his arrest for shoplifting in 1996 only came to light when the Sacramento Division ran a routine NACI check in preparation for a formal request that SA Lau be examined to determine his fitness for duty.  He was going to be referred for a fitness for duty due to several incidents in which he exhibited disturbing behavior.  Mr. Lau presented examples of these incidents with his formal statement and written documentation that

the ARC entered into the formal record during his hearing on July 27, 2000.

The ARC finds the FBI's handling of Mr. Lau's psychological difficulties has been problematic. SA Lau was assigned to do dangerous, highly classified undercover work immediately out of the academy. The nature of the work, the methodology of the assignment and the work which SA Lau was assigned to complete required him to work against aggressive and hostile entities. The FBI clearly failed in its obligations to provide Mr. Lau with psychological treatment and organizational support. Based on this failure, it could be argued, the FBI contributed to his current and past psychological problems, which led to the revocation of his security clearance and his termination from the rolls of the FBI.

Proper adherence to agency policies and procedures when Mr. Lau demonstrated his aberrant behavior in 1993, with his first instance of shoplifting, would have meant that SA Lau would have been provided competent medical care by psychologists who had the requisite security clearance and were authorized to hear his disclosures. That the FBI knew SA Lau was psychologically traumatized to a significant and sufficient degree to force him to act "uncharacteristically" was evident from a response to a proposed disciplinary action against him.

Steven L. Pomerantz, Assistant Director, Administrative Services Division, wrote in 1993:

> "...I have examined a great deal of information which described the difficult and challenging circumstances you encountered during the first five years of your career. Were it not for those unique circumstances and attendant stressors, which I believe contributed to your uncharacteristic display of impetuous poor judgement on December 24, 1990, I would have had no choice but to remove you from the rolls of the FBI. However, inasmuch as I believe that your actions on that date were, to some degree, the by-product of the unusual work-related stress you were subjected to, I have concluded that disciplining you for the incident at Sears would be inappropriate."

However, despite Mr. Pomerantz's acknowledgment in 1993 that because of job related stress, Mr. Lau was psychologically impacted to a sufficient degree that contributed to his acting "uncharacteristically," the FBI did almost nothing to facilitate his recovery from the stress. There is no evidence that Mr. Lau's treatment included anything more than being sent to the Undercover Safeguard Unit for not more than 5 days. The FBI failed to refer Mr. Lau to the Employee Assistance Program or to offer him psychological or medical help from professionals cleared for hearing top secret disclosures.

During all its proceedings and investigations, Mr. Lau was denied access to the medical care that he desperately sought. On September 10, 1999, appellant's counsel, Mr. Silva, wrote to the FBI seeking medical and psychological treatment since Mr. Lau was not allowed to discuss

Memorandum from John Vail to Edward Shubert                                      Page 7
Subject: Appeal of Lok T. Lau (ARC-00-04)

the basis of his medical and psychological conditions as it relates to the classified work he did during the course and scope of his duties as a Special Agent. The FBI's Legal Counsel's Office responded with erroneous information that EAP representatives in the field were authorized to hear top secret information. They are not. While that office subsequently corrected this misinformation, it maintained that Mr. Lau had received care or that it was available to him. From the record before the ARC, we conclude that such care was, to the contrary, never provided or made available to the appellant.

In fact, in October 1999, the FBI received a request from Dr. Bruce Ebert. Dr. Ebert wrote for the express purpose of obtaining temporary approval from the appropriate authorities at the FBI or the Department of Justice to conduct an intensive psychological evaluation of Mr. Lau. He presented his credentials and explained that he had maintained the requisite approval and security clearance to hear classified information on two previous FBI espionage cases. The FBI failed to reply to Dr. Ebert or to grant anyone the authorization to listen to classified information presented by Mr. Lau. For all these reasons, the ARC cannot endorse the actions of the FBI.

However, under the Guidelines, the sole issue before the ARC for decision, and the extent of its authority, pertains to whether the FBI's revocation of Mr. Lau's top secret security clearance was warranted.[1]  Conditions that could mitigate these concerns include (a) the information was unsubstantiated or not pertinent to a determination of judgement, trustworthiness, or reliability; (b) the falsification was an isolated incident, was not recent, and the individual has subsequently provided correct information voluntarily; (c) the individual made prompt, good-faith efforts to correct the falsification before being confronted with the facts; and (d) omission of material facts was caused or significantly contributed to by improper or inadequate advice of authorized personnel.

Of these conditions, the ARC finds mitigating that Mr. Lau's attorney advised him to ignore the summons to appear in court and that, in fact, the charges against Mr. Lau for the second shoplifting incident, were dropped in the interests of justice because of procedural irregularities. However, we agree with the FBI that Mr. Lau had an obligation to inform the FBI of the incident and his arrest, despite his attorney's instructions to the contrary. His failure to fulfill this responsibility, which as a Special Agent he was well aware existed, cannot be ignored or

---

[1]The ARC has no authority to make any decisions with respect to Mr. Lau's former employment with the FBI or his inability to receive appropriate psychological care. Therefore, while we are unanimous in our disappointment with the FBI's handling of Mr. Lau's circumstances, the ARC cannot intervene nor allow disapproval to influence its determination regarding the eligibility of Mr. Lau to have his top secret clearance reinstated. The FBI assured the ARC during the July 27, 2000 hearing that it has initiated steps to correct the deficiencies that occurred in the support provided to Mr. Lau, who experienced a negative reaction to the stressful nature of his undercover assignment.

mitigated because he chose to follow instruction from his attorney that conflicted with FBI requirements. Therefore, the ARC must agree with the FBI that Mr. Lau displayed a lack of candor, both in his refusal to admit that he shoplifted the items in question and his efforts to hide the shoplifting from the FBI.

In making its determination to revoke Mr. Lau's security clearance, the FBI also relied on Guideline J, Criminal Conduct, Section 31 (b) which states:

"a single serious crime or multiple lesser offenses."

The FBI found that Mr. Lau displayed a history or pattern of criminal activity which created doubt about his judgement, reliability, and trustworthiness. He was arrested on two separate occasions for shoplifting. During both incidents he knowingly removed items from the stores without paying for them. While the first shoplifting incident in 1990 was mitigated due to stress Mr. Lau suffered from his undercover assignment, the FBI found no valid basis for mitigation for the second incident.

The record supports the FBI's determination that Mr. Lau shoplifted from the Raley Store and by maintaining his innocence through the investigative process, lied under oath to investigators. In his personal reply to the ARC, Mr. Lau provided documentation connecting his two shoplifting incidents with stress he was experiencing due to the nature of his assignments with the FBI and his inability to obtain psychological treatment. Mr. Lau's failure to voluntarily disclose his arrest to the FBI and his refusal to be forthcoming about the shoplifting cannot be excused or condoned. Both of these failures attest to Mr. Lau's lack of judgement and trustworthiness, as claimed by the FBI.

While the ARC cannot conclude that the FBI has met its obligations to Mr. Lau, as the FBI pointed out during Mr. Lau's personal reply on July 27, 2000, that issue is not relevant in this proceeding. This Committee's jurisdiction extends only to the revocation of Mr. Lau's security clearance, not to other employment matters, such as the ones raised during this proceeding.

Under the Guidelines for adjudicating security clearance determinations, the ARC must err on the side of caution if there is any question that allowing an individual to retain access to classified information is not consistent with the interests of National Security. Exec. Order No. 12968 § 3.1(b). Given this requirement, the ARC has unanimously determined that Mr. Lau's

access to classified information does not satisfy this requirement.   We therefore affirm the revocation of Mr. Lau's security clearance.[2]

cc:      Lok T. Lau
         3828 Woodcrest Road
         Sacramento, CA 95821

         Antonio V. Silva, P.C.
         Attorney at Law
         2616 Montana Avenue
         El Paso, Texas 79903

         David Margolis, Member
         Robert Davis, Member

         D. Jerry Rubino
         Department Security Officer

---

[2]The other members of the ARC have reviewed this memorandum and concur in its analysis.

# *ANTONIO V. SILVA, P.C.*

Attorneys at Law
2616 Montana Avenue
El Paso, Texas 79903

*Antonio V. Silva**
*Enrique Lopez*

*Phone (915) 564-5444*
*Fax   (915) 564-4413*
*asilva2616@aol.com*

**Licensed in Texas*
*and New Mexico*

# COPY

*Via facsimile*

April 23, 2003

U.S. Department of Justice
Federal Bureau of Investigation
Office of the General Counsel
Attn.: Ms. Deborah Samuel Sills
Assistants General Counsel
Employment Law Unit II
935 Pennsylvania Avenue N.W., Room 7947
Washington, D.C. 20535-0001

Re:   *Lok Thye Lau v. Janet Reno, Department of Justice*

Dear Ms. Sills:

As you are aware, this law office represents Mr. Lok T. Lau with respect to various employment matters. As a former special agent of the FBI Mr. Lau worked in covert undercover operations against very dangerous instrumentalities and individuals. Mr. Lau had now learned that Atrina Leung compromised many covert operations of the FBI and many operatives. The purpose of this letter is to request whether my client, Mr. Lok T. Lau, is in any danger as a result of these revelations. If Mr. Lau is in danger I expect the appropriate precautions to be taken for him. Please advise me immediately on this matter.

Very truly yours,

*ANTONIO V. SILVA, P.C.*

By: _____
    Antonio V. Silva

AVS: ms
cc: Mr. Lau
cc:  as appropriate

Exhibit 13



U.S. Department of Justice

Federal Bureau of Investigation

---

Office of the General Counsel                           Washington, D.C. 20535

May 1, 2003

# COPY

Antonio V. Silva, P.C.
Attorneys at Law
2616 Montana Avenue
El Paso, Texas 79903

RE: Lok T. Lau

Dear Mr. Silva:

This is to acknowledge receipt of your letter of April 23, 2003 regarding your client Mr. Lau.

At this time the FBI is not aware of any facts that would compromise the safety of your client, Mr. Lau. Should the situation change, we will advise you accordingly.

Sincerely,

Anne M. Gulyassy
Deputy General Counsel

Exhibit 14

# CERTIFICATE OF SERVICE

I hereby certify that the attached letter was sent to the following person via the indicated method on the date indicated below:

### VIA FACSIMILE:

### Complainant's Representative

Antonio V. Silva, Esquire
Attorney at Law
2616 Montana Avenue
El Paso, Texas  79903
(915) 564-4413

May 5, 2003
Date

Angela Kreitzer-McClay
Paralegal Specialist
Employment Law Unit II
Office of the General Counsel
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C.  20535-0001

**U.S. Department of Labor**

Employment Standards Administration
Office of Workers' Compensation Programs
Washington, D.C. 20210



File Number:

JUN 1 7 2003

7004616

Lok T. Lau
3828 Woodcrest Road
Sacramento, CA 95821

Dear Mr. Lau:

I am writing in reply to your letter of May 22, 2003. You had written in reference to your request for a hearing in your workers' compensation claim.

As you know, your previously scheduled hearing was postponed. Your employer expressed concerns over our security measures.

I have spoken with Mr. Larry Russell of your employer. He is in the process of having Mr. Jeffrey Reddig's clearance transferred to your agency. They now intend to fly you to Washington for the hearing to be conducted here. Your employer will bear the travel costs and produce the hearing transcript.

As soon as these arrangements are made, you will be notified. In the interim, please contact our office if I can be of assistance.

Sincerely,

Edward G. Duncan
Deputy Director
Federal Employees' Compensation

cc:   Ms. Madeline Moxley
      Injury Compensation Supervisor, FBI

Exhibit 15

*Working for America's Workforce*





Search the Web and ABCNEWS.com



May 8, 2003

HOMEPAGE
NEWS
SUMMARY
US
INTERNATIONAL
MONEYScope
WEATHER
LOCAL NEWS
ENTERTAINMENT
ESPN SPORTS
SCI/TECH
POLITICS
HEALTH
TRAVEL

**Original Report**



Katrina Leung may have cost the United States two decades of intelligence on China, officials say. (ABCNEWS.com)

**FBI Knew About Alleged Double Agent**
**Sources: Leung Was Exposed 12 Years Ago**

*By Brian Ross and Vic Walter*
abcNEWS.com

May 8—— FBI officials were told 12 years ago that alleged double agent Katrina Leung was secretly working for the Chinese, an ABCNEWS investigation has found.

☒ New York Times
(Ad served by AtlasDMT)

FEATURED
SERVICES
RELATIONSHIPS
SHOPPING
DOWNLOADS
WIRELESS

INTERACT
VIDEO &
AUDIO

SINGULAIR
(MONTELUKAST SODIUM)

Exhibit 16

ALS

• Acc
Raise
Years

• Hav
Chan
Years

• Will
Color
Disco

WI

• FBI
Doubl
Years

• Purp
Tape

• Econ
Fuel

• An (
Imper
Specie

• Pent
Mobil
Found

The case of Leung, an American citizen who is charged with giving the Chinese classified information she allegedly took from a longtime lover

BOARDS
CHAT
NEWS ALERTS
CONTACT ABC

and retired FBI counterintelligence agent, has left two decades of U.S. intelligence on China in shambles, sources say.

The ex-agent, James J. Smith, 59, was arrested last month and indicted Wednesday on charges of negligence and wire fraud for allegedly letting Leung have access to secrets during the course of a 20-year affair.

A federal grand jury in Los Angeles today handed down a five-count indictment against Leung, 49, charging her with two counts of copying defense-related documents with reason to believe they would be used to the injury of the United States or to benefit a foreign nation and three counts of unauthorized possession of documents relating to the national defense.

Leung's cozy access to top Chinese officials through family ties, including then-Premier Jiang Zemin, led U.S. officials to consider her America's No. 1 spy against China. Her reports went straight to the Oval Office until she was finally unmasked as an alleged double agent working for Beijing.

"It says that the assumptions that our leaders have about China are probably flawed because it's based on information that was fed to them very carefully and tainted," said William Triplett, former China analyst for the CIA.

Intelligence sources say the case also raises questions about why the FBI began its ultimately fruitless investigation of Taiwanese-born American scientist Wen Ho Lee and whether he was a victim of disinformation passed to the FBI.

"They're going to have to look at that completely if they have the stomach for it," Triplett said.

In addition to allegedly feeding suspect reports through former senior China counterintelligence agent Smith, one of the her two FBI handlers and longtime lovers, Leung is also accused of taking top-secret files from Smith's briefcase that revealed FBI undercover agents and secret operations.

Intelligence sources told ABCNEWS that Leung is suspected of telling the Chinese in 1998 how their consulates and embassy in the United States had been bugged by the FBI with listening devices and miniature cameras placed in copy machines, shredders and other office equipment.

And in the year 2001, she is believed to have tipped off Beijing that the FBI had planted listening devices in the Chinese premier's Boeing 767 aircraft, sources said.

"It looks we lost everything from China for the last 20 years," Triplett said.

A Pretty Big Warning Flag

Yet top FBI officials at the Washington headquarters, Los Angeles field office and probably the San Francisco field office were told in May 1991 that Leung was secretly working for the Chinese, sources said.

Now-retired FBI agent I.C. Smith says the FBI learned then that Leung had tipped off Chinese authorities about a secret mission he took to China to evaluate embassy security. He says he even took still photos of the Chinese agents he caught following him. "They knew we were coming before we even left," I.C. Smith said.

Traveling with him to China, it turns out, was the other now-retired FBI agent accused of having a secret sexual relationship with Leung, William Cleveland of San Francisco.

It was clear to him, I.C. Smith said, that at least 12 years ago a pretty big warning flag went up to the FBI.

"There's no doubt about it," he said. "And I viewed that as absolutely a monumental management failure within the FBI that allowed this source to continue to operate."

The FBI tells ABCNEWS it is now investigating what happened 12 years ago — why Leung's alleged secret life as a double agent was not stopped then, when much of the damage could have been prevented.

Attorneys for all the suspects deny the charges. ∎

*ABCNEWS' David Scott contributed to this report.*

Search the Web and ABCNEWS.com      leung; brian ross; c  | **GO** |

Copyright © 2003 ABCNEWS Internet Ventures.
Click here for:  HELP   ADVERTISER INFO   CONTACT ABC   TOOLS   PR T
PRIVACY POLICY

Family of sites:     ABC.com      ABC Family      ESPN.com      Disney.
FamilyFun.com      GO Mail      Movies.com

*To print:* Click **here** or Select **File** and then **Print** from your browser's menu



This article was printed from the Columns

section of the *Sacramento News & Review*.

This article may be read online at:

http://www.newsreview.com/issues/sacto/2003-11-20/editnote.asp

Copyright ©2003 Chico Community Publishing, Inc.

Printed on 12/15/2003 10:50:54 PM.

Editor's note

# Federal Bureau of (Don't) Investigate
## By Tom Walsh

I'm afraid of FISA.

It is a powerful, shadowy organization built around a law that few know about--it's the kind of stuff that fuels paranoids, who may, in this case, actually have something to fear in regard to their civil rights.

FISA (the Foreign Intelligence Surveillance Act) is a law that allows some spy guy or girl to grab an e-mail, tap a phone or eavesdrop on a conversation. No one will know, except for some federal agents and a few judges who meet in secret.

As if that's not bad enough, the USA Patriot Act came along and expanded those powers. The FISA court that issues these orders meets and decides in secret, so we have no idea who is requesting the secret surveillance or how many orders are issued, and no one has the opportunity to contest an order. Ironically, the court doesn't even report to Congress, the folks who drafted the law. There is no public oversight.

It's all in the name of terrorism. The Patriot Act-FISA net is wide and meant to entrap terrorists, but that doesn't mean its targets are always terrorists. It simply may be someone living here who is, or was, connected to a foreign country--someone like the subject of our cover story ("Patriot acts") who once worked undercover overseas.

Federal prosecutors requested a court order that would allow federal agents to enter into a broad range of people's computers and erase court documents that once were public in his case. Under the order, the FBI's computer experts would seize what you and I got legally and erase it. FISA wasn't applied in this case, and the judge rightfully ruled in public and said, in essence, no way.

The feds surely were interested in finding out what Lok Lau was up to and whether he was revealing previously secret information from his undercover FBI days in China. We have no idea if Lau was surveilled by the federal government, and we won't know by asking the Justice Department. It doesn't have to tell us a thing about FISA requests.

Exhibit 17



**SN R**
**newsreview.com**

[𝕏] blue nile       Searc

News&features
Arts&culture
Calendar
Music
Film
Eat It Up
Columns
Classifieds
Jobs
Personals
Spicy
Promotions
Guides
About SN&R
Author Pages
Archives
HOME

**NEWCITY.COM**
NETWORK MEMBER

☆ AWS

## News&features

Cover Story                                          Print Page )        November

# Patriot acts                                       E-mail Page )       Table of Cont

*The U.S. government does not want you to know
what Lok Lau did as an undercover agent for the FBI. Federal
prosecutors also wanted to do extraordinary things to keep his
story from coming out. They weren't successful.*

N&R Events,
stuff

News
Queer face fo
race
City-council ca
Boyd deals wit
issues.

**By** Bill Forman **and** Cosmo Garvin

*"Someone tell me why / I do the things that I
don't want to do / when you're around me / I'm
somebody else."*
--From "Teenage FBI" by Robert Pollard/Guided
By Voices

Field of drean
Teed-off Lighth
come out swing
Sacramento.

**Lok Lau remembers** that his bags were already
packed hours before dawn, when a senior FBI
agent showed up at his door bearing the worst
possible news.

Bites
**Groping towa**
Arnold and Mor
for the action-f

It was a cold Chicago morning in November 1987,
and Lau, who had been up most of the night
preparing for his first undercover mission for the
FBI abroad, ushered the agent into his living
room. According to Lau, they proceeded to go
through all of his baggage, ostensibly to make
sure he wasn't bringing along anything that could
blow his cover overseas.

Arts Feature
**Tales from au**
**oceans**
An appreciatior
band that balar
leanings with ir
smarts.

"Right after the search of my bags," recalls Lau, "I
was told, 'We have something we feel we have to
tell you, and it's your decision.'"

Photo By Larry Dalton
*"What had I become?" Poet Rita Dove's
words reflect the dilemma of Lok Lau,
shown here on one of many visits to
Sacramento's federal courthouse.*

**Previously in
Cover Story:
In one era an
other**
Jeff Kearns 11.

The news, he says, was that the bureau believed
Lau had been outed as an agent to the violent
gangs he had infiltrated. The choice was whether
to proceed with the undercover mission.

**Gulp!**
Cosmo Garvin

"I was really shocked," he recalls. But Lau had made a commitment to the investigation.
"I'd sacrificed enough to reach this point, and I wasn't about to throw it all away."

**Adventures in**
Clive Thompsoi
**more...**

Complicating the situation, says Lau, was an upper-level political conflict in the FBI over
whether he should be sent overseas in the first place. "You always have this tug of war,"
he says of the conflict between "gung ho" street agents and more conservative
bureaucrats. "And in my case, my former SAC [Special Agent in Charge], Jim McKenzie,
was literally threatening the deputy director at headquarters, saying that if you do not
approve this, he'll make sure he has an audience with the director himself, [William]
Sessions. And as I was later told, when the generals are at war, the foot soldiers suffer,
because whether you win or lose, coming back from a battle, you still lose. You create
very powerful enemies."

**Other articles**
**Bill Forman a**
**Garvin:**
**Homeward bc**

Lau stuck to the original plan and put himself in jeopardy rather than cancel and confirm
suspicions that he was more than the private businessman he pretended to be.

**Axis of Arnol**
**Injunction ju**
10.16.03
**more...**

## Something blue.



blue nile

Although the classified nature of his undercover work prevents Lau from providing details, one could surmise from court records that the trip was to China and that a second excursion followed a few months after the Tiananmen Square uprising. It is also likely that at least part of his work was with gangs that were involved in the smuggling of illegal immigrants--known in the industry as "human snakes"--into the United States.

"Life is very cheap outside of America," says Lau, "and it's definitely a very thriving trade. You're talking about an average illegal alien paying about $40,000 to $50,000 to come to America from all over Asia and the Third World, and you have a boatload of three or four hundred people crammed into it. It amounts to millions of dollars of pure profit. And a lot of times, that amount is even higher because of human servitude, when they cannot pay." Lau says such individuals end up in sweatshops or worse: "Yes, or red-light district, white slavery, whatever--you name it."

In addition to immediate personal risks from working undercover, the trips to foreign lands would, more than a decade later, entangle Lau in the ongoing battle between the Bill of Rights and the Patriot Act. In fact, just last month, Attorney General John Ashcroft's Justice Department made an unprecedented attempt not only to seal documents in Lau's court case--he's sued for wrongful dismissal from the FBI--but also to gain access to the hard drives of activists, journalists and anyone else suspected of having copies of the documents.

In testimony, subsequently blacked out by the Justice Department, Lau claimed that "personnel armed with machine guns were a constant reminder to me of my fate if something went wrong. ... I anticipated death on several occasions, but I somehow survived it all."

The undercover mission earned Lau a commendation from then-FBI Director William Sessions--Lau brags that Sessions even posed with a cap from China's People's Liberation Army for the occasion--but the job also exacted a personal toll.

"Well, [the overseas trip] was the high point of the undercover assignment, but it was the low point of my own personal life," he muses, gazing out the window of a friend's Sacramento-area home. "It's like it was good for the project, but it was bad for me personally."

The worst point in the journey, he says, was when people he met there made it clear to him that they knew the whereabouts of Lau's family members, both near and distant, right down to their individual addresses.

Lau figures it was their way of saying, "We know who you are." Lau's family, meanwhile, had no idea what he was really up to. And, as time went on, Lau would begin to wonder himself.



Greetings from Tiananmen Square: Lok Lau stands among the tank tracks circa 1989.

**Born in Singapore** in 1957, Lau was 19 when he immigrated to the United States, moved in with a married sister in Michigan and began work as a sheriff's deputy. According to his testimony, Lau was recruited by the FBI and CIA--both of which needed agents fluent in Mandarin and Cantonese, as Lau was. He chose the FBI because the recruiter painted it as both a better and "more glamorous" way to serve his country.

Lau says he went straight from the FBI academy to undercover work, an unusual trajectory that gave him little opportunity to learn and identify with bureau culture. Instead, he was plunged immediately into an undercover assignment that lasted from 1986 to 1991 and was punctuated by the two "harrowing" trips overseas.

Current Promo
**Searching for**
**Sacramento L**
Searching for S
Release Shows
Radisson July 1

August 8

**Call for Unity**
Celebrate the r
diversity of our
through an eve
interfaith music

**Building Unity**
Sign up to help
in Oak Park

According to Lau, the stress and anxiety of that assignment left him psychologically scarred. But when he needed help, Lau says, the FBI ignored him. Ultimately, Lau would bring an employment-discrimination lawsuit against the government. In the process, he would shed some light on areas that the Justice Department, more than a decade after his trips, wants to remain in the dark.

"The FBI took a young, virile, intelligent man who was working for law enforcement and told him he was a special agent of the FBI and all he had to do was serve his country," wrote Julie Marquez, chair of the League of United Latin American Citizens (LULAC), in an amicus brief for Lau's case. Throughout the past few years, LULAC has battled what it believes is a pattern of discrimination inside national-security and law-enforcement agencies like the FBI and CIA.

"From a reading of the record," testified Marquez, "it is not difficult to discern that Lau was involved in espionage activities, kidnappings, trading in human slavery, illegal immigration, murder, torture, kidnapping, extortion, hostage taking and any number of other criminal incidents that involved crimes against humanity, then and now, in his undercover work. Lau 'penetrated' the Chinese Triads, the Tongs and other Chinese Organized Crime Organizations that trade in all of these things as a way of life."

But immediately after Marquez filed this brief in early October, she says, the government accused her of recklessly exposing classified information. The government later would go to great lengths to remove portions of the LULAC brief and some of Lau's own testimony from the public record, complaining that both contained "intelligence methods and activities that are used in the FBI's present intelligence, counter-intelligence and counter-terrorism investigations."

Looking at the sanitized and unsanitized versions of the court documents, it is not hard to see what information the government considered sensitive. In both Lau's declaration and the amicus brief filed by LULAC, the government took pains to remove any reference to Lau being overseas or abroad.

Marquez says she believes the government may be trying to cover up wrongdoing. "The FBI was not supposed to be involved in espionage overseas," she explains.

Though the FBI and CIA historically have been confined to domestic and overseas operations, respectively, there are plenty of reasons an FBI agent might be working abroad and even be working undercover.

"He might have been undercover, but he would have been working closely with the foreign government," says Elizabeth Rindskopf Parker, dean at the McGeorge School of Law and former general counsel for the CIA. If that was the case, the government might have reason to keep Lau's overseas mission quiet, even after all these years. "There might be something about what he was doing that is still ongoing," Rindskopf Parker says.

But the court record suggests that he was also involved in overseas espionage. On one occasion in the declaration, he mentioned having FBI and CIA "handlers." In another passage, describing a later mission, Lau said he was sent to what he called a "hostile country ... in total chaos." Lau wrote in his declaration of the constant presence of "personnel armed with machine guns." All of this information was removed from the court record by the Justice Department.

If Lau was involved in espionage, as the court record may suggest, First Amendment advocates believe the American public has a right to know. "One thing that provokes curiosity is the notion of the FBI conducting covert intelligence in a foreign country," says Terry Francke, director of the California First Amendment Coalition (CFAC), who condemned the sealing of the court documents in Lau's case and moved immediately to post them on the coalition's Web site. "The narrative is about spying—and dangerous spying at that. I was not aware that the FBI had the authority to do that," Francke says.

Under an executive order signed by Ronald Reagan in 1980, there are some limited instances in which the FBI is allowed, in coordination with the CIA, to engage in foreign espionage. But so far, the government has offered no assurances that Lau's mission, whatever it was, actually was sanctioned by U.S. law.

**Former FBI agent** John Vasquez testified that, when he would meet with Lau, the young agent "would ask to see and hold my badge. This was a flag to me that he was saying, 'I

do not know who I am.'"

When asked about this, Lau explains that after graduation, he'd only had his credentials for 10 minutes before having to relinquish them to a field-office vault in order to keep his undercover identity secure. Holding his colleague's badge, he says, gave him "a sense of security and identity, because at some point, I became really confused as to who I am or what I am, in the sense that I'm constantly being somebody that I'm not for the subjects, even to my girlfriend. I can't really confide in anybody what I really do for a living, not even my own mother."

Vasquez testified that he'd felt Lau was "screaming for help" and inevitably would "do something to bring negative attention upon himself." Sure enough, on Christmas Eve of 1990, Lau "acted out" in a strangely incongruous shoplifting incident that would come back to haunt him.

"Paint brush and rollers. It wasn't like a Rolex watch and a diamond bracelet. Oh, and a paint tray. That's really concealable!" says Lau, laughing and shaking his head at what he now characterizes as "a cry for help."

"I was just lashing out, just angry. I had waited around [the store], nobody came, you know, it was Christmas Eve, and everybody was busy. And I knew there were cameras there because my nephew had worked there, and they always talked about who was picked up because of the security camera. So, it wasn't like I didn't know."



Lau and former FBI Director William Sessions (in a People's Liberation Army hat) clown it up after Lau's 1987 trip.

Lau ended up being suspended from the FBI for two weeks. His supervisor wrote that the punishment would have been more severe but cited the stress of Lau's undercover work as a mitigating factor.

His undercover assignment coming to an end, Lau says, it was typical for an undercover agent to write his or her own ticket when it came to transferring. In Lau's case, he wanted to be back near his family and jumped at the opportunity to relocate to the Seattle office. Instead, he was transferred to Sacramento. And that's where things really began to unravel.

**"The American dream,"** says Lau with a smile, as he parks his car in a front of a house that's identical to every other one in its neighborhood and countless other developments across the country. An inconspicuous Buddha in the entranceway is the sole sign of individuality.

(Lau would not be interviewed in his own house and even refused to give out his friend's address over the phone. Instead, he asked to meet in a parking lot where the reporter's car would be left behind and Lau could drive the reporter to the interview site.)

With his hangdog expression and dry sense of humor, it's sometimes difficult to tell where Lau's wit ends and paranoia may begin. When it's mentioned that the passenger window isn't all the way up, he says not to worry, mischievously remarking that "it's not big enough for a bomb." But at other times, he seems deadly serious, as when he insists that "a lot of people are going to get shot, literally," as a result of his full story coming out. "Those people who were double or triple agents, who were known to hang out with me, will be in serious trouble."

Though he says he never fell victim to Stockholm syndrome (where an agent or captive begins to identify with an adversary), Lau contends his undercover work was psychologically draining. "If I see some atrocities or crimes, sometimes I have to pretend that I even enjoy it, but deep down in me, it's all an act. I had no choice. In order to be successful, I had to go with the flow or run with the pack, so to speak.

"I think psychologically, when I cannot put these people in jail because they were not the

main objective of the undercover, I felt very helpless, you know, as an investigator and a human being."

Lau says even the worst criminals he dealt with didn't appear much different from anyone else, apart from being better dressed. "When I first sit and have dinner with these people, they do not advertise and say, 'I am one of the most wanted guys in America' or 'I got boys who can break your bones and nose in a New York second.' Just like, you know, the first time you run into me, you really don't know who I am. For all you know, I could be America's most wanted, or I could be a saint. You see what I'm saying?

"What made matters worse was that I wasn't really trusted," Lau says of his fellow FBI agents. During his five years undercover, Lau figures, he was polygraphed at least a dozen times. "And it's really sad because I'm treated like a second-class or third-class citizen, and yet guys like Robert Hanson [a former FBI agent accused of spying], he was never polygraphed. The majority of spies that are caught, I'm sorry to say, are Caucasian, my friend."

Lau's years in Sacramento have been difficult. In addition to transitioning from the field to the office, he had problems with depression and sleep apnea, which eventually resulted in the bureau taking away his car and gun. "They set me up to fail," claims Lau. "They know I have a history of allergies, and guess what? Sacramento is the allergy capital of the world."

The 1996 holiday season would end up being another turning point for Lau. At approximately 10 p.m. on December 5, 1996, Special Agent Lau used a ceremonial sword to confront an intruder outside the FBI's Sacramento headquarters.

"[The intruder] had tremendous respect when he saw the sword in my hand," says Lau, who'd been given the "weapon" by a co-worker after the FBI took away Lau's gun. One of Lau's supervisors, Jim Wedick, also showed respect, commending the action in writing. "But upper management," says Lau, "viewed it as aberrant behavior."



Lau likens his use of the sword to a Caucasian grabbing a baseball bat. "If you do something out of context to the American culture," he says, "that is aberrant behavior."

Three days later, Lau was involved in his second shoplifting incident. Charges were dropped, but when the FBI found out about the incident, the bureau used it to fire him.

Photo By Roberta Barnes
*The League of United Latin American Citizens' Julie Marquez characterizes the government's reactions to Lok Lau's case as "outrageous and unconscionable."*

In court documents, the Justice Department argued that Lau shoplifted not once but twice and deserved to be fired. The department also dismissed a declaration by Vasquez regarding Lau's post-traumatic stress and psychological damage as "nothing more than an attempt to put the FBI on trial for every wrong [Lau] believes he suffered during his 15-year employment with the FBI."

The federal government also denies Lau's allegations of race and national-origin discrimination. "Lau's evidence," the attorney argued, "can be summed up this way: 'I am Asian and was born in Singapore; my supervisors were not. Any problem I had in the workplace was caused by their racism.'" In addition to his wrongful-termination suit, Lau also has filed numerous Equal Employment Opportunity complaints, which are still being investigated.

But the Feds didn't pay much attention to Lau until a story about him appeared in the October 10, 2003, edition of the San Antonio Business Journal. (Lau's main legal adviser, who successfully sued the FBI on behalf of Hispanic agents, also is based in Texas.)

The Justice Department responded immediately by seeking a court order to suppress documents used for the story. Specifically, the department objected to the amicus brief filed by Marquez of LULAC and to the 23-page declaration by Lau that chronicles some of his experience in the FBI. Lau's declaration mentions a dangerous undercover assignment several times but never says where the mission took place or who his targets were.

Ironically, these documents had been in the public record for nearly three weeks before the U.S. attorneys moved to have them sealed. Within days of the federal government's motion, the documents were posted to CFAC's Web site, where they remain to this day.

Federal court Judge Garland Burrell did order that Lau's declaration and the amicus brief in the court record be sealed, and the documents were removed. Later, new versions were substituted, with sensitive information redacted in black marker. At the same time, agents were sent to the offices of Lau's attorneys in Sacramento and San Antonio, to confiscate copies of the documents.

But the government wanted to go further in imposing secrecy. The Justice Department then asked the judge for permission to search for copies of the document that were already out, stored on individual computers, and to destroy the information.

The brief concluded with this remarkable request: "Finally, if Lau's declaration and amicus brief are included on any computer hard drives that are not authorized to contain classified information, defendant John Ashcroft respectfully requests in this court order that an FBI computer specialist be permitted to remove the specific files containing information from the unauthorized computer."

The request was so broad that it might have included the computers of Lau's attorneys, San Antonio reporter Bill Conroy, LULAC or CFAC.

This time, Burrell rebuffed the feds, saying the government had no authority to go after copies of the documents that weren't already in possession of the court. (The ruling, however, was not prejudicial, and the Justice Department is considering re-filing the request.)

But the U.S. attorneys may have attempted to go around the judge's order.

Marquez says she was contacted by Doug Hendricks, an assistant U.S. attorney in Sacramento, who asked her to turn over her copies of the same documents. At the time, Marquez says, "he told me that he didn't want any more media coverage. He wanted to shut down the media." But Marquez refused to hand over anything. "I told them to come back when they had a court order."

Her organization has asked that the government be found in contempt of court for attempting to circumvent a court order and other "acts of outrageous and unconscionable misconduct." In court documents, Marquez said that she was contacted by assistant U.S. attorney Kristin Door immediately after LULAC had filed its amicus brief in the case. Marquez said that Door informed her that a criminal background check on Marquez had been done and that Door also had badmouthed Lau and his attorneys over the phone.

"It was all supposed to intimidate me. Of course, I am intimidated. These people can throw you in prison," Marquez says. "But if you are going to have any integrity, you have to do the right thing."

According to the San Antonio Business Journal, Lau's attorney in Texas, Antonio Silva, said Hendricks also asked to inspect Silva's computers and erase any sensitive information. Silva declined. George Allen, Lau's Sacramento attorney, also says Hendricks asked him about computer files, but Allen told Hendricks he didn't have any sensitive information on his computer.

Allen calls the move a "perversion of due process" and an attempt to deprive Lau of effective legal representation. "Since I don't have the security clearance, I'm not even supposed to look at that information," Allen notes. "I could have the smoking gun in my briefcase, and I wouldn't be able to use it to help my client."

Marquez said the attempt by U.S. attorneys to inspect computers after the judge said they had no authority to do so, and the effort to retrieve documents from LULAC after the judge said the government could not confiscate documents that were not already in possession of the court, represent "outrageous abuse of power" for which the government should be fined.



Photo By Larry Dalton
*Terry Francke's California First Amendment Coalition has posted the redacted testimony from Lok Lau's case on its site.*

Hendricks refused to comment on whether he approached Marquez for her copies of the classified information. However, he denied saying anything to Marquez about wanting to stop media coverage of the case.

Door would not comment, other than to say the case was being "blown way out of proportion" and to refer SN&R to the U.S. attorney spokesperson, Patty Pontello, who also declined to answer questions regarding the sealing of documents or the extraordinary attempt to access individuals' computer hard drives.

In the LULAC request for sanctions against the government, Marquez noted that Lau's psychiatrist, Dr. Bruce Ebert, had his Roseville office burglarized in the middle of October, around the same time as the Justice Department's attempt to suppress the information coming out of Lau's case. There were break-ins at several offices in Ebert's office complex that night, and there is no real evidence that the burglary is related to Lau's case.

Marquez, however, thinks the break-in is suspicious. "One is led to the inescapable similarity to the Pentagon Papers case of Dr. Daniel Ellsberg and the 'burglary' of [Ellsberg's] psychiatrist. Coincidence?" she says.

On November 10, Burrell denied the motion for sanctions against the Justice Department and ordered it stricken from the court record--saying that LULAC was not entitled to file the motion because it was not directly involved in the case. In the same order, Burrell ordered LULAC's amicus brief stricken as well, saying that he never gave permission for it to be filed and that it was "largely devoid of legal analysis" and therefore not useful to the court.

Francke doubts the Justice Department would have gotten away with sealing the court records or even would have attempted to a few years ago.

"One could imagine that the FBI and the Justice Department feel that they are on a roll right now," Francke says. In the new, fearful America post-9/11, "judges have been very deferential to claims of national security."

And though he says the Lau case is unusual in many ways, the government's sanitizing of public documents in this case "seems entirely consistent with this [Bush] administration's zest for keeping the lid on things."

If, however, the FBI's intention was to shut down media coverage of the Lau case, it couldn't have come up with a more backward way of going about it.

Case 2:03-cv-02682-MCE-KJM    Document 131-2    Filed 10/15/07    Page 32 of 70

"The best way for the government to get a lot of publicity for something is to stamp it 'top secret,'" Francke says with a laugh. "If they wouldn't have made such a fuss about it, it likely wouldn't have gotten the small amount of press that it has."

On October 30, in the case of Lok Thye Lau v. John Ashcroft, Burrell ruled in favor of the defendant--saying that it was a lawful firing and that Lau had violated the "bright line" policy, a statement of ethical standards that the bureau instituted in 1994. In his decision, Burrell cited the FBI director's statement on this policy: "In short, I believe in the simple truth that lying, cheating or stealing is wholly inconsistent with everything the FBI stands for and cannot be tolerated." Lau is now appealing the decision to the 9th Circuit Court of Appeals.

**In Wayne Wang's** 1982 debut film, *Chan Is Missing*, two taxi drivers go looking for their missing friend Chan in what becomes a metaphorical search for Asian-American identity. Ultimately, Chan can be found only in the fragmented reflections of the disparate people who knew him.

The same may well be the case for Lau. CFAC sees Lau as a First Amendment lightning rod in the age of Ashcroft. To LULAC's Marquez, Lau was a "young, virile, intelligent man" who got used up and spat out by the agency. The FBI characterizes him as a liar and petty thief, though the extremity of their response suggests the bureau also considers him a security threat.

So, who is Lau? Nearly three years after his dismissal, he's living on federal disability retirement, based on diagnoses of post-traumatic-stress disorder, depression and sleep apnea. Despite repeated requests to the bureau, he has not been given access to a psychiatrist who has sufficient security clearance to hear the details of his story.

He used to hope the FBI would find a role for him--one that would make use of his knowledge of Chinese dialects or allow him to teach what he learned on the streets--but these days, he's understandably pessimistic. He figures he'll stay in the Sacramento area, if only because it's near the courthouses.

Ultimately, Lau remains something of a cipher, perhaps even to himself. Yet, his story raises compelling questions about free speech, individuality, cultural identity, ethics and power--as well as what we as a society are willing to sacrifice for security purposes or what we need to preserve.

Having grown up in Singapore, which he describes as a police state, Lau says he fears the direction in which America now appears to be moving. He cites the politically motivated outing of CIA agent Valerie Plame and the invasions of Afghanistan and Iraq as examples.

"Apparently, we are reliving history over and over again," he says. "The real sad part is that you're dealing with human beings with feelings and their life and flesh and blood. It's not a concept. But I guess, at the upper-management level, to them, it's a game. Everything is just on paper. We are a number. We are a digit. We are just another name."

© Copyright 2003 Chico Community Publishing, Inc.



# BABELOGUE

**Introducing...**
City Pages Online Blog Community

(advertising info)



THIS BLOG IS PART OF THE TWIN CITIES BABELOGUE COMM...

# Bush Wars  bushwarsblog.com

Steve Perry: Daily notes and links on the adventures of the Bushmen of the Beltway

Send Comments
and Tips to:
**Bush Wars**

⌐ << Check Box to have links open new windows...

☑ This blog only

---

**November 2003**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     |     |     |     |     |     | 1   |
| 2   | 3   | 4   | 5   | 6   | 7   | 8   |
| 9   | 10  | 11  | 12  | 13  | 14  | 15  |
| 16  | 17  | 18  | 19  | 20  | 21  | 22  |
| 23  | 24  | 25  | 26  | 27  | 28  | 29  |
| 30  |     |     |     |     |     |     |

Oct   Dec

Home

Who the Hell is Steve
Perry?

CP Article Archive

Old Blog

Babelogue Index

# BABELOGUE

Published By:

# CITY PAGES

---

**Thursday, November 6, 2003**     PERMALINK:

## A response to Rumsfeld's memo
### by Mark Gisleson

Asia Times has a harsh report from a retired Army colonel in response to Donald Rumsfeld's leaked memo:

> **Does the Department of Defense need to think through new ways to organize, train, equip and focus to deal with the global "war on terror"?**
>
> Definitely. The first step is to declare the end of the global "war on terror". Next, the Pentagon should shift from lead to supporting agency, with the State Department becoming the new lead. The Justice Department would assume a more prominent supporting role in keeping with the emphasis that terrorist incidents are criminal acts.
>
> Al-Qaeda has been dealt a blow and the regime that was most visible in its support of global terror, the Afghan Taliban, has been replaced. This is not to say that those Taliban and al-Qaeda loyalists still at large pose no residual threat, either to Afghanistan or, through other, loosely affiliated groups, to other governments. But these groups seem less interested in pressing a global jihad than in achieving specific goals within the countries in which they are

---

**THE COALITIO**
**THE UNWILL**

VITAL
Cursor
Counterpun

FOREIGN PR
Al-Ahram We
Al-Bawab:
Al Jazeer:
Arab New:
BBC News
Globe & Ma
Guardian
Ha'aretz
Hindustan Ti
Independe:
Middle East Ti
Mirror
Telegraph
Times of Lon

GOOD BLO
Brad Zella
Cheek
Civil Liberties
Fimoculou
Joshua Micah M:
Lew Rockw
Not So Private
Sam Smith
Progressive Re
Tom Nadea
Tom Tomorrow

Modern Wor
MaxSpeak
Neal Pollac
Where is Rae

**REFERENC**
C-SPAN
DoD
releases/trans
Iraq Body Co
Iraqomete
Iraqwar.ru
Polling Rep

operating. (This is true even in Iraq, where the US presence acts as a magnet for jihadis.) They of course will always accept money, equipment and training from any source, al-Qaeda or not.

At least part of the current US dilemma stems from an inability to see simultaneously the two levels of terror in the 21st century. The administration's emphasis on "global war" masks the reality that all terrorist acts are local. This suggests that the effort to stop or at least control acts of violence directed against non-combatants should remain at the local - or no more than a regional - context. Were this done, the Department of Defense would be able to re-form its plans and organization to support the police and justice systems when these civilian-oriented agencies determine they do not have the resources to track, apprehend, or where necessary, fight and defeat those committing acts of terror.

**[much more]**

Also in the Asia Times, Conn Hallinan reports on **"Rumsfeld's new model army."**

Gary Webb, the San Jose Mercury News reporter who all but ended his career when he exposed the CIA's connection to Contra cocaine smuggling scandal, has a new spy story about former **FBI agent Lok Lau.** Unsurprisingly, the DOJ has done its damnedest to destroy his career even though Lau burrowed more deeply into the Chinese government than any other American agent.

Regular reader Gaius Publius sent in this link to a **San Diego Union-Tribune** story about the FBI's abuse of the Patriot Act. Apparently domestic political corruption now qualifies as part of the war on terrorism. The AP article also notes that the act has also been used to "crack down on drug traffickers and child pornographers." As someone once said, "by any means necessary."

The Hill's Peter Savodik thinks there's a good chance **Terry McAuliffe** may be on his way out. My joy over this news is somewhat dampened by the



SAN ANTONIO
# BUSINESS JOURNAL
THE ESSENTIAL BUSINESS TOOL

## EXCLUSIVE REPORTS

### Former federal agents' spy story opens Pandora's box for FBI

**Bill Conroy**

British intelligence agent Alec Leamas runs the gauntlet of the seedy underworld of espionage only to get cut down by a bullet at the Berlin Wall in the 1966 film "The Spy Who Came in From the Cold."

Former FBI special agent Lok Thye Lau, like Leamas, also took on a covert assignment overseas and now finds himself up against another form of the Berlin Wall -- one he contends is built on a foundation of ruthlessness, racism and indifference. And like the fictional Leamas, Lau, too, says he faces the very real prospect of being cut down before he can get beyond that wall.

Today, Lau is back on home turf, but he remains out in the cold, discarded, he alleges, by the very agency for which he put his life on the line.

Lau, who claims he served for a time, in essence, as an international spy for the FBI, was fired from his job as a special agent in February 2000. Since then, he has been fighting to prove that he was hung out to dry by the FBI because, as Lau and others assert, the Bureau views him as an expendable pawn who now knows too much.

Factoring into the equation, Lau contends, is that he was a minority agent operating in an FBI culture replete with institutional racism. He alleges such a culture is ultimately a threat to national security because it makes it impossible for agents of color to do their jobs properly.

The FBI paints a different picture of Lau. The Bureau claims Lau was fired because he is a liar and a petty thief.

Kristin S. Door, the assistant U.S. Attorney defending the FBI against a civil-rights claim filed by Lau in federal court, describes Lau's case as "pretty straight-forward."

"He (Lau) claims he was fired because he's Chinese, from Singapore, but he was fired because he shoplifted and then lied about it," Door claims. "They (Lau and his attorney) are trying to make it complicated, trying to make it something it's not."

But this is more than a simple case of Lau's word against that of arguably the single most powerful law-enforcement agency in the nation. A number of people who held high-level roles within the FBI also have stepped forward in defense of Lau.

"The FBI used Mr. Lau and then when it was over discarded him. Along the way, the FBI did nothing to support him," states former undercover FBI agent John Vasquez in legal pleadings filed in federal court on Lau's behalf.

Vasquez, who retired from the FBI as unit chief of training, research and development, is the founder of the Bureau's Safeguard Unit, which evaluates potential FBI undercover candidates and continues to monitor and counsel those agents once they are in the field.

"They needed him for a particular (undercover) task, and then they chucked him," adds Dr. Frederic Whitehurst, an attorney and director of the FBI Oversight Project of the National Whistleblower Center, a Washington, D.C.-based advocacy organization.

Whitehurst, a former FBI chemist and explosives expert, in 1995 was catapulted into national prominence after exposing a pattern of management and evidence-handling failures in the FBI Lab.

"(Lau) has a lot of information that would be very embarrassing to the government," Whitehurst says, "so they are trying to destroy his credibility."

Lau has gone to great lengths to create a paper trail of his story. He has filed a civil-rights lawsuit in federal court in Sacramento, Calif., alleging he was discriminated against by the FBI because of his race and disability -- a disability he claims was caused by the extreme stress of his five-year FBI undercover assignment.

Lau also has several pending Equal Employment Opportunity (EEO) administrative-law cases, one of which is ripe to be filed in federal court. In addition, Lau has accumulated reams of federal Freedom of Information Act documents that, despite being heavily redacted to remove sensitive information, still go a long way in verifying his remarkable claims.

However, because of the highly classified nature of Lau's undercover work, he is prohibited from disclosing specifics about his assignment. That fact, he asserts, has made the job of proving his case in the courts nearly impossible. Even Lau's attorney does not have the security clearance necessary to hear his entire story.

"I was part of an elite group. So few do what I do," Lau explains. "... We were like the Flying Tigers (fighter squadron). We do not wear a uniform, but we do the most damage against the enemy.

"But now, I'm like a prize fighter in a fight with his hands tied behind his back."

## Becoming the dragon

On the surface, the FBI's rationale for firing Lau seems pretty clear-cut. During his tenure as an FBI agent, he was arrested twice for shoplifting, once in 1990 and again in 1996, which led to his termination. The Bureau claims Lau was not forthcoming during the investigation of those events and that he attempted to use his position as an agent to pressure his accusers into dropping the charges.

"The FBI, as a law enforcement agency, must take severe disciplinary action, including dismissal, against employees who engage in illegal activity ..." state government's court pleadings related to Lau's firing.

But if you delve beneath the surface of Lau's case, you will find yourself immersed in a house of mirrors where few things are as they appear to be.

Lau is a native of Singapore who is fluent in both Mandarin and Cantonese -- the two major languages spoken in China and Taiwan. He immigrated to this country in 1976 and six years later became a naturalized citizen of the United States.

After attending several colleges and operating an Asian restaurant in Michigan for a few years, Lau says he enrolled in the police academy in Oakland, Mich. Shortly after, Lau was sucked into the netherworld of espionage.

In 1984, court records state, Lau was recruited as an asset by the government to work in foreign counter-intelligence.

"I was a CIA operative," Lau alleges. "(They) operated me inside the USA."

In July 1984, Lau successfully brought on board a valuable asset for the U.S. intelligence community, for which he was commended by his FBI and CIA "handlers," Lau states in federal court pleadings.

Lau says he was recruited heavily by both the CIA and FBI, but made the decision to join the Bureau "because the FBI recruiter painted a more glamorous picture." He completed his college degree in 1985 and a year later reported to the FBI Academy in Quantico, Va., for training as an FBI special agent.

From there, Lau was sent to Chicago and immediately put into a deep, dangerous undercover assignment that required him to "work against hostile and aggressive foreign powers for years," court records indicate.

As part of his undercover work, Lau was immersed in the world of his targets, cut off from his family. He did not go into the office like a regular agent, but worked the streets, filing reports on napkins at times to ensure his cover was not blown. He also alleges in court filings that he had numerous problems with his desk-bound supervisors, who seemed more concerned with budgets than with his life. Lau contends racism also entered into the picture, putting his life in danger in a very real way.

"As the funds were finally allocated, management risked my life and safety by being so skeptical they would not even turn over the title of the government's motor vehicle to my name because some were worried ... I might steal it," Lau alleges in a declaration filed in federal court in Sacramento. "Driving an FBI vehicle on a deep undercover assignment is suicide, but the FBI did not seem to care. This realization was mentally devastating."

But Lau says he persevered and penetrated the target community further. By 1987, Lau's subjects had invited him to go overseas, the real goal of the undercover assignment. His FBI supervisors, though, remained skeptical, Lau claims, afraid that he might set off "an international incident."

The pressure mounted further, as on the eve of his overseas trip, Lau states in court pleadings that he was made aware that one of the Bureau's "highly placed assets had betrayed him."

"I did not cancel my trip for it would confirm the asset's allegation," Lau contends in his court pleadings. "... The historic trip turned out to be very stressful, with subjects giving me enhanced security during the visit. Personnel armed with machine-guns were a constant reminder to me of my fate if something went wrong, and there were frequent roadblocks on my route of travel. I anticipated death on several occasions, but I somehow survived it all."

Lau says his mission was a success, setting the stage for a second overseas trip that would take place in 1989. However, after returning from his first covert overseas trip, he discovered that his girlfriend -- who had no clue as to the nature of his trip -- had finally given up waiting on him. She had married someone else.

## Dragon tales

Lau is prohibited due to national security concerns from discussing specifics about his undercover mission. However, the public record does offer some clues as to the nature of his work and also indicates that travel to China and Taiwan was a probable part of his undercover assignment.

Lau describes his undercover work as follows:

"I was dealing with life and death stuff on a pretty regular basis. If I got killed, and they do kill people, the day I died they would not want my family to know. That way, my family would not be pulled in. Every day, intelligence operatives are killed, but the government is not going to say, 'Oh, that was one of ours.' It's all covert."

In a letter to the FBI dated Dec. 7, 1995, Lau was praised for the thoroughness of a briefing he provided to CIA agents and analysts on the subjects of "Chinese alien smuggling, Asian organized crime and Asian cultural

issues in general.

Keep in mind that through that date, the bulk of Lau's in-the-field experience as an FBI agent was garnered through his five-year undercover assignment.

Also telling is an April 23, 2003, letter sent to the FBI by Lau's attorney, Antonio Silva of El Paso. The letter concerned the case of Katrina Leung -- a Los Angeles socialite and Republican party stalwart who has been accused by the Bureau of spying for the Chinese government.

"As a former special agent of the FBI, Mr. Lau worked in covert undercover operations against very dangerous instrumentalities and individuals," Silva's letter states. "Mr. Lau has now learned that Katrina Leung compromised many covert operations of the FBI and many operatives. The purpose of this letter is to request whether my client ... is in any danger as a result of these revelations."

The FBI responded to Silva in May 2003, stating that "at this time, the FBI is not aware of any facts that would compromise the safety of your client. ... Should the situation change, we will advise you accordingly."

Even with all the stress, bureaucratic obstacles and life-threatening risks that Lau encountered in his undercover assignment, he somehow managed to succeed in his mission. That success was recognized in January 1988 by then FBI Director William Sessions, who flew to Chicago to personally present an incentive award to Lau.

"Without your dedication and professionalism, you might not have been able to endure the personal sacrifices and hardships brought to you during this time," Sessions wrote in a Jan. 20, 1988, letter addressed to Lau. "Your acceptance of this very difficult role is a tribute to all FBI special agents as you have performed your myriad duties in an exceptional manner, far above the call of duty."

But the covert assignment did take its toll on Lau.

"Until 9/11, the government was saying the FBI can't conduct undercover work overseas and the CIA can't do domestic surveillance. Look at me and you know that it was not true." Lau says. "I'm like one of the first to do what I did for the FBI, and I assure you there have been a lot of people after me.

"They taught me to be ruthless, and for a while I was immersed in that. Thank God for a conscience, which is why I pulled back. But if you become a dragon slayer, you can't help becoming a dragon yourself."

## Return to the lair

Lau's attorney, Silva, is extremely cautious about what he says about his client due to the national security implications of Lau's case. However, Silva admits that, due to those national-security restrictions, he probably knows only about "40 percent" of what he ideally would like to know to represent Lau in court.

Chief among Lau's claims, according to his legal pleadings, is that he was so psychologically traumatized by his five-year undercover assignment that he has become disabled -- a fact he claims the FBI has refused to acknowledge.

"It's like a jig-saw puzzle where I have the outer edges and some of the inner pieces. ...," Silva explains, referring to Lau's case. "Whatever is not there is of such a horrific nature, and what Lok (Lau) had to do, is of such a horrific nature, that whatever it was it has destroyed him as a human being."

By 1990, after being immersed in the high-stakes game of espionage and treachery for more than four years, Lau was beginning to crack. He told his supervisors he needed to get out, but it took time to wind down the assignment, to extract him properly. The pressure cooker was too much for Lau, he claims, leading him to act out in December 1990 by shoplifting a paint brush and some paint rollers from a Sears store in Ann Arbor, Mich.

The FBI reacted by keeping him on his undercover assignment for six more months. When Lau emerged from his undercover role, he was not sent for psychological treatment, but instead received a couple weeks of re-training before being shipped off to the FBI's Sacramento field office -- despite his request to be located in Seattle. As he began his new job as a special agent in Sacramento, an investigation into the shoplifting incident was still hanging over his head.

"One cannot simply (take) an agent undercover for years and then simply place the agent in an office and expect that person to function normally," argues former FBI Unit Chief Vasquez in legal pleadings filed in federal court. "It is similar to a veteran returning from the war and finding persons who did not understand the contributions or sacrifices made."

Predictably, according to Vasquez, Lau began to run into problems adjusting to the special agent job -- for which he had no real training.

"Mr. Lau should have been placed in a teaching position wherein his expertise could be used," Vasquez states in a legal declaration. "Mr. Lau gained expertise that does not appear in the manuals and the FBI did not recognize this. Instead, Mr. Lau was (made) a nobody who did not know how to be an FBI agent.

"The supervisor of the squad in Sacramento probably felt he was a thorn in the side of the office and the Bureau, as a 5-year agent should be able to do any assignment."

In 1993, nearly three years after the shoplifting incident occurred, Lau's punishment was meted out by the Bureau. He received a 14-day suspension without pay.

Steven Pomerantz, then assistant director of the FBI's Administrative Services Division, in an Oct. 12, 1993, letter to Lau, stated that "were it not for (the) unique circumstances and attendant stressors" of Lau's undercover assignment, he would have no choice but to fire him for the shoplifting incident.

"However, inasmuch as I believe that your actions on that date were, to some degree, the by-product of the unusual work-related stress you were subjected to, I have concluded that disciplining you for the incident at Sears would be inappropriate," Pomerantz wrote.

The head of the FBI's Safeguard Unit at the time, Dr. Stephen Band, stated in a June 29, 1993, memorandum that Lau "may again exhibit unacceptable behavior (shoplifting) if he was placed in a position which (he) perceived as stressful."

Still, the FBI provided Lau with no treatment. In fact, Silva argues in court pleadings that through the date of his firing, "Mr. Lau was denied adequate medical and psychological treatment since he could not discuss the basis of his medical and psychological condition since it related to classified work ... ."

## Getting the boot

The situation in the Sacramento field office only got worse for Lau after he was punished for the Sears shoplifting episode. In 1995, his supervisor tasked him with the humiliating job of running photocopies for the office after Lau failed to perform to expectations on several assignments. Then, in the fall of 1996, Lau's government vehicle and gun were taken from him due to a medical mandate related to Lau's sleep apnea -- a sleeping disorder he was diagnosed with some two years earlier.

Despite not having a gun or car, Lau claims his supervisor ordered him to continue performing his normal duties.

"Incredibly, despite being stripped of his weapon, agent Lau was required to investigate, make arrests and serve search warrants as any normal armed agent," writes attorney Brian Varner in an April 21, 1997, letter to the FBI. "Between Nov. 14, 1996, and March 24, 1997, Agent Lau executed four federal search warrants on

residential and business properties which were controlled by Asian organized crime subjects, executed two federal arrest warrants on two subjects and obtained four federal Grand Jury indictments.

"I have represented law enforcement personnel from many different agencies," Varner adds. "I cannot recall ever coming across a law enforcement agency that would even consider for a moment sending an investigating agent out into the field unarmed."

Matthew Fogg, executive director of the Congress Against Racism and Corruption in Law Enforcement and an inactive Chief Deputy U.S. Marshal who successfully sued his agency for civil-rights violations in 1998, claims what happened to Lau is "criminal."

"By putting him out there without his gun, that's someone telling him, 'We can get you killed easily,' " Fogg says. "Racism has infiltrated law enforcement. Lok (Lau) got caught up in that system. All he is saying is, 'Let me survive.' "

Lau did survive, but he was not unscathed. One month after his weapon was yanked, he again was arrested for shoplifting, this time at a grocery store in Sacramento. Lau allegedly lifted some toothpaste, coffee and a small padlock.

Vasquez said of the incident:

"Mr. Lau was alleged to have shoplifted in (1996). This was a desperate cry for help and an indication he needed help. Mr. Lau was trying hard and making blunders and the FBI was holding it against him. Mr. Lau's contributions were not recognized."

The shoplifting incident was followed by a series of other strange behavior episodes on the part of Lau. For example, in the winter of 1996, after two suspicious individuals were observed lurking near the FBI office one evening, Lau confronted them with a sword in a scabbard. (Lau's gun and vehicle were not returned to him until March 1997.)

In the summer of 1997, after hearing an unexplained noise one night in the FBI field office, Lau drew his handgun from an ankle holster and began to slink through the dark hallways and squad areas with his gun drawn.

And in the fall of 1998, the executive director of the FBI Agents Association gave a special presentation at the Sacramento field office. During the talk, the guest speaker asked if housing was expensive in Sacramento. Lau responded by saying it was so expensive he was forced to raise fish in his swimming pool for food.

Even though the shoplifting charges against Lau in the Sacramento case were eventually dropped, the FBI used the incident, coupled with Lau's other bizarre behavior, to end his career.

By February 2000, Lau had been dismissed from the ranks of the FBI.

As part of the dismissal process, Lau's security clearance also was yanked. However, the Access Review Committee, a federal authority that deals with questions of access to classified information, did find fault with the FBI's handling of Lau's case. But, the committee was only charged with reviewing Lau's security clearance and had no power to act with respect to the FBI's decision to fire him.

"The FBI clearly failed in its obligations to provide Mr. Lau with psychological treatment and organizational support," wrote U.S. Deputy Attorney General John C. Vail, chairman of the Access Review Committee, in a Dec. 13, 2000, statement on Lau's case. "Based on this failure, it could be argued, the FBI contributed to his current and past psychological problems, which led to the revocation of his security clearance and his termination from the rolls of the FBI."

Lau's psychiatrist has diagnosed him with severe depression and post traumatic stress disorder -- a condition caused by exposure to extreme stress.

Lau says he has been seeking to collect workers' compensation through the Department of Labor for the past three years. However, he alleges the Bureau has, to date, failed to authorize the necessary security clearances for his case to be heard.

The FBI, in court pleadings in Lau's case, claims that its doctors found that "Lau did not have any major mental illness, but that he had a personality disorder that impacted his judgment and rendered him unfit for duty as a special agent."

Ironically, Lau says he has qualified for disability retirement benefits from both the Office of Personnel Management, the federal government's human resources arm, as well as from Social Security.

And, according to the legal declaration provided by the founder of the FBI Safehouse Unit, Lau was mentally fit at the time he went undercover.

"The psychological tests did not reveal any psychological or emotional problems," Vasquez states.

## Out in the cold

In the wake of his firing, Lau, who still lives in Sacramento, has taken his plea for justice to the courts.

However, both he and his attorney understand the struggle there will be difficult, because of the restrictions placed on Lau due to national security concerns. Even the judge in his pending civil-rights case filed in U.S. District Court in Sacramento does not have the security clearance necessary to hear Lau's full story. In that case, Lau is seeking compensatory damages of $300,000, back-pay, attorney's fees and, as he says, "security (clearance) for shrinks for my treatment."

The judge is slated to rule in the near future on the FBI's pending motion for summary judgment in Lau's case. Should the court rule in the Bureau's favor, Lau could appeal. He also has a separate EEO case that has wound its way through the administrative-law process and is ready to be filed in federal court. But the reality is, according to Lau, if the judge dismisses his current case, it will take years and thousands of dollars to continue pursuing his litigation against the FBI.

But Lau recently attracted an ally in his legal battle. The League of United Latin American Citizens (LULAC) has come on board in support of Lau's cause. The Hispanic civil-rights group lodged a friend-of-the-court brief in Lau's federal case in Sacramento and, according to a spokesperson for the group, also plans to bring Lau's case to the attention of Congress.

LULAC officials contend that Lau's case is of critical importance to the American people because it demonstrates how racism and the cover of national security can be used to subvert our national security. In the post 9/11 world, the work of undercover agents, particularly agents of color, is of critical importance in gathering crucial intelligence in the war on terrorism, LULAC argues.

"How the FBI, the United States and the American People deal with those who sacrifice themselves and put their own lives at risk to safeguard the freedoms we treasure, in our great country, will send a message of how we, as a country, deal with the faceless heroes who protect us and our way of life," LULAC states in its court pleading. "... (Lau's) case is of paramount importance to the safety and security of all of us in the United States and to those ... who risk their lives and the lives of their families at every turn, 24 hours a day, while they are involved in undercover work."

Whitehurst echoes LULAC's message:

"I think what the FBI did to Lok Lau is criminal. They put him undercover in a manner that the FBI manual says should not be done," he says. "And then, because he learned too much, they are trying to destroy him, and the public record shows that. This should be a warning to any minority agent: When they're finished with you, they'll chew you up and spit you out."

Doug Hartnett, national security campaign coordinator for the Government Accountability Project, a Washington, D.C.-based watchdog group, says Lau's case highlights the inherent problem that our society faces in dealing with classified information and abuse by a national security agency.

"They (the agencies) consistently hide behind the cloak of national security and thereby cut short any credible accountability for their actions," Hartnett adds.

The FBI, though, contends Lau was dealt with fairly. In arguing that Lau's federal court case be dismissed, the FBI's pleadings state, "With respect to the termination claim, Lau cannot demonstrate that he was treated differently than any other special agents who were similarly situated. ..."

Assistant U.S. Attorney Door adds that Lau's case "doesn't have all these mysterious cloak-and-dagger overtones that Mr. Lau is trying to convince everyone it does. It's a straight-forward disciplinary action."

Lau, for his part, stresses that he is far from giving up the ghost in his quest for justice. In his mind, that struggle is about survival.

"The FBI treated me like dirt," he says. "If they do it to one of their own, what do you think they do to the American people?"

The more pressing question in Lau's case, though, might boil down to the measure of compassion.

John Le Carré wrote the novel that was the basis for the 1960s movie "The Spy Who Came in From The Cold." In his book, Le Carré offers a literary insight into the life of a spy who, like Lau, has been immersed in the Big Game for too long.

"We have to live without sympathy, don't we? That's impossible of course. We act it to one another, all this hardness; but we aren't like that really. I mean ... one can't be out in the cold all the time; one has to come in from the cold. ..."

© 2003 American City Business Journals Inc.

⇥ Web reprint information

*All contents of this site © American City Business Journals Inc. All rights reserved.*







« Coming Soon: The FBI's "Ten Most Wanted Hard Drives" |
Main | Good Blogkeeping »

In the Salón Chingón Reading Room:

# TALK RADIO MANIFESTO

**Al Giordano:**
al@bigleftoutside.com

**Dan Feder:**
webmaster@bigleftoutside.com

**Latest Comment:**
**It's the system** by **Greg** on Talk Radio
Manifesto at 12/15/03 12:27

**Readers' Comments Index**

**Big, Left, Outside Archives**

**Subscribe for Free Email Alerts**

⊙ Add ⊙ Remove

Submit

**Who Killed the NY Times?**
**The New York Times**
**James Romenesko**
**Andrew Sullivan**
**Glenn Reynolds/Instapundit**
**Mickey Kaus**
**Matt Drudge**
**Seth Mnookin**
**Sridhar Pappu**
**Cynthia Cotts**
**Howard Kurtz**
**Jack Shafer**
**James Taranto**
**Narco News**

**Frequently Consulted:**
**Ken Layne**
**Barry Crimmins**
**The Razor Wire**
**Subcomandante Marcos**
**Dan Kennedy**
**Danny Schechter**
**FAIR**

October 22, 2003

## COURT REJECTS FBI REQUEST TO SEARCH COMPUTER HARD DRIVES

This just in from **AP**:

> *The Justice Department sought extraordinary permission to let the FBI conduct a search-and-destroy mission on any computers harboring classified information about a 1980s case that temporarily became public in a lawsuit. A federal judge, however, rejected the idea...*

> *U.S. District Judge Garland E. Burrell Jr. agreed with the government's request to remove the classified documents from the court file and substitute sanitized versions. But in his decision last week, Burrell rejected as ``unsupported by authority'' the government's broader request to seek out and delete any electronic copies that might have been downloaded onto others' computers before they were effectively sealed.*

Scroll down BigLeftOutside for previous reports and links on this battle. Saludos to Authentic Journalist Bill Conroy from whose courageous reporting in the *San Antonio Business Journal* has come yet another victory.

People often ask me "What is Authentic Journalism? What distinguishes it from other journalism?" One o the things that distinguishes it has been shown in

29 November 2003.

---

November 25, 2003

I found the brief article about the FBI visit to Cryptome interesting, in that your site had only days earlier posted a link to a story about former FBI agent Lok Thye Lau. The story you ran carried links to documents that the government determined were "classified" after those documents had been in the public record for some three weeks.

Although I'm not certain why you received a visit from agents, at the very least I thought you would find it interesting that about the same time you were called upon, a civil rights group and lawyers for Lau also were contacted by the government concerning the "classified" documents.

Below are links to the stories I've written on the subject, as well as links to other media coverage of the Lau case. You may already be aware of all this, but in the event you are not, it might factor into your analysis of why you received a visit, particularly given the lack of response to your FOIA request.

Sincerely,

Bill Conroy

---

*San Antonio Business Journal* stories:

• LULAC seeks sanctions against government in Lau spy case
http://sanantonio.bizjournals.com/sanantonio/stories/2003/11/10/story3.html

• Lawyers, civil rights group claim government turning up the heat in Lau spy case:
http://sanantonio.bizjournals.com/sanantonio/stories/2003/10/20/daily42.html

• Media's computers are on FBI's radar screen in Lau spy case:
http://sanantonio.bizjournals.com/sanantonio/stories/2003/10/20/daily11.html

(AP's follow to our story above:)
http://www.guardian.co.uk/uslatest/story/0,1282,-3297228,00.html

• Judge orders previously public court records sealed in case of former FBI agent:
http://sanantonio.bizjournals.com/sanantonio/stories/2003/10/13/daily12.html

• Former federal agents' spy story opens Pandora's box for FBI:
http://sanantonio.bizjournals.com/sanantonio/stories/2003/10/13/story1.html

---

OTHER MEDIA LINKS ON SUBJECT

http://cryptome.org/lau112503.htm                                    12/16/2003

FBI spy revelation could be a thread that unravels the Bureau
http://www.commondreams.org/views03/1030-10.htm

Judge redacts records in FBI spying case, but won't issue deletion order
http://www.rcfp.org/news/2003/1023lauvas.html

Court nixes FBI bid to purge unspecified computers
http://www.cfac.org/#anchor5191639

Federal judge seals records alleging FBI's involvement in international spy business
http://foi.missouri.edu/evolvingissues/fedjudge.html

Court nixes FBI bid to purge unspecified computers
http://www.cfac.org/#anchor5191639

The spy who was left out in the cold, By Gary Webb
http://www.atimes.com/atimes/China/EK07Ad03.html

Patriot Acts
http://newsreview.com/issues/sacto/2003-11-20/cover.asp

BIGLEFTOUTSIDE BLURB
http://www.bigleftoutside.com/archives/000197.php

---

# Singapura

**Sit well back** now, search your memory but hold on to your hard disks.

Have you or your country ever been visited by Singapore born **Lau Lok** Thye? If so he was probably sent on a spying mission.



Evidence filed in court show that **Lau**, a naturalised US citizen was specially picked by the **FBI** to do counter-intelligence work abroad soon after he received **FBI** training. **Lau** said he did deep undercover work for the **FBI** on Group 2 assignments, i.e. work taking 6 months or more. Some evidence also show that he had both **FBI** and CIA handlers and that he'd worked in a 'hostile country...in total chaos.' You may read some of this in **Lau's** (redacted) Court Declaration. and in the rambling Amicus Curiae document filed by the Hispanic civil rights group, the League of United Latin American Citizens (LULAC).

Not bad you may think, for someone who left Singapore at an early age to become a gum-chewing American. But things aren't good for **Lau** at the moment. In a civil suit naming John Ashcroft, Attorney General, as defendant, he claims psychological damage from those high risk assignments, that he was badly treated and abandoned by the **FBI** on his return, racial prejudice even. In 2000 after two "cry for help" shoplifting offences, he was sacked. Reasonable enough complaints considering what happened to Egyptian-born **FBI** agent Gamal Abdel-Hafiz. [See: News From the World of the **FBI**]

**Lau** said that the **FBI** gave him no 're-entry' help, and that he was so badly stressed after his assignments that he was actually doing things to draw attention. Hell, if it were Singapore it'd have been easy for him to do just that by spitting in the street and expressing loudly a desire for Wrigley's Spearmint; but this was the US, so he did the next best thing. He went to the shops and lifted tooth-paste, bars

of soap, paint-brush, things like that. (Moreover, in an interview, **Lau** said that Singapore is a police state. Tsk, Tsk.)

The **FBI** says that **Lau** is a liar and a petty thief and there's no substance to his claim. But later the Government asked for the Court documents to be sealed, and also filed a motion to ask for powers for **FBI** agents to erase 'classified information' relating to the **Lau** case from any unauthorised computer hard drives. No substance then? Don't answer the door if you've already downloaded those documents I've just mentioned. The assistant U.S. Attorney defending the **FBI** against **Lau's** civil-rights claim is named Kristin S. Door, by the way.

And then **FBI** agents were sent to **Lau's** lawyers and LULAC to retrieve documents, and to press the delete button on their hard drives if they'd only allow them. Then, by unhappy coincidence, the office of Dr Bruce Ebert, **Lau's** psychologist was burgled. Things don't just happen in the U.S. of A but they come down in a torrential rain. Judge Garland E. Burrell Jr. recently declined the Government's requests to put a lid on the case as "unsupported by authority", but there's nothing to stop them from appealing. Meantime their application for the case to be summarily dismissed is pending in the District Court in Sacramento, California.

If anything, what did **Lau** do? From what little we know, he was involved in 'deep' spying for the **FBI**, and this may have involved penetration into the activities of the Chinese Tong (Triad) activities outside the US. Then there are indications that he was in China at least once, maybe during the Tiananmen 'uprising'. (Did he have a hand in it do you think?). And he probably went to other countries too on spying missions for the **FBI** or the CIA, or both.

Besides the way he has been treated by the authorities, the latter role raised alarm bells among civil rights people in the US. **FBI** and CIA...they do make you think of John Ashcroft again, don't they? After the Twin Towers incident he came up with that preposterous Patriot Act which — he said — was necessary to bring down the wall between the two agencies. But what if **Lau** is right about acting for those agencies even then? Then not for the first time the nose of the Attorney General of the USA will look like it's come straight out of a fairy story. Pinocchio comes to mind.

 Some believe this is the reason why the

Government is so keen to block press coverage of the **Lau** case. In a way they succeeded. Most of the US media ignored the story; it broke only in the relatively obscure San Antonio Business Times.

As they say: watch this space. ß

// posted by Beta @ 11:40 AM
Spy Who Came In Fr. Singapura









In the Salón Chingón Reading Room:

# TALK RADIO MANIFESTO

**Al Giordano:**
**al@bigleftoutside.com**

**Dan Feder:**
**webmaster@bigleftoutside.com**

**Latest Comment:**
**It's the system** by Greg on Talk Radio
Manifesto at 12/15/03 12:27

**Readers' Comments Index**

**Big, Left, Outside Archives**

**Subscribe for Free Email Alerts**

⊙ Add  ○ Remove

[ Submit ]

**Who Killed the NY Times?**
**The New York Times**
**James Romenesko**
**Andrew Sullivan**
**Glenn Reynolds/Instapundit**
**Mickey Kaus**
**Matt Drudge**
**Seth Mnookin**
**Sridhar Pappu**
**Cynthia Cotts**
**Howard Kurtz**
**Jack Shafer**
**James Taranto**
**Narco News**

**Frequently Consulted:**
**Ken Layne**
**Barry Crimmins**
**The Razor Wire**
**Subcomandante Marcos**
**Dan Kennedy**
**Danny Schechter**
**FAIR**



« Friendly Fire | Main | From Somewhere in a Banana
Republic Called Florida... »

November 20, 2003

## MORE ON THE STORY THE FBI WANTS TO STOP YOU FROM KNOWING

The more that the FBI tries to squash this story - as
previously discussed here, they even tried to get
Court permission to hack web sites and remove
content (and, as noted here, they failed) - the more
comes out.

Today, it's journalists Bill Forman and Cosmo
Garvin at the **Sacramento News & Review** who
bring the story farther. The report begins:

> *The U.S. government does not want you
> to know what Lok Lau did as an
> undercover agent for the FBI. Federal
> prosecutors also wanted to do
> extraordinary things to keep his story
> from coming out. They weren't
> successful...*

Keep pulling that string, auténticos!

### Read Comments: Cracks in the Empire

### Submit a Comment

Posted by Al Giordano at 10:11 AM

« Friendly Fire | Main | From Somewhere in a Banana
Republic Called Florida... »

# Common Dreams
# NEWS CENTER

Breaking News & Views for the Progressive Community

Our Readers Most Forwarded
Article This Week
**Bush and Iraq:**
**Mass Media, Mass Ignorance**
by Jeff Cohen

Home | Newswire | About Us | Donate | Sign-Up | Archives

Tuesday, December 16, 2003

## Featured Views

🖶 Printer Friendly Version    ✉ E-Mail This Article

*Published on Thursday, October 30, 2003 by CommonDreams.org*

# FBI Spy Revelation Could be a Thread That Unravels the Bureau
**by Bill Conroy**

Evidence has surfaced recently that the FBI has been spying on foreign nations for years.

The revelation is so sensitive that in the wake of the secret surfacing, the FBI has embarked on a mad scramble to cover up the evidence. The Bureau has gone as far as to pressure a federal judge into sealing previously public court records that open a window on the FBI's overseas spying mission.

In addition, with the help of the U.S. Attorney's Office (John Ashcroft's Justice Department) the FBI also sought, through a proposed court order, to seize any computer anywhere that the Bureau suspected might have contained the sensitive court pleadings.

The controversy stems from a civil rights case filed in federal court in Sacramento, Calif., by former FBI agent Lok Thye Lau. In his case, Lau filed a Declaration in late September that detailed his FBI career and the fact that he was engaged as a spy in a dangerous undercover assignment that required him to "work against hostile and aggressive foreign powers for years." Although he is precluded from discussing specifics about that assignment due to national security concerns, the public record available on his case indicates that the likely target country was China.

Why have you heard so little about this case? Well, for the most part, the mainstream media has ignored it – and consequently, the serious implications raised for civil liberties in this country. As evidence of how the big media was asleep at the wheel in this case, it was the San Antonio Business Journal, a small weekly in South Texas, that broke the story in early October.

After the Business Journal's story was already in print, a federal judge sealed the public court records that the newspaper used for that story. Those records included Lau's Declaration and a friend-of-the-court brief filed by the League of United Latin American Citizens (LULAC), one of the nation's oldest Hispanic civil rights groups.

In addition, after the Business Journal's story had hit the streets, the U.S. Attorney's Office and FBI sought permission from the court to seize any computer that they suspected of containing the previously public court documents. The court, for now, has refused to grant the FBI that power.

The Associated Press followed the Business Journal's exclusive by publishing a story on the government's efforts to seize computers. In addition, several 1st Amendment press organizations have given the story attention -- such as the Reporters Committee for Freedom of the Press.

The California First Amendment Coalition put its neck on the line by actually posting the controversial "sealed" court pleadings on its Web site at http://www.cfac.org/Attachments/fbi_spy_story.html. A Web blog (bigleftoutside.com) also stepped out on a limb and put links to the pleadings on its site.

The latest development in this breaking story was an effort by the U.S. Attorney's Office in Sacramento to pressure LULAC and Lau's lawyers to turn over documents and computers to the FBI absent a court order.

According to LULAC, the official from the U.S. Attorney's Office who contacted the group stated that he wanted to "shut down media coverage" on the case.

So why all the fuss?

Maybe the FBI has a genuine concern that the information in Lau's Declaration, which they allowed to remain in the public court record for some three weeks, now represents a threat to ongoing FBI spying methods and sources. But, if that's really the case, then why was Lau put back in the field after his undercover assignment as a quite in-the-open FBI agent? And why did the FBI allow Lau's legal claim to progress so far in the court system?

Could there be something else at play here?

If you recall, the American people were told immediately following 9/11 that the FBI (a domestic law enforcement agency) and the CIA (an overseas intelligence agency) were hamstrung by their agency turf limitations and their inability to share intelligence information. To solve the problem, Attorney General Ashcroft brought us the Patriot Act, which broke down the wall between the FBI and CIA in the intelligence game.

Well, if Lau's spy story is true, then that wall may have never existed to begin with, and Ashcroft's Patriot Act argument was based on a false premise. And an even bigger issue looms, one that may offer a hint as to why the Justice Department wants to "shut down" the press coverage of Lau's case.

If the FBI was operating spies in foreign countries prior to 9/11 -- and with Lau, it would seem that was the case dating back to the mid-1980s -- what happened to that intelligence information? Could it have been helpful in preventing 9/11? Who in our government knew or sanctioned such spying activity?

Such questions reach into the very nerve center of power in this country, and they are questions that undoubtedly unnerve those in power -- which may be why there is now an effort on the part of the Justice Department to seal previously public records and to intimidate anyone who might try to shed further light on this case.

(For more news coverage of this issue, go to this Web link.)

*Bill Conroy (Wkc6428@aol.com), a former investigative reporter for the Shepherd-Express in Milwaukee, is currently the editor of the San Antonio Business Journal. The opinions expressed in this article are those of its author and do not necessarily represent the views of the San Antonio Business Journal or its parent company.*

### ###

🖶 Printer Friendly Version   ✉ E-Mail This Article

FAIR USE NOTICE
This site contains copyrighted material the use of which has not always been specifically authorized by the copyright owner. We are making such material available in our efforts to advance understanding of environmental, political, human rights, economic, democracy, scientific, and social justice issues, etc. We believe this constitutes a 'fair use' of any such copyrighted material as provided for in section 107 of the US Copyright Law. In accordance with Title 17 U.S.C. Section 107, the material on this site is distributed without profit to those who have expressed a prior interest in receiving the included information for research and educational purposes. For more information go to: http://www.law.cornell.edu/uscode/17/107.shtml. If you wish to use copyrighted material from this site for purposes of your own that go beyond 'fair use', you must obtain permission from the copyright owner.

**Common Dreams NewsCenter**
A non-profit news service providing breaking news & views for the progressive community.
Home | Newswire | About Us | Donate | Sign-Up | Archives

© Copyrighted 1997-2003
www.commondreams.org



**BRADYS**

**h.o.b.**
house of bargains
831 Eastland Plaza - 761-7368

*Rent-it*
5505 Business 50 West - 893-736

Wedding &
Party Center

McK
Moto





Jefferson City

# News Tribune
### Online Edition

**Thursday, October 23, 2003**

**MARKETPLACE**
Classifieds
Merchandise/Garage
Sales
Employment
Real Estate
Automotive
Auctions
Apartment Guide
Yellow Pages

**NEWS**
Front Page
Local News
State News
U.S. & World
Sports
Features
Business
Opinion
Community
Obituaries
Headlines
Archives
Special Sections
Entertainment
Dear Abby
Lottery
A&E Calendar

**HELP**
General Information
Contact Us
Home Delivery

# Judge rejects U.S. request to find, delete classified records

WASHINGTON (AP) -- The Justice Department says it may renew an extraordinary request to let the FBI conduct a search-and-destroy mission on any computers harboring classified information about a 1980s case that temporarily became public in a lawsuit. A federal judge previously rejected the idea.

The initial request from federal prosecutors in Sacramento, Calif., was considered highly unusual by legal experts because it did not specify which computers the government believed might contain the classified information or how agents would retrieve and destroy information already made public.

"This stuns me," said Kate Martin, director for the Washington-based Center for National Security Studies. "I have never heard of them asking for such authority before. It's very disturbing that the FBI is contemplating going out and secretly examining hard-drives to see whether they contain this information."

Assistant U.S. Attorney Kristin S. Door in Sacramento said she was researching laws that might support renewing the government's request.

At issue are two court filings in a suit by a former FBI counterintelligence agent. The documents include brief references to a one-month undercover trip overseas in late 1987 by the agent, Lok T. Lau, who was fired for shoplifting more than a decade later and is suing over his dismissal.

The documents -- still containing the classified material -- were





FREE ti
comes with
FREE
banking@

available from the courthouse for up to 19 days. Copies have been published on the Internet, including the Web site for the Sacramento-based California First Amendment Coalition, an open-government group.

The organization's lawyer, Terry Francke, said he had not yet been contacted by prosecutors or the FBI. The documents were available on the group's Web site Wednesday.

Lau's attorney, Tony Silva of El Paso, Texas, said government investigators contacted him as recently as Tuesday to question whether his law firm's computers might contain the classified information.

Silva told the government that copies had been stored on floppy disks and were deleted using special software to ensure the data could not be recovered.

The government did not tell the judge how it might determine who copied the classified material onto the computers, nor did it suggest whether it already has searched anyone's hard drives for the documents. In the past, the FBI has usually surrendered efforts to protect classified documents once they become available publicly.

"If the text is published in a newspaper or a document is posted on the Web, it's futile to attempt to recover it," said Steve Aftergood, director of a project on government secrecy at the Federation of American Scientists. "Information moves faster today that ever before."

The legal skirmish occurs amid heightened sensitivity within the Bush administration over intelligence leaks, as the Justice Department tries to find out who revealed the name of the undercover CIA officer married to former Ambassador Joseph C. Wilson.

"It's completely unheard of that the FBI would try to exercise that kind of control," said James X. Dempsey, an expert on national security with the Center for Democracy and Technology in Washington.

U.S. District Judge Garland E. Burrell Jr. agreed with the government's request to remove the classified documents from the court file and substitute sanitized versions. But in his decision last week, Burrell rejected as "unsupported by authority" the government's broader request to seek out and delete any electronic copies that might have been downloaded onto others' computers before they were effectively sealed.

The classified sections of the court papers describe a covert mission by Lau in November 1987 to a country he does not identify. Lau said he was warned the night before his trip that one of the FBI's "highly placed assets" betrayed his identity as an undercover FBI agent, but, to avoid confirming the disclosure, he did not cancel the trip.

"Personnel armed with machine guns were a constant reminder to me of my fate if something went wrong, and there were frequent roadblocks on my route of travel," Lau wrote. "I anticipated death on several occasions, but I somehow survived it all."

Lau argued that the stress of his undercover assignments led to what he describes as his "aberrant" behavior that resulted in his firing. He said he was unconcerned he might be prosecuted for disclosing classified information, noting that he withheld some details from his court papers, such as the country where his mission took place.

"I know the bureau will try to prosecute me and discredit me at every opportunity," Lau said. "Whatever national security argument the FBI is making is hogwash."

Burrell denied the government's Oct. 10 motion "without prejudice," meaning prosecutors may renew their request.

Door, the prosecutor, said she was researching laws that might support such a decision. She acknowledged that even she does not have sufficient government clearance to read the classified documents.

"We're hoping there has been no harm," Door said. "As soon as the FBI determined it was classified, we moved promptly to try to retrieve it from the public record."



Top Local State Opinion World Business

Obituaries Sports Dear Abby Classifieds Community

News Archives About the News Tribune Home Delivery

All Contents © Copyright 2003 *News Tribune Co.* All rights reserved.
AP stories ©Copyright 2003 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed. Click for copyright details.

Comments or questions? Contact us.



| **ASIA TIMES** | cricket |

www.atimes.com

Front Page
China
Southeast Asia
South Asia
Japan
Korea
Central Asia

Middle East
War and Terror

Business in Brief
Asian Economy
Global Economy

Letters

Archive    About Us    Contact Us    Advertise

# China

Nov 7, 2003

## The spy who was left out in the cold
By Gary Webb

SACRAMENTO, California - As far as can be told, former Federal Bureau of Investigation agent Lok Lau may be a genuine American hero, the first agent in FBI history to penetrate the top levels of the Chinese government. But the US Department of Justice is doing everything in its power - and some things that aren't - to prevent even the tiniest detail of Lau's highly classified work from becoming public.

As far as the Justice Department is concerned, Lau is nothing more than a lying, thieving malcontent who was fired for shoplifting $15 worth of merchandise from a California supermarket. And that's the way the US government would like to keep it.

The full truth about Lok Lau and his six-year-long foreign-counterintelligence mission may never be known. But judging from information that briefly became public as a result of an employment-discrimination suit Lau filed against the FBI - and the Justice Department's frantic efforts to purge the public record of what it claims were national-security secrets "illegally" divulged by Lau and his lawyers - the 46-year-old Singapore native was involved in some very heavy, very clandestine and very dangerous work inside the People's Republic of China, on behalf of US intelligence, for years.

It is also clear that once Lau's highly praised undercover assignment was completed, the FBI decided he was a liability and began a concerted effort to get rid of him, which it eventually did.

Why the FBI turned with such vengeance against an agent its own director had personally commended for heroism is not known, but it wasn't because Lok Lau wasn't good at his job. If anything, his problem might have been that he was too good at it.

That Lau - who worked for the FBI as a special agent (SA) from 1986 until 2000 - is the possessor of powerful secrets is beyond dispute; it is a matter that has troubled the FBI for some years, records show. Lau was considered so hot that in 1998 the FBI decided it could never put him on a witness stand because of "the extremely sensitive nature of SA Lau's assignment".

A year later, as the Bureau contemplated firing Lau, FBI headquarters asked its National Security Division in a secret


Print article
Email article
Currency converter

**RELATED ARTICLES**

The spy who was anything but cold

(May 27. '03)

Search Asia Times

Search

Advanced Search


Currency Converter

Book Reviews

memo "to conduct an additional evaluation of the damage that might result if, as seems likely, the circumstances of this Agent's career are publically [sic] disclosed". One option the memo raised was to buy Lau's silence with "a settlement that would preclude litigation and require confidentiality on the part of the Agent and his attorneys". The FBI's Office of Professional Responsibility agreed. "Significant damage would be done if information related to his [deleted] work were revealed," a 1999 memo stated. "It may be in the best interest of the FBI to avoid litigation if possible."

The results of the FBI's damage estimate are still secret and Lau is forbidden by law to speak of his mission, which is also still classified. But in 2000 Lau was fired and has since been publicly branded by the Justice Department as a liar and a thief. Though the shoplifting charge was eventually dismissed for insufficient evidence, the FBI argued that Lau had been dishonest and was therefore unworthy of being an FBI agent. After losing his US$81,000-a-year job, Lau sued the FBI, claiming racial discrimination, and the case dragged through the court system unnoticed for more than a year.

In mid-October, however, a reporter for the San Antonio Business Journal called the US Attorney's Office in Sacramento and asked for a comment on a declaration Lau had made in the case. Within days, the Justice Department stormed into federal court, demanded a private meeting with the judge, and persuaded him on national-security grounds to black out every mention of Lau's work in China, both from his declaration and in a friend-of-the-court brief filed by the League of United Latin American Citizens, a Texas anti-discrimination group.

Then it sought the judge's permission to seize any computers that might have a copy of Lau's secrets on their hard drives - and to erase them. That order, which was declined, was written broadly enough to have covered not only the computers used by Lau and his lawyers, but those of a Texas journalist covering the Lau story, the League of United Latin American Citizens, and the California First Amendment Coalition, a newspaper-industry advocacy group that had publicized the Justice Department's strange actions.

"What's extraordinary is that the government, in this case, succeeded in sealing something that had been on the public record for three weeks," said Terry Francke, the First Amendment Coalition's general counsel.

Though the Justice Department had asked for and been denied permission to seize all paper copies of Lau's declaration from anyone who had it, Lau's lawyers and his support group in Texas all received phone calls from the Sacramento US Attorney's Office asking for the papers back. Lau's lawyers complied; the Texas anti-discrimination group refused.

"I said show me a court order," said Julie Marquez, who handles criminal-justice issues for the San Antonio-based organization. "Even though the judge specifically told them they couldn't go out and get these papers, they were still calling people up and telling them to give them back."

The First Amendment Coalition posted uncensored copies of those documents on its website, prompting the Justice Department to return to court and ask for an electronic search-

and-destroy order. And, coincidentally, while all of this was going on, the offices of Lau's psychologist were burglarized and computer equipment was taken.

The obvious question is: What is so explosive about Agent Lau's work that, despite the passage of a dozen years, its merest mention causes the Justice Department to react so stridently?

Francke and others believe the FBI may be trying to conceal the role it played in a foreign intelligence operation, because Lau's activities in China were either illegal or unauthorized. While it is true that the FBI is confined by law to domestic - not foreign - counterintelligence, there is one specific instance in which it is perfectly legal for FBI agents to be used as international spies: when it's being done "in coordination with the CIA". President Ronald Reagan authorized that in the early 1980s in an executive order, 12333, which is still in effect today. That means Lau's mission was either illegal or it was sanctioned by the Central Intelligence Agency.

Lau says he doesn't know, nor does it matter to him. "You're talking to one of the footsoldiers here. I was out on the street all the time. My assumption is that what I was doing was legal. When the director of the FBI flies out to see you and personally shakes your hand for something you've done, then yeah, my assumption is that this was all approved."

Prior to becoming an FBI agent, Lau had been a CIA operative, spying on and occasionally recruiting Chinese students at the University of Michigan in the early 1980s. "A former Bureau guy who was working for the CIA spotted me," recalled Lau, who was a communications major and fluent in Mandarin and Cantonese. "They recruited me right on campus ... because I could speak the language."

In 1984, he was hired as an FBI "asset", working as a paid informant and operative in foreign-counterintelligence investigations. Within months, he scored a major coup. "In July 1984, I was highly commended by my FBI and CIA handlers for having recruited a valuable asset for the US intelligence community," Lau wrote in a now-classified portion of his court declaration. A year later he cracked another big case, one that reportedly involved the exposure of a Chinese double agent. Believing he had more than proved his worth to the FBI, Lau requested admission to the FBI Academy in Quantico, Virginia. The Bureau demurred. But when Lau threatened to quit and take a job with the Seattle Police Department, a spot was quickly found in the May 1986 training class, and Lau entered the FBI Academy to begin the process of becoming a full-fledged FBI agent.

At the time Lau was recruited, the Bureau was reeling over the discovery of several Chinese moles within its walls. "There had been a number of cases, and the feeling inside the FBI was that if they were going to do this to us, then we were going to do something back to them, like put someone inside their intelligence service," said a former law-enforcement official familiar with Lau's work.

All Lau would say on that score was that he "was supposed to avenge the failings of the intelligence community".

John Vasquez, the FBI's chief of training and research at the time Lau attended the academy, knew Lau as a student and said in a court filing that he was stunned to discover that the Bureau - halfway through Lau's training - had already assigned him to work on an undercover foreign-counterintelligence operation, something that struck the longtime FBI man as extraordinary. Rookie FBI agents typically wait years before they are deemed ready for undercover work. "The placement of an agent [into an undercover operation] right out of the academy is very unusual," Vasquez said. "Mr Lau had never seen a case file, worked a case, arrested anyone ... No one had ever taken an undercover assignment right out of the academy as Mr Lau did, before he was even an agent." Vasquez, who followed Lau's career, concluded that Lau "was probably recruited by the FBI for a specific operation".

After graduation, Lau was assigned to the Chicago FBI office, which houses one of the Bureau's most active foreign-counterintelligence centers, and he began working espionage cases undercover. He asked his bosses to tell him how much danger he was in. "'Will I get my tail shot off or will I get, you know, killed?' I asked [about] all the dangerous scenarios. Do you know what the answer was, ladies and gentlemen?" Lau asked an FBI security committee in 2000. "Nobody knew, because nobody had ever done it before ... I was told that I was the second FBI agent in history then, back in 1986, to attempt this project."

In five years, he saw the inside of the FBI's office once. He was living another life, that of a Chinese businessman and an associate of Chinese organized-crime figures. He was so far undercover that other FBI agents placed him under surveillance.

"Then they'd get all pissed off because nobody had bothered to tell them and they wasted all this manpower doing surveillance of me," Lau recalled. "Most of the time the right hand didn't know what the left hand was doing."

"Mr Lau was in deep cover. Mr Lau did not go home at night. He did not see his family," former FBI training official Vasquez said. "Mr Lau's credentials and badge were in the vault in the field office. He did not get a chance to see or hold his badge. When I visited him, he would ask to see and hold my badge."

According to the statements the Justice Department struck from the public record as secret - which seems to confirm their veracity - Lau twice went overseas, once in November 1987 and again in September 1989, as an undercover FBI agent. Prior to his first trip overseas, he was betrayed by a high-level FBI asset. The country he revisited in the fall of 1989 was then in turmoil, which accurately describes China at the time. Also stated was the fact that he had briefed CIA agents on his area of expertise, which happens to be China.

"I don't think there's much mystery left as to which country Lau was working in," newspaper lawyer Francke said jokingly. "It doesn't sound like he was in Denmark."

"During November of 1987, the historic trip turned out to be very stressful, with subjects giving me enhanced scrutiny during the visit, personnel armed with machine-guns were a constant reminder to me of my fate if something went wrong," Lau wrote in

one section that was deemed classified. Because Lau was in China posing as a businessman instead of a diplomat, which is the typical cover used by CIA agents, he had no diplomatic immunity to spying charges. If caught, he would have been imprisoned or executed, not merely deported.

The month-long trip was a success, Lau said in another classified section, "and my accomplishments had exceeded all expectations. The skeptics made me undergo an extensive polygraph test to ascertain my loyalty and accomplishments."

According to the Justice Department, those bits of information are state secrets because they have been "deemed to describe intelligence methods and activities that are used in the FBI's present intelligence, counterintelligence and count-terrorism investigations". They are such important secrets that even the lawyer defending the FBI against Lau's lawsuit, assistant US attorney Kristin Horn, isn't allowed to know them. "I don't have a security clearance high enough," she explained.

Declassified FBI documents suggest that by 1991, Lau was deep inside the Chinese diplomatic community. In his performance review for that year, Lau's supervisor wrote: "SA LAU continues working in an undercover capacity in a complex, sensitive investigation of a major criteria country diplomatic establishment. He has succeeded in becoming a trusted confidant of numerous subjects of investigation and has also penetrated the 'inner circle' of the subject community. As a result, he obtains singular and sensitive information ..."

Lau's undercover mission was so productive, court records show, that then-FBI director William Sessions flew to Chicago in January 1988 to commend Lau personally and award him a bonus check for his work. One of his supervisors, former top FBI official Michael Waguespack - whose forte was Soviet intelligence and Chinese industrial espionage - described Lau's work in a 1992 report as an "exceptional performance".

Asked why he thinks the FBI wants to keep his highly lauded achievements secret after so many years, Lau replied that in the world of counterintelligence, there is often no such thing as "too" long ago. "Counterintelligence work takes time to produce results. It is like wine sometimes. The longer it ages," he said, "the more valuable it becomes." Sometimes, Lau suggested, double agents recruited at a young age eventually end up as influential policymakers or military officials.

There may be other reasons for the Bureau's squeamishness about Lau's career becoming public: it is likely he was committing crimes as part of his undercover role, crimes the FBI would have authorized Lau to commit.

"From a reading of the record, it is not difficult to discern that Lau was involved in espionage activities, kidnappings, trading in human slavery, illegal immigration, murder, torture, extortion, hostage-taking and any number of other criminal activities that involved crimes against humanity," claims a partially classified brief filed in support of Lau by the League of United Latin American Citizens. "Lau penetrated the Chinese Triads, the Tong, and other Chinese Organized Crime Organizations that trade in all of these things as a way of life ... For six years Lau had to be on

his guard and had to participate in whatever these hostile forces demanded of him."

Lau would neither confirm nor deny that. "I'm not going to discuss that issue without immunity," he said flatly. But he asked if it made sense to imagine that an FBI undercover agent could gain the trust of a hostile foreign power by "just walking into some country and saying, 'Hi, I'm Lok Lau and I'd like to be your friend.' It doesn't work like that."

Lau's lawsuit against the FBI claims that his undercover assignment left him emotionally scarred and suffering from stress-induced disorders, but the FBI rebuffed his requests for counseling, saying there were no therapists with security clearances high enough to hear those kinds of woes. Lau asked the Bureau to find someone, and he was assured something would be done.

"The FBI failed to ... grant anyone the authorization to listen to classified information presented by Mr Lau," the FBI's Access Review Committee, which decides matters regarding security clearances, declared in a blistering 2000 decision. "The [committee] cannot endorse the actions of the FBI."

Lau's frustrations finally boiled over in a Sears store in Ann Arbor, Michigan, on Christmas Eve in 1990. Pocketing some paintbrushes, Lau tried to leave without paying for them. He was stopped and charged with shoplifting, to which he pleaded guilty. The FBI did an internal investigation and concluded that the stress of Lau's double life "contributed to your uncharacteristic display of impetuous poor judgment" and was a misdeed the Bureau could live with, given "the difficult and challenging circumstances you encountered during the first five years of your career". Lau immediately went back undercover; years later he served a two-week suspension. No one, apparently, thought an FBI agent caught shoplifting might need psychiatric help; in any event, none was offered.

A few months later, the undercover operation ended and, after six years in deep cover, Lau finally came in from the cold. He was through with undercover work, and he asked to be transferred to the Seattle office as a field agent so he could be close to his family, none of whom were allowed to know where he was or what he'd been doing since the mid-1980s.

His superiors in the Chicago FBI office, citing his undercover performance, strongly backed Lau's request, but FBI headquarters inexplicably rejected their recommendation. "I feel very strongly that as an institution the FBI mishandled SA Lau's transfer," former Chicago FBI official Waguespack complained in 1992. At the time, Waguespack was director of counterintelligence for the National Security Council.

Instead, the FBI granted Lau his fourth and final preference: the Sacramento office, where the resident agent, Deborah Pierce, soon began "building a book" on her slightly eccentric new hire, who had never worked in an FBI office before. His employment files for those years show he was assigned mostly mundane chores and every bureaucratic misstep and social faux pas he committed was duly noted and filed away:

"He laughs and tells stories to fit in when he joins a group, but his stories don't always fit the circumstances and he laughs at inappropriate places."

"He appeared to be trying to gain favor from his peers by being funny."

"Lau gave one of the steno clerks a T-shirt for doing his typing ... Lau's behavior resulted in this individual feeling uncomfortable."

In 1995, Lau asked for a transfer to the night shift because it paid more and because he had been having trouble sleeping. When his supervisor, Pierce, spoke to him about it, he "informed me that he liked to do the midnight shift for other people because then they would like him", she noted in a report. Those statements were later used against Lau in a fitness report - evidence, according to Pierce, that he was "overly concerned about money" and trying to "curry favor" with his co-workers. Those aberrations led Piece to conclude that Special Agent Lok Lau was "vulnerable to approach from a foreign government" and she told her superiors she considered Lau "a potential security risk" because of his poor attitude and his dislike of his current job.

For Lau, a naturalized citizen, it was his official death sentence as an FBI counterintelligence agent, and the Bureau's unkindest cut. "I risked my life for this country, for this agency, for six years. I had a top-secret security clearance," Lau complained. "I had a higher security clearance than she did."

"We needed a record to show poor performance and now have a year's worth," Pierce gloated in a handwritten 1995 memo to another FBI supervisor. "Now we have to start on the poor performance for investigations, which may take another year or more. Maybe we can get HIM to make the move out." Soon, the FBI took away Lau's gun, allegedly for medical reasons, revoked his Top Secret clearance, and confined him to working during daylight hours. Meanwhile, his supervisors chided him for his "delusions of persecution by management".

Assigned to copy files for other agents and run background checks on FBI job seekers, Lau began a mental meltdown and once again sought psychiatric care. Once again, the FBI declined.

"The FBI clearly failed in its obligations to provide Mr Lau with psychological treatment and organizational support," the FBI's Access Review Committee concluded. "The ARC unanimously agrees ... that Mr Lau did not receive appropriate support or psychological treatment." But it upheld the decision to lift Lau's security clearance anyway.

During the 1996 holiday season, Lau went into a Raley's supermarket in Sacramento and pilfered some toothpaste and a Master Lock. He was caught by a security guard, wrestled to the ground, handcuffed and hustled into a back room, where he pleaded with the guard to let him go, saying he was an FBI agent and would lose his job if he was prosecuted. The store pressed charges anyway, but the District Attorney's Office dropped them "in the interests of justice". Lau never told the FBI about it. And that was all it took for the FBI - which discovered the shoplifting incident several years later - to kick him out the door. Since then

he has been fighting, unsuccessfully, to get his job back.

Assistant US attorney Horn, who succeeded in getting his discrimination suit dismissed a few days ago, called Lau's claims "ludicrous" and said the FBI had perfectly good reason to fire an agent who steals and lies. His years of undercover work, she said, "are irrelevant to this case". To help ensure that, Horn got Lau's expert witnesses - psychiatrists who diagnosed him as suffering from post-traumatic stress disorder and major depression - barred for failure to meet a filing deadline. "He can't introduce anything pertaining to stress, or his undercover work. He doesn't have much of a case left," Horn said in an interview shortly before the suit was dismissed.

Former FBI official Vasquez believes the travails of Lok Lau are a tragedy. "The FBI used Mr Lau and then, when it was over, discarded him," Vasquez stated.

"Everyone is disposable," Lau said matter-of-factly. "No matter what."

(Copyright 2003 Asia Times Online Co, Ltd. All rights reserved. Please contact content@atimes.com for information on our sales and syndication policies.)



# TAIPEI✦TIMES

No material from Asia Times Online may be republished in any form without written permission.
Copyright 2003, Asia Times Online, 4305 Far East Finance Centre, 16 Harcourt Rd, Central, Hong Kong

Privacy and Legal Policies

*03/11/03*

### FILE SHARING PITS COPYRIGHT AGAINST FREE SPEECH
*New York Times via Corante.com*

The New York Times has a piece on a different type of filesharing. Diebold Election Systems' fight against college students is raising legal questions about file sharing and freedom of speech. Students are posting internal Diebold memos that cast a harsh light on the company's election systems. Diebold has responded by trying to stifle critics using the DMCA's takedown provisions to remove the memos from the Web. Students argue that they are using civil disobediance to spread the word about flaws in Diebold's voting systems, and that fair use protects the posting of Diebold memos. Siva Vaidhyanathan, a professor, of culture and communication, says that the case shows that file sharing is more than an issue of swapping music. "We're so focused on the microview -- whether EMI is going to make a buck next year -- but there is so much more at stake in our battle to control the flows of information."

*Source: http://www.corante.com/policy/redir/32533.html*

---

*02/11/03*

### FBI SPY REVELATION COULD BE A THREAD THAT UNRAVELS THE BUREAU
*Commondreams.org (30/10) -- heavily edited, please see original*

The revelation is so sensitive that in the wake of the secret surfacing, the FBI has embarked on a mad scramble to cover up the evidence. [...] The controversy stems from a civil rights case filed in federal court in Sacramento, Calif., by former FBI agent Lok Thye Lau [... who] was engaged as a spy in a dangerous undercover assignment that required him to "work against hostile and aggressive foreign powers for years." [...] Why have you heard so little about this case? Well, for the most part, the mainstream media has ignored it [...] the U.S. Attorney's Office and FBI sought permission from the court to seize any computer that they suspected of containing the previously public court documents.

[...] If you recall, the American people were told immediately following 9/11 that the FBI (a domestic law enforcement agency) and the CIA (an overseas intelligence agency) were hamstrung by their agency turf limitations and their inability to share intelligence information. To solve the problem, Attorney General Ashcroft brought us the Patriot Act, which broke down the wall between the FBI and CIA in the intelligence game. Well, if Lau's spy story is true, then that wall may have never existed to begin with, and Ashcroft's Patriot Act argument was based on a false premise.

*The California First Amendment Coalition put its neck on the line by actually posting the controversial "sealed" court pleadings on its Web site at:*
*http://www.cfac.org/Attachments/fbi_spy_story.html*
*Source: http://www.informationclearinghouse.info/article5114.htm*

---

*02/11/03*

### HOUSE NIXES ANTI-PROFITEERING PENALTIES



**Guardian**

"The Guardian Review -
exemplary coverage of ideas, books and arts
that matter; unfashionably intelligent; a pleasure to read."

Sign in | Register

Go to: | Guardian Unlimited home ▼ | Go

**Guardian**Unlimited  **Guardian**Unlimited

| Home | UK | Business | Online | World dispatch | The Wrap | Weblog | Talk | Search |
| The Guardian | World | News guide | Arts | Special reports | Columnists | Audio | Help | Quiz |

**Breaking
news**

# Request to Erase Classified Files Nixed

**Wednesday October 22, 2003 11:01 PM**

**By TED BRIDIS**

**Associated Press Writer**

New York Tourism
Booms During
Holiday
**10:31 am**

Clark's Income
Skyrockets After
Career Move
**10:16 am**

Dem. Front-Runner
Dean Comes Under
Attack
**10:16 am**

Ex-Female Combat
Pilot Can't Sue
Critics
**10:01 am**

Bush: Halliburton
Must Pay for
Overcharge
**9:46 am**

N.D. Search for
Student to Resume
on Sat.
**9:16 am**

Schwarzenegger
Signs Calif. Fiscal
Plan
**8:46 am**

WASHINGTON (AP) - The Justice Department says it may renew an extraordinary request to let the FBI conduct a search-and-destroy mission on any computers harboring classified information about a 1980s case that temporarily became public in a lawsuit. A federal judge previously rejected the idea.

The initial request from federal prosecutors in Sacramento, Calif., was considered highly unusual by legal experts because it did not specify which computers the government believed might contain the classified information or how agents would retrieve and destroy information already made public.

``This stuns me,'' said Kate Martin, director for the Washington-based Center for National Security Studies. ``I have never heard of them asking for such authority before. It's very disturbing that the FBI is contemplating going out and secretly examining hard-drives to see whether they contain this information.''

Assistant U.S. Attorney Kristin S. Door in Sacramento said she was researching laws that might support renewing the government's request.

At issue are two court filings in a suit by a former FBI counterintelligence agent. The documents include brief references to a one-month undercover trip overseas in late 1987 by the agent, Lok T. Lau, who was fired for shoplifting more than a decade later and is suing over his dismissal.

The documents - still containing the classified material - were available from the courthouse for up to 19 days. Copies have been published on the Internet, including the Web site for the Sacramento-based California First Amendment Coalition, an

Judge Rips Lawyers
in Detroit Terror
Case
**8:46 am**

Historians: D.C.
Boundries Were
Different
**8:46 am**

Rowland Says
Others Helped Pay
for Home
**8:46 am**

From the Associated Press

open-government group.

The organization's lawyer, Terry Francke, said he had not yet been contacted by prosecutors or the FBI. The documents were available on the group's Web site Wednesday.

Lau's attorney, Tony Silva of El Paso, Texas, said government investigators contacted him as recently as Tuesday to question whether his law firm's computers might contain the classified information.

Silva told the government that copies had been stored on floppy disks and were deleted using special software to ensure the data could not be recovered.

The government did not tell the judge how it might determine who copied the classified material onto the computers, nor did it suggest whether it already has searched anyone's hard drives for the documents. In the past, the FBI has usually surrendered efforts to protect classified documents once they become widely available publicly.

``If the text is published in a newspaper or a document is posted on the Web, it's futile to attempt to recover it,'' said Steve Aftergood, director of a project on government secrecy at the Federation of American Scientists. ``Information moves faster today that ever before.''

The legal skirmish occurs amid heightened sensitivity within the Bush administration over intelligence leaks, as the Justice Department tries to find out who revealed the name of the undercover CIA officer married to former Ambassador Joseph C. Wilson.

``It's completely unheard of that the FBI would try to exercise that kind of control,'' said James X. Dempsey, an expert on national security with the Center for Democracy and Technology in Washington.

U.S. District Judge Garland E. Burrell Jr. agreed with the government's request to remove the classified documents from the court file and substitute sanitized versions. But in his decision last week, Burrell rejected as ``unsupported by authority'' the government's broader request to seek out and delete any electronic copies that might have been downloaded onto others' computers before they were effectively sealed.

The classified sections of the court papers describe a covert mission by Lau in November 1987 to a country he does not identify. Lau said he was warned the night before his trip that one of the FBI's ``highly placed assets'' betrayed his identity as an undercover FBI agent, but, to avoid confirming the disclosure, he did not cancel the trip.

``Personnel armed with machine guns were a constant reminder to me of my fate if something went wrong, and there were frequent roadblocks on my route of travel,'' Lau wrote. ``I

anticipated death on several occasions, but I somehow survived it all."

Lau argued that the stress of his undercover assignments led to what he describes as his ``aberrant'' behavior that resulted in his firing. He said he was unconcerned he might be prosecuted for disclosing classified information, noting that he withheld some details from his court papers, such as the country where his mission took place.

``I know the bureau will try to prosecute me and discredit me at every opportunity,'' Lau said. ``Whatever national security argument the FBI is making is hogwash.''

Burrell denied the government's Oct. 10 motion ``without prejudice,'' meaning prosecutors may renew their request.

Door, the prosecutor, said she was researching laws that might support such a decision. She acknowledged that even she does not have sufficient government clearance to read the classified documents.

``We're hoping there has been no harm,'' Door said. ``As soon as the FBI determined it was classified, we moved promptly to try to retrieve it from the public record.''

Guardian Unlimited © Guardian Newspapers Limited 2003

# Wednesday on codshit.com

## FBI spy revelation could be a thread that unravels the bureau

**Go back to bed America... Go back to bed Europe.... Sweet dreams China, don't let the terrorists bite... Only question is: WHO EXACTLY ARE THE TERRORISTS??????**



Evidence has surfaced recently that the FBI has been spying on foreign nations for years.

The revelation is so sensitive that in the wake of the secret surfacing, the FBI has embarked on a mad scramble to cover up the evidence. The Bureau has gone as far as to pressure a federal judge into sealing previously public court records that open a window on the FBI's overseas spying mission.

In addition, with the help of the U.S. Attorney's Office (John Ashcroft's Justice Department) the FBI also sought, through a proposed court order, to seize any computer anywhere that the Bureau suspected might have contained the sensitive court pleadings.

The controversy stems from a civil rights case filed in federal court in Sacramento, Calif., by former FBI agent Lok Thye Lau. In his case, Lau filed a Declaration in late September that detailed his FBI career and the fact that he was engaged as a spy in a dangerous undercover assignment that required him to "work against hostile and aggressive foreign powers for years." Although he is precluded from discussing specifics about that assignment due to national security concerns, the public record available on his case indicates that the likely target country was China.

Why have you heard so little about this case? Well, for the most part, the mainstream media have ignored it—and consequently, the serious implications raised for civil liberties in this country. As evidence of how the big media were asleep at the wheel in this case, it was the San Antonio Business Journal, a small weekly in South Texas, that broke the story in early October.

After the Business Journal's story was already in print, a federal judge sealed the public court records that the newspaper used for that story. Those records included Lau's declaration and a friend-of-the-court brief filed by the League of United Latin American Citizens (LULAC), one of the nation's oldest Hispanic civil rights groups.

In addition, after the Business Journal's story had hit the streets, the U.S. Attorney's Office and FBI sought permission from the court to seize any computer that they suspected of containing the previously public court documents. The court, for now, has refused to grant the FBI that power.

The Associated Press followed the Business Journal's exclusive by publishing a story on the government's efforts to seize computers. In addition, several 1st Amendment press organizations have given the story attention—such as the Reporters Committee for Freedom of the Press.

The California First Amendment Coalition put its neck on the line by actually posting the controversial "sealed" court pleadings on its website. A web blog (bigleftoutside.com/) also stepped out on a limb and put links to the pleadings on its site.

The latest development in this breaking story was an effort by the U.S. Attorney's Office in Sacramento to pressure LULAC and Lau's lawyers to turn over documents and computers to the FBI absent a court order.

According to LULAC, the official from the U.S. Attorney's Office who contacted the group stated that he wanted to "shut down media coverage" on the case.

So why all the fuss?

Full story...

*posted by ewar @ 8:27 PM*

Direct Link ::: Tell me what you think ::: Sign the Guestmap ::: Back to the Headlines

## When Did "Arab" Become a Dirty Word?

I think I have to agree with Dr. Mahatir of Malaysia, he has the courage to say that which all others fear. When you see fascism it's best to describe it accurately and voiciferously because otherwise you'll end up with a jack-boot crushing your throat. To voice dissent is to embody the spirit of democracy, to cow-tow to those who would seek to silence opposition is to simply make it easier for fascism to take root and flourish - how many of you want that?

## Smearing Said and Hanan Ashrawi

# OCNUS.NET

**News Before It's News**

Last Updated: **Dec 13th, 2003 - 09:25:32**

Front Page

**Africa**

**Analyses**

**Business**

**Dark Side**

**Defence & Arms**

**Dysfunctions**

**Editorial**

**International**

**Labour**

**Light Side**

**Research**

Search

[_____] **Go**

[Entire Site ▼]
Advanced Search

# DARK SIDE

## The Spy Who Was Left Out in the Cold

By Gary Webb, Asia Times 6/11/03
Nov 8, 2003, 11:15

Email this article
Printer friendly page

SACRAMENTO, California - As far as can be told, former Federal Bureau of Investigation agent Lok Lau may be a genuine American hero, the first agent in FBI history to penetrate the top levels of the Chinese government. But the US Department of Justice is doing everything in its power - and some things that aren't - to prevent even the tiniest detail of Lau's highly classified work from becoming public.

As far as the Justice Department is concerned, Lau is nothing more than a lying, thieving malcontent who was fired for shoplifting $15 worth of merchandise from a California supermarket. And that's the way the US government would like to keep it.

The full truth about Lok Lau and his six-year-long foreign-counterintelligence mission may never be known. But judging from information that briefly became public as a result of an employment-discrimination suit Lau filed against the FBI - and the Justice Department's frantic efforts to purge the public record of what it claims were national-security secrets "illegally" divulged by Lau and his lawyers - the 46-year-old Singapore native was involved in some very heavy, very clandestine and very dangerous work inside the People's Republic of China, on behalf of US intelligence, for years.

It is also clear that once Lau's highly praised undercover assignment was completed, the FBI decided he was a liability and began a concerted effort to get rid of him, which it eventually did.

Why the FBI turned with such vengeance against an agent its own director had personally commended for heroism is not known, but it wasn't because Lok Lau wasn't good at his job. If anything, his problem might have been that he was too good at it.

That Lau - who worked for the FBI as a special agent (SA) from 1986 until 2000 - is the possessor of powerful secrets is beyond dispute; it is a matter that has troubled the FBI for some years, records show. Lau was considered so hot that in 1998 the FBI decided it could never put him on a witness stand because of "the extremely sensitive nature of SA Lau's assignment".

A year later, as the Bureau contemplated firing Lau, FBI headquarters asked its National Security Division in a secret memo "to conduct an additional evaluation of the damage that might result if, as seems likely, the circumstances of this Agent's career are publically [sic] disclosed". One option the

## DARK SIDE
## Latest Headlines

Baradei Tries Unilateral Disarmament

Monsters and Cannibals at War in Haiti

Voting Machines Gone Wild!

Karimov Returns to Square One

Capitol Kickbacks

China's Secret Plague

Nathaniel Jones: A 350-Pound Black Man

The Syrian-Produced Ramadan TV Special

Turkey, Losing Its Fine Balance?

Camp Museum Honour Zeks