```
LAW OFFICES OF GARY W. GORSKI
8549 Nephi Way
Fair Oaks, CA  95628
Telephone:    (916) 965-6800
Facsimile:    (916) 965-6801
usrugby@pacbell.net
www.gwgorski.com
GARY W. GORSKI - CBN:  166526
Attorney for Plaintiff

Co-Counsel
DANIEL M. KARALASH - SBN: 176422
(916) 787-1234
(916) 787-0267
```

THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID K. MEHL; LOK T. LAU; FRANK FLORES<br>            Plaintiffs,<br><br>vs.<br><br>LOU BLANAS, individually and in his official capacity as SHERIFF OF COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; COUNTY OF SACRAMENTO; BILL LOCKYER Attorney General, State of California; RANDI ROSSI, State Firearms Director and Custodian of Records.<br>            Defendants | CASE NO.: CIV S 03 2682 MCE/KJM<br><br>**PLAINTIFFS' ADDITIONAL MATERIAL FACTS IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND COUNTER MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 78-230(e)**<br><br>Date: November 16, 2007<br>Time: 9:00 a.m.<br>Ctrm: 3<br>Judge: Honorable Morrison C. England, Jr. |

1. Amber Wong first started working for the Sheriff's department as a Records Clerk in October of 2001 when Lou Blanas was still Sheriff. Pl. Exh. "B", Wong. 7:14-21

2. In November of 2003 when Blanas was still Sheriff, Wong began her involvement with the process of the issuance of CCWs, or concealed weapons permits.  Wong Depo. 8:11-23

3. In November of 2003, Wong was appointed as a Senior Records Specialist.  Prior to this the position was held by Ruth Trembly. Pl. Exh. "B", Wong Depo . 9:3-13

4. Wong admitted that she "had an idea" that the reason she was present for her deposition was in regards to "my CCW permits". Pl. Exh. "B", Wong Depo . 10:3-6

5. Wong handles "all incoming applications, process[es] them, to where they need to go for the reviewing detective." And "keep[s] the files updated as far as the renewals of the permits, making sure proper documentation is maintained within the files." Pl. Exh. "B", Wong Depo . 10:10-17

6. In November of 2003 the people having access to the cabinets where the CCWs were kept were the members of the Special Investigations Unit; some of whom were, Lieutenant Tim Sheehan, Sergeant Mike McKeal, Detective R.L. Davis, Detective Mike Wright, Detective Santos Ramos. Pl. Exh. "B", Wong Depo . 11:21-25 thru 12:1-4

7. The Special Investigations Unit is now referred to as the SIIB or Special Investigations Intelligence Bureau. In November of 2003, the persons in the SIIB, were the "paper processor" (Wong's position) and the reviewing detectives. Pl. Exh. "B", Wong Depo . 12:18-25 thru 13:1-4

8. In November 2003, the location of the office for the processing of CCWs was "across the hall and diagonal" from the sheriff's office; in other words "directly across from the sheriff's office". This only changed "two months ago [from the date the deposition was taken]". Pl. Exh. "B", Wong Depo . 13:8-24.

9. In November 2003 it was not Ruth Trembly who told Wong how to handle a CCW application. Wong was told how to handle the CCWs "between phone calls with Department of Justice and Detective Steve Bray" who told her to "Have them filled out and process it as you will." Pl. Exh. "B", Wong Depo . 15:10-21

10. 10. Wong is familiar with the Section Seven on the CCW application form; a standard application for CCWs from the DOJ. DOJ told her that it is a standard statewide form. Pl. Exh. "B", Wong Depo . 14:20-25 thru 15:1-6

11. Bates Stamps on the documents D 03424 through D 03430 are stipulated as being Wong's Bates Stamps. Pl. Exh. "B", Wong Depo . 16: 7-12

12. Wong was shown a Section Seven where it "says, interview, investigations interview notes" and she said she saw it. Pl. Exh. "B", Wong Depo . 16:18-20

13. Wong said she had read the instructions on the CCW application which said that the

|   |     |   |
|---|-----|---|
| 1 |     | investigator will contact the application to fill it out and that the applicant is not to fill it |
| 2 |     | out.  Pl. Exh. "B", Wong Depo . 17:1-7 |
| 3 | 14. | Wong said that there are times where people did and did not fill out the application when |
| 4 |     | they were submitting it.  When it was not filled out she would try to contact the applicant |
| 5 |     | to gather the information and then fill the form out for them.  However, this procedure |
| 6 |     | "briefly" changed; though she cannot recall the exact date. Pl. Exh. "B", Wong Depo . |
| 7 |     | 17:12-25 thru 18:1-8 |
| 8 | 15. | At the time the procedure "briefly" changed, in order to "coincide with the instructions of |
| 9 |     | the application", SIIB followed the "actual application instructions versus what we were |
| 10|     | doing and had the applicant come in, sit down with [Wong] where [Wong] completes |
| 11|     | page 11 with them face-to-face, as well as page 12".  Wong would hand write the notes |
| 12|     | in, and currently follows this same procedure.  Pl. Exh. "B", Wong Depo . 18:15-25 |
| 13| 16. | 'Currently' the application procedure would be that the applicant would come in to hand |
| 14|     | the application to Wong, at which time she would fill it out with the applicant standing in |
| 15|     | front of her.  Pl. Exh. "B", Wong Depo . 19:4-11 |
| 16| 17. | If the public telephones Wong and asks her, they can find out the specific times during |
| 17|     | which they may apply  for a CCW.  Pl. Exh. "B", Wong Depo . 19:18-20 |
| 18| 18. | Other than the FBI and Ms. Pappone, only members of the SIIB would "occasionally" ask |
| 19|     | for a certain CCW application on a person.  Pl. Exh. "B", Wong Depo . 25:4-9 |
| 20| 19. | Since the change to the process, the "Investigator's Notes" portion of the Section Seven |
| 21|     | of the CCW application, wherein the application is explained or justified, is filled out by |
| 22|     | the "reviewing detective" who contacts the applicant "via phone".   Pl. Exh. "B", Wong |
| 23|     | Depo . 26:7-17 |
| 24| 20. | Prior to the "changes" noted previously it is "fair to say there was an ambiguity as to how |
| 25|     | the application was to be filled out and by whom".   Pl. Exh. "B", Wong Depo . 26:21-25 |
| 26|     | thru 27:1-3 |
| 27| 21. | There was no written policy or any instructions regarding implementing the "change" in |
| 28|     | policy for filling out the forms. Pl. Exh. "B", Wong Depo . 27:22-25 |

3.

22. Prior to, or in and around November 2003, the general procedure for someone applying for a CCW, was that they would turn in a fully completed application with their filing fee. If the application was incomplete Wong would try and contact the person. If she was unable to do so she would mail the form back with a letter telling them to fill out the form completely. It would not have been considered proper procedure to place a 'sticky' on the area which required further information. Pl. Exh. "B", Wong Depo . 29:7-25 thru 31:1-10

23. After the applicant had submitted an application, Wong would put a cover letter on it to go before a detective. The cover letter would show the applicant's name and occupation, and the reviewing committee member's signature. Pl. Exh. "B", Wong Depo . 31:17-21

24. The document Bate stamped D 030423 is a cover letter.   Pl. Exh. "B", Wong Depo . 31:22-25

25. Wong's personal understanding was that after the detective received the application, he would contact the individual if there were further questions regarding the application. Pl. Exh. "B", Wong Depo . 33:18-25 thru 34:1-5

26. There were three names listed as the committee members, in addition to an appellate decision maker. Pl. Exh. "B", Wong Depo . 34:6-12

27. Though she doesn't take any notes, Wong is present at the committee meeting. This committee tries to meet every six to eight weeks. Pl. Exh. "B", Wong Depo . 35:24-25 thru 36: 1-14.

28. Wong has heard of applications that were approved wherein the applicant asked for a CCW "just for self defense". Pl. Exh. "B", Wong Depo . 40:9-23.

29. An application has to go through the committee to be approved. Wong has the files saying approved and denied. Pl. Exh. "B", Wong Depo . 41:10-13. However, Defendant Blanas has bypassed this so-called procedure, and provided CCWs to those whom he personally knows - directly, without any committee overseeing the application. Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7.

30. Wong knows of "only two" applications which were approved with a CLETS check,

|     |     |
|-----|-----|
| 1   | criminal just background check, or a range card.  They were originally issued as |
| 2   | "emergency first while we could get the DOJ stuff done".  Pl. Exh. "B", Wong Depo . |
| 3   | 44:4-11 |
| 4   | 31.  When shown her, Wong recognized **Plaintiff's Exhibit 2**, pages six of 10 and she |
| 5   | recognized the name Pasquale Montesano, as being from one of her previous files. Wong |
| 6   | said that this file "expired 10/22/06."  Pl. Exh. "B", Wong Depo . 51:8-21 |
| 7   | 32.  Sergeant McKeal told Wong to start processing an "emergency" CCW on Edwin Gerber. |
| 8   | This would effectively give Gerber a 90 day CCW permit prior to his standard two-year |
| 9   | permit.  Gerber did not have a range card indicating a required 64 hour class,  nor did he |
| 10  | have a CLETS criminal history background check.  Pl. Exh. "B", Wong Depo . 62:7-25 |
| 11  | thru 63:1-10; see also Exhibit E. |
| 12  | 33.  Ed Gerber did "eventually get a range card".  Pl. Exh. "B", Wong Depo . 65:19-21; see |
| 13  | also Exhibit E. |
| 14  | 34.  A CCW Permit Evaluation was marked as Plaintiff's Exhibit 5.  Pl. Exh. "B", Wong |
| 15  | Depo . 67:1-14 |
| 16  | 35.  Wong identified Exhibit 5 as one that she had created a file for.  It is Wong's handwriting |
| 17  | where it says "Edwin".  The application says "Occupation, business owner".  Pl. Exh. |
| 18  | "B", Wong Depo . 79:22-25 thru 80:1-20 |
| 19  | 36.  On the first page of Exhibit Five, Bates stamped D 03548, Wong did not make the check |
| 20  | mark approving the application.  Wong recognized the handwriting used to make the |
| 21  | approving signature as being that of Sheriff Blanas.  Wong personally typed in, |
| 22  | "Approved by Sheriff Blanas", after being told to do so by Sergeant Mike McKeal.  To |
| 23  | her knowledge, Wong believes that Sheriff Blanas told Sergeant Mike McKeal that |
| 24  | Gerber's application had been approved.  Pl. Exh. "B", Wong Depo . 83:11 thru 85:7 |
| 25  | 37.  Wong could not recall the emergency regarding Gerber's emergency issuance of a CCW |
| 26  | permit.  The handwriting on the permit stating, "Carry large sums of cash ... expensive |
| 27  | jewelry" was already filled out when Wong saw the form.  Wong was simply told that |
| 28  | Gerber had a "need" for the permit.  Pl. Exh. "B", Wong Depo . 85:22 thru 86:20; |

1  62:7-25 thru 63:1-10; see also Exhibit E.

2  38. The committee had never met on Gerber's application.  From Wong's understanding of
3  the committee's approval process, Gerber's criteria for approval was not "typical criteria
4  for approval."  However, once the application had been approved by the Sheriff it doesn't
5  go to the committee.  Pl. Exh. "B", Wong Depo . 87:6-22; 85:22 thru 86:20; 62:7-25 thru
6  63:1-10; see also Exhibit E; Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7.

7  39. Wong believes that "there are a few" other applications which have also bypassed the
8  committee and been approved only by the Sheriff.  Pl. Exh. "B", Wong Depo .87:23 thru
9  88:1

10 40. Some of the forms on the applications have never been filled out.  They might have been
11 added on after the fact, after the committee had already met, if it was an older file.  There
12 could be many reasons.  Pl. Exh. "B", Wong Depo . 88:19-22

13 41. For a CCW renewal it was up to the reviewing detective to decide whether the individual
14 should continue "carrying".  The committee would not meet on a renewal of a permit.  Pl.
15 Exh. "B", Wong Depo . 89:7-16

16 42. Wong believes that it is fair to say that the renewal process is treated differently than a
17 new applicant process.  Pl. Exh. "B", Wong Depo . 96:24 thru 97:2

18 43. Wong has never seen a renewal come back disapproved.  Pl. Exh. "B", Wong Depo .
19 98:5-7

20 44. When Edwin Gerber's application was approved by Sheriff Blanas there was no
21 committee meeting on the matter.  The initial application indicates it was July of 2006.
22 The committee did not meet until March of 2007.  Pl. Exh. "B", Wong Depo . 98:16-25;
23 Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7.

24 45. When the committee met to discuss Gerber's permit, Wong was present and said that the
25 committee did not see a valid reason for him to be carrying a permit.  Pl. Exh. "B", Wong
26 Depo . 101:7-12

27 46. Wong created the Gerber approval document and Blanas signature was placed on it
28 afterwards.  Pl. Exh. "B", Wong Depo . 105:3-8.

47. A few other times Wong remembers that Sheriff Blanas had personally approved applications but can't recall the names offhand.   Pl. Exh. "B", Wong Depo . 105:16-25.

48. Wong remembers a few emergency permits had been approved by the Sheriff.  No one else had approved any other emergency CCW permits.  Pl. Exh. "B", Wong Depo . 106:6-18

49. Defendant Blanas was recruited by then Sheriff Glen Craig commencing in 1987, to raise money for Craig's three election campaigns for Sheriff.  In return, Craig hired Defendant Blanas into a Captain's slot without even taking a Captain's exam, by-passing approximately 1600 sworn deputies opportunities to advance in the Sheriff's Department. From their, Defendant Blanas advanced upon to Undersheriff faster than any other officer in the Department, even though Defendant Blanas was not even qualified for the rank of Sergeant with the Sacramento City Police Department in that he failed the exam two, "maybe" three times.  In fact, one of the first assignments for Defendant Blanas was supervising CCW issuance.  Blanas Depo. 8:1-16:23, 31:9-39:24.

50. Exhibit R is an accurate compilation of large volumes of CCW Application data and campaign records, accurately reflecting a summary of the approximate 4000 pages of documents produced by Defendant Blanas and Defendant County of Sacramento Sheriff's Department under the penalty of perjury. is the database described herein were created for the express purpose of: 1. allowing computerized analysis of a large amount of information, and 2. providing a Bate Stamp reference back to the source document. The four step process of correlating those who contributed with those who received or did not receive a CCW was accomplished as follows.

51. First, from the CCW source documents obtained from Defendants, information regarding names, addresses, and dates of issuance or denial were entered into a database.  At this point no Bate Stamps were recorded.  This database information was "scrubbed" for errors such as misspellings and cross-checked back with the source documents, then exported into a more sophisticated SQL server-type program.  This more sophisticated program allowed further tailoring in order to input information obtained from campaign

1  contribution records.  These are known as RDBMS or relational database management
2  systems because they allow sophisticated querying, comparisons, and analysis of
3  information relationships.

4  52.  Second, selected information from all the campaign contribution records provided in
5  discovery under the Penalty of Perjury were inputted into a database.  This information
6  included names, companies, and names listed with companies, including addresses, Bate
7  Stamps on the documents the information was taken from, and in many cases amounts of
8  contributions by the donor individuals or companies.  Through the year 2000 an effort
9  was made to enter most of the information available.  This information was briefly
10 analyzed for relationships between CCWs, contributions, addresses, company names and
11 company addresses, and dates.  Increased emphasis thereafter was placed upon
12 individuals who were recognized as having been issued a CCW, with the understanding
13 that many of those who had not applied for a CCW would not be placed into the
14 database.

15 53.  Third, every single CCW application and cover sheet that was provided, was personally
16 reviewed, and further relevant information from those applications (such as Bate Stamps,
17 middle names, spouse names, and further personal information) was extracted and added
18 to the database.  After analysis, this further information allowed the database to
19 corroborate a relationship between the CCW holder and the campaign contributor, if one
20 existed.  This was accomplished by first correlating home addresses and names, or the
21 listing of current employer or occupation.   Amazingly, many of the CCW permit holders
22 that had companies listed under page 11, of section 7 ("Applicant Occupation",
23 "Business/Employer Name", and "Business Address."), were companies that contributed
24 to Blanas's political campaign as well.

25 54.  Fourth, the Deposition of Blanas was used to further verify the data; correlating the
26 names of CCW permit holders whom Blanas knew to also be campaign contributors.
27 Further, this also allowed a cross-check of campaign records to verify that all
28 contributors were listed who also had CCWs.  However, some of them were not listed in

|   |     |   |
|---|-----|---|
| 1 |     | campaign records, though Blanas testified that they contributed and had CCWs. |
| 2 | 55. | Exhibit R is an accurate summary of the contents of voluminous writings. |
| 3 | 56. | Defendant Blanas reviewed documents marked as Exhibits 1, 1a, 2, and 3 during his deposition, which was prepared by the County of Sacramento Sheriff's Department responding to a request for a list of individuals who had applied for CCWs.  From those exhibits, Defendant Blanas was able to identify the following individuals as people he knew who were also campaign contributors. Pl. Exh. "A", Blanas Depo. 63:14-67:1, 68:10-69:4, 83:2-84:24. |
| 9 | 57. | In addition, Lt. Timothy G. Twomey (now retired), was able to conduct an analysis of CCW applications provided under the penalty of perjury, which said applications were also signed under the penalty of perjury, and cross-reference those documents with campaign contributions records provided by Defendant Blanas in discovery under the penalty of perjury, which said campaign records themselves were also authenticated under the penalty of perjury.  From this data, the following individuals all contributed to Blanas's campaign, and received CCWs, and either their approved-application was not provided or the applications that were provided indicated no good-cause criteria, and better qualified applicants were rejected *in toto*; the glaring common denominator and relationship among the rejected applications being that they were not campaign contributors; the few who were CCW-rejected and campaign contributors was insignificant. |
| 21 | 58. | A simple database was formed consisting of a cross-reference between CCW names and campaign records names, and matches were then crossed referenced with any companies associated with those names listed in the campaign records (i.e. business owners, for example, Ed Gerber with Energetic, Padilla with Padilla Bail Bonds) |
| 25 | 59. | From this data, the following individuals all contributed to Defendant Blanas's campaign, and received CCWs, and either their application that was approved was not provided or the ones that were provided provided no good cause criteria whatsoever, and more qualified applicants were rejected *in toto*; the only common denominator being that none |

of the rejected applications provided contained names of campaign contributors.

60. Edwin Gerber owns what appears to be a million dollar vacation home in Reno with Defendant Blanas, contributes to his campaign under Energetic Drywall, which is reported in campaign disclosure records under the penalty of perjury, but his individual contributions were not reported, though Defendant Blanas testified that Gerber personally donated money; Defendant Blanas personally approved Gerber's CCW application with a stated justification by Gerber in that he carries large sums of cash and wears expensive jewelry.  Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7; Pl. Exh. "B", Wong Depo . 87:6-22; 85:22 thru 86:20; 62:7-25 thru 63:1-10; see also Exhibit E; Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7; Exhibit 5, Pl. Exh. "B", Wong Depo Wong Depo . 79:22-25 thru 80:1-20, 83:11 thru 85:7.

61. Jack Kimmel contributed to Defendant Blanas's campaign, and received a CCW even though on his application it said "self defense" and "self defense" is NEVER justification for issuance of a CCW; in addition to Jack Kimmel Construction Company and "Sacramento Rendering."  Pl. Exh. "A", Blanas Depo. 50:7-12, 50:24-51:5, 70:17-71:5, 88:6-8.

62. Chris Lee contributed to Defendant Blanas's campaign, and received a CCW in 1996.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 71:7:12, 88:6-8.

63. Michael Koewler contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 71:12-17, 88:6-9.  Like Jack Kimmel, he also is a business owner with Sacramento Rendering, which contributes significant amounts of money to Blanas (See Twomey Decl. and Bate Stamps D02071, 01898, 01660, etc.)

64. Dave Mastagni contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 72:16, 88:6-8.

65. John Morgan contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 83:2-84:24, 89:1-6.

66. Pasquale Montesano contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 83:2-84:24, 89:11-90:11.

67. Bill Meyers, "the Padillas" (i.e. Alejandro, Anselmo, Greg, Jess, Michael a.k.a. Padilla Bail Bonds) contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 74:21-25.

68. Ronald Yee, a dentist, contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 83:2-84:24, 92:3-6.

69. contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 83:2-84:24,

70. Alvin and Gary Ricci contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 75:1-2.

71. Hatim Shariff contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:2-7, 91:1-3.

72. Bill Spurgin gave Defendant Blanas jewelry, donated to his campaign and received a CCW, and his CCW is a non-law enforcement CCW issued in 1996 and is still current. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:8-14.

73. Ben Upton a.k.a. Benjamin Upton, a contractor in Elk Grove, contributed to Defendant Blanas's campaign which was not reported, and received a CCW.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:15-23, 91:22-25.

74. Bob Frink contributed to Defendant Blanas's campaign, and received a CCW, plus he is a "friend" of Defendant Blanas.  Pl. Exh. "A", Blanas Depo. 83:2-84:24, 86:8-14.

75. Attorney John Virga contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:15-23.

76. Jim Anderson a.k.a. James Anderson owner of Pacific Coast Building Products, Inc., is a major contributor to Defendant Blanas's campaign by the way of "forgiven loans" [D 01807, 01796, 01647], and received a CCW commencing in 1994; his CCW application is missing.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 77:8-9, 83:2-84:24, 84:21-85:12.

77. Julie Rollofson contributed to Defendant Blanas's campaign, and received a CCW, plus her father Dr. Rollofson also donated to Defendant Blanas's campaign [this was established by Julie Rollofson listing her father as her employer on her CCW Application

11.

|     |     |     |
| --- | --- | --- |
| 1   |     | and Dr. Rollofson's address matches on the campaign records.  Pl. Exh. "A", Blanas |
| 2   |     | Depo. 68:10-69:2, 77:13-78:1, 91:2. |
| 3   | 78. | Both John and Steve Raptakis have CCWs, and John Raptakis contributed to Defendant |
| 4   |     | Blanas's campaign.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 77:16-78:1, 91:2. |
| 5   | 79. | Dave Baker, carpet business, contributed to Defendant Blanas's campaign, and received a |
| 6   |     | CCW, and his application was "approved Chief Dan Lewis", and bypassing the so-called |
| 7   |     | committee altogether, and his application is missing, and the single document provided is |
| 8   |     | bate stamp D_03052, Plaintiffs' Exhibit D.  Pl. Exh. "A", Blanas Depo. 23:20-25, 24:4-9, |
| 9   |     | 26:19-20, 68:10-69:2, 69:10-13. |
| 10  | 80. | Chris Hansen, of Chris Hansen Insurance in Elk Grove, contributed to Defendant |
| 11  |     | Blanas's campaign, and received a CCW, and there is no CCW application produced for |
| 12  |     | him.  Pl. Exh. "A", Blanas Depo. 68:10-69:2, 69:23-70:4, 83:2-84:24, 86:21-4. |
| 13  | 81. | Ernest Martini a.k.a. Ernest Martini contributed to Defendant Blanas's campaign, and |
| 14  |     | received a CCW, see Bate Stamp #D 01694, D 01725, D 02012.  Pl. Exh. "A", Blanas |
| 15  |     | Depo. 83:2-84:24, 88:2-20. |
| 16  | 82. | Jerry a.k.a. George Brannigan contributed to Defendant Blanas's campaign, and received |
| 17  |     | a CCW.  Pl. Exh. "A", Blanas Depo. 18:6-14; 21:2-15. |
| 18  | 83. | James Grey contributed to Defendant Blanas's campaign, and received a CCW.  Pl. Exh. |
| 19  |     | "A", Blanas Depo. 83:2-84:24, 87:19-23. |
| 20  | 84. | John Valensin contributed to Defendant Blanas's campaign, and received a CCW, and |
| 21  |     | the reason for his application was defense of property from trespassers (which is illegal to |
| 22  |     | use deadly force to protect property). Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4- |
| 23  |     | 9, 76:17-23 |
| 24  | 85. | Jack Sellers contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. |
| 25  |     | "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9. |
| 26  | 86. | Steve Sellers contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. |
| 27  |     | "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9 |
| 28  | 87. | Ron Sellers contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. |

1     "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9, 91:4-6.

2  88.   During his two terms as Sheriff of Sacramento County, Defendant Blanas **personally**

3     "**issued several hundred CCWs.**"   Pl. Exh. "A", Blanas Depo. 23:20-23.

4  89.   Jack Kearns a.k.a. John Kearns contributed to Defendant Blanas's campaign, and

5     received a Non-peace officer CCW. Pl. Exh. "A", Blanas Depo. 67:9, 70:9-16.

6  90.   Defendant Blanas was deliberately evasive in responding to questions regarding who he

7     issued a CCW and Honorary Badges to and who contributed to his campaigns, with

8     coaching by his attorney.  Pl. Exh. "A", Blanas Depo. 23:15-25:24, 29:13-30:21,   In fact,

9     at one point, Defendant Blanas deliberately lied about his ownership of a million dollar

10     vacation home in Reno with CCW and campaign contributor Edwin Gerber, then he

11     changed his mind on the subject.  Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:12.

12  91.   Bill Mosier contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh.

13     "A", Blanas Depo. 25:17-25, 26:23-25

14  92.   James Colonfrancisco contributed to former Sheriff Craig's and Defendant Blanas's

15     campaigns, and received a CCW, and this application is missing from the records.  Pl.

16     Exh. "A", Blanas Depo. 31:9-33:12; Pl. Exh. "C", McAtee Depo.

17  93.   Defendant Blanas issued Honorary Deputy Badges to only approximately 50 campaign

18     supporters and contributors over his tenure, some of which were also issued CCWs. Pl.

19     Exh. "A", Blanas Depo. 29:14-19

20  94.   Defendants have no "written" policy on how CCWs are issued, and the only common

21     denominator as to who qualifies for a CCW is those who either have access to Defendant

22     Blanas personally whereby they can ask him for a CCW or those who have contributed

23     money to Defendant Blanas's political campaign; the buzzword for bypassing the so-

24     called committee is "emergency CCW".  Pl. Exh. "A", Blanas Depo. 41:5-14, 43:16-19.

25  95.   Defendant Blanas's wife is employed by the Christie's, who both possess CCWs issued

26     by Defendant Blanas, though Defendant Blanas lies about this in his deposition.  Pl. Exh.

27     "A", Blanas Depo. 44:17-19.  Interestingly, the Christie's and Defendant Blanas' wife

28     work in the exact same office as Defendant Blanas's biggest campaign contributor all

|     |      |                                                                                                          |
| --- | ---- | -------------------------------------------------------------------------------------------------------- |
| 1   |      | located at John Anthony Christie's office, 7700 College Town Dr #101, Sacramento, CA                     |
| 2   |      | 95826, License ID: 00891191, Salespersons working under his license is no other than                    |
| 3   |      | Blanas, Nanette June, home address 4121 Puente Way, Sacramento, CA 95864, the very                      |
| 4   |      | same address as Defendant Blanas.  Twomey Decl. *                                                        |
| 5   | 96.  | The Maloofs (owners of the Sacramento Kings') contributed to Defendant Blanas's                         |
| 6   |      | campaign, and received Honorary Deputy Badges, along with their mother.  Pl. Exh. "A",                  |
| 7   |      | Blanas Depo. 83:2-84:24, 93:13-21.                                                                       |
| 8   | 97.  | James Colafrancesco disputes that he made any statements to Detective McAtee that he                     |
| 9   |      | bought his CCW with campaign money.  Exhibit Q.                                                          |
| 10  | 98.  | McAtee is a detective in the Sacramento Sheriff office, and has been a deputy sheriff for                |
| 11  |      | over eight years beginning in 1988.  Pl. Exh. "C", McAtee Depo. 7:10-22                                  |
| 12  | 99.  | McAtee graduated from Sacramento State University and admittedly has good writing                        |
| 13  |      | skills.  At the Sheriff's Academy emphasis was placed upon "include[ing] all facts that                  |
| 14  |      | you feel are relevant and try[ing] to be as accurate as possible." Pl. Exh. "C", McAtee                  |
| 15  |      | Depo. 8:5-19                                                                                             |
| 16  | 100. | In order to take accurate notes "you don't write [your report] while [the subject is]                    |
| 17  |      | talking."  You always take notes in the field so that you can type up your report when you               |
| 18  |      | return to the office.  Pl. Exh. "C", McAtee Depo. 9:20 thru 10:3                                         |
| 19  | 101. | McAtee is admonished regarding his deposition by Gorski that his testimony is given                      |
| 20  |      | under penalty of perjury, and therefore it is important that McAtee understand the                       |
| 21  |      | question before responding to it.  Additionally, he'll be given the opportunity to review                |
| 22  |      | the transcripts of his deposition for accuracy.  Anything that he does not correct or                    |
| 23  |      | change at that time may be used to impeach his testimony at the time of trial. Pl. Exh.                  |
| 24  |      | "C", McAtee Depo.  10:8 thru 11:18                                                                       |
| 25  | 102. | When taking statements from witnesses in the field with notes, McAtee does not ever                      |
| 26  |      | electronically record the statements. Pl. Exh. "C", McAtee Depo. 13:22 thru 14:17                        |
| 27  | 103. | Between 1989 to the time of the deposition, McAtee states that an estimate of 3600 crime                 |
| 28  |      | reports, or 200 a year, would be a low estimate of the number of crime reports that he has               |

filled out. Pl. Exh. "C", McAtee Depo. 15:10-25

104. When recording information in a police report, McAtee is accurate and never fabricates any statements. To the best of his ability, his field notes are based upon when the information is still fresh in his mind and transcribed to the police report as soon as possible. Pl. Exh. "C", McAtee Depo. 16:14 thru 18:6

105. McAtee believes the deposition regards "concealed weapons permits that somebody wanted to get". He understands that he is just a witness. Pl. Exh. "C", McAtee Depo. 19:17 thru 20:9

106. McAtee remembers taking a report of James Colafrancesco. He remembers this because "It's an odd name and I have a really good memory." Pl. Exh. "C", McAtee Depo. 20:15-21

107. McAtee is shows Plaintiff's Exhibit Four which he reviews with his attorney. He had last seen the report sometime in 1994. Pl. Exh. "C", McAtee Depo. 21:13-22

108. Reviewing the report refreshed McAtee's recollection "a little bit". McAtee had filled out only the portions of the Exhibit with his own name on them. Pl. Exh. "C", McAtee Depo. 22:13-19

109. McAtee identifies the first Bates stamp on the Exhibt as D-01500, and the very lay Bates stamp as D-01535. Pl. Exh. "C", McAtee Depo. 22:20 thru 23:5

110. McAtee identifies Exhibit Four and reads the report number as 94-076998. Depo. 23:6 thru 24:4

111. McAtee says that a crime report number is assigned within at least one day of the crime itself, and describes the practice for assigning a crime report number. Pl. Exh. "C", McAtee Depo. 24:10-20

112. McAtee says that the underlying crime for the report number for Exhibit Four is "Rude or threatening display of a firearm." Pl. Exh. "C", McAtee Depo. 25:6-8

113. One of the pages prepared by McAtee was Bate stamped D-1501. Pl. Exh. "C", McAtee Depo. 25:9-12

114. Deputy Morgan filled out the first page of Exhibit Four, the one with a sticker on it, or

15.

1      Exhibit One. Pl. Exh. "C", McAtee Depo. 25:16-17

2 115. McAtee identified the pages he filled out as Bate stamps D-01501, D-1508, D-1509,
3      D-01510, D-01511, D-01512, D-01513, D-01514, D-01515, D-01516, D-01517,
4      D-01518, D-01519, D-01520, D-01521, and D-01524. These pages are all part of the
5      crime report and not an addendum. Pl. Exh. "C", McAtee Depo. 25:12 thru 26:13

6 116. The first page of Exhibit Four, or the face sheet is like a synopsis. The facts of the case
7      are supplemental pages. Pl. Exh. "C", McAtee Depo. 17:1-4

8 117. Exhibit Four refreshed McAtee's recollection "a little bit" regarding the events as they
9      transpired on the evening described within the Exhibit. Pl. Exh. "C", McAtee Depo.
10      29:5-8

11 118. McAtee and his partner were dispatched to a guy brandishing a gun at Brother Oliver's
12      prior to 2 a.m. Upon arriving they were told that after a brief argument with somebody
13      the guy was brandishing a gun and was currently in the bathroom. When McAtee and his
14      partner went to the bathroom they saw the guy with a Colt .45 on his hip and took the gun
15      from him and escorted him out to the car. Pl. Exh. "C", McAtee Depo. 29:11-22

16 119. The person McAtee arrested "talked a lot" and at one point or another told McAtee that
17      he had a concealed weapons permit for his firearm. Pl. Exh. "C", McAtee Depo. 29:24
18      thru 30:10

19 120. The arrestee was intoxicated and his ability to understand simple instructions and simple
20      sentences was heavily impaired, with slurred speech. McAtee based his opinion that the
21      arrestee was drunk on his knowledge of the objective signs of drunkenness and his
22      expertise. The arrestee, now referred to in the deposition as Mr. Colafrancesco, asked
23      McAtee several times if he was being arrested for urinating. Pl. Exh. "C", McAtee Depo.
24      31:1-18

25 121. The firearm was confiscated and McAtee does not know what happened to it. Pl. Exh.
26      "C", McAtee Depo. 32:2-6

27 122. Colafrancesco was arrested for a California Penal Code violation of 417 on October 2nd,
28      1994. Pl. Exh. "C", McAtee Depo. 32:9-19

123. McAtee clarified that it was not he who arrested Colafrancesco, but that it was a citizen's arrest because it was for a misdemeanor and was not committed in McAtee's presence. Pl. Exh. "C", McAtee Depo. 33:5-12

124. Colafrancesco's brandishing of a firearm was coupled with a threat according to statements that were taken by McAtee. Pl. Exh. "C", McAtee Depo. 34:20-23

125. Colafrancesco was cited and released. Pl. Exh. "C", McAtee Depo. 34:21

126. Without reading the report, McAtee remembered Colafrancesco mentioning both Sheriff Blanas and Mo Bailey on several occasions. Pl. Exh. "C", McAtee Depo.38:6-10

127. The report marked as **Exhibit Four** is an accurate reflection as to what Colafrancesco said to McAtee because the notes taken by McAtee were contemporaneous and immediately turned into Exhibit Four. Pl. Exh. "C", McAtee Depo. 38:15-24

128. McAtee went through Colafrancesco's wallet and recalled seeing an honorary deputy's ID and badge and a concealed weapons permit. Pl. Exh. "C", McAtee Depo. 39:21 thru 40:9

129. McAtee felt that the detailed description from his report in Exhibit Four "would be far more accurate than [his] memory." Pl. Exh. "C", McAtee Depo. 41:14-21

130. Brother Oliver's is at Madison and Manzanita just north of Madison. It would be fair to say that page D-01518 describes the events as McAtee perceived them on the early morning hours of October 2nd, 1994. Pl. Exh. "C", McAtee Depo. 42:15-22

131. McAtee reiterates that what is recorded in the document marked as Exhibit Four is the best evidence as to what happened as far as his actions and what he heard and saw on the morning of October 2nd, 1994. Pl. Exh. "C", McAtee Depo. 45:2-12

132. McAtee reads Exhibit Four into the record verbatim as a prior recollection recorded, corroborating that Colanfracesco admitted to obtaining a CCW and a Deputy Badge by paying Campaign contributions to Defendant Blanas. Pl. Exh. "C", McAtee Depo. 45:14 thru 62:14

133. McAtee was reassigned to RCCC with the Sheriff's department within a week of filing Exhibit Four, and thus, McAtee contacted someone at the sheriff's union regarding disciplinary matters that were pending against him. Pl. Exh. "C", McAtee Depo. 71:23

1 | thru 72:6

2 | 134. One of the issues raised by the his employer regarding disciplinary matters involved a
3 | police report, but did not involve the accuracy of his reports, the formatting of his reports,
4 | or the way he wrote reports. It involved the time it took McAtee to complete his reports.
5 | Pl. Exh. "C", McAtee Depo. 72:23 thru 74:15

6 | 135. McAtee "felt that it was in the best interest of the public that [Colafrancesco] not have [a
7 | CCW permit]." and recommended revocation of this permit in his report. Pl. Exh. "C",
8 | McAtee Depo. 79:17 thru 80:4

9 | 136. McAtee has an ID card signed by the sheriff that tells everyone that he is a peace offer.
10 | McAtee described the ID card that Colafrancesco was carrying as "very similar" to his
11 | own; using the words "very similar" twice. Pl. Exh. "C", McAtee Depo. 80:16 thru 81:2

12 | 137. The badge that Colafrancesco was carrying differ from McAtee's own only by having the
13 | word "honorary" written on it in lieu of the badge number. Pl. Exh. "C", McAtee Depo.
14 | 81:16-20

15 | 138. McAtee said, "I know that when I first looked at [Colafrancesco's ID badge], it looked
16 | like a legitimate law enforcement badge." Pl. Exh. "C", McAtee Depo. 82:4-5

17 | 139. McAtee again affirmed that upon first inspection Colafrancesco's ID badge looked like a
18 | law enforcement credential. Pl. Exh. "C", McAtee Depo. 83:3-7

19 | 140. Out of all the arrests that he's made, people he's come into contact with, or crime reports
20 | he's fill out, to the best of his recollection, the only person McAtee recalls having a CCW
21 | was James Colafrancesco. Pl. Exh. "C", McAtee Depo. 84:23 thru 85:5

22 | 141. In 1994, McAtee remembers Mo Bailey as "a very popular person within the department.
23 | I think most people know him." and believes he was a sergeant. Pl. Exh. "C", McAtee
24 | Depo. 85:19 thru 86:5

25 | 142. Based upon a totality of all the evidence, Lt. Twomey's expert opinion creates a triable
26 | issue of fact that CCW applicants who contributed money to Defendant Blanas received
27 | CCWs, and those who did not, were subjected no form of consistent review whatsoever.

28 | 143. Based upon a totality of all the evidence, Lt. Twomey's expert opinion creates a triable

issue of fact that because Plaintiffs did not contribute money to Defendant Blanas' political campaigns, their CCW applications were denied and those that contributed money received CCWs.

144. Plaintiffs were subjected to unequal treatment in the application process for CCWs simply because they were not campaign contributors who had access to Defendant Blanas.

DATED:        November 2, 2007              Respectfully submitted,
                                            LAW OFFICES OF GARY W. GORSKI

                                             /s/ Gary W. Gorski
                                            GARY W. GORSKI,
                                            Attorney for Plaintiffs