LAW OFFICES OF GARY W. GORSKI
8549 Nephi Way
Fair Oaks, CA 95628
Telephone: (916) 965-6800
Facsimile: (916) 965-6801
usrugby@pacbell.net
www.gwgorski.com
GARY W. GORSKI - CBN: 166526
Attorney for Plaintiff

Co-Counsel
DANIEL M. KARALASH - SBN: 176422
(916) 787-1234
(916) 787-0267

THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID K. MEHL; LOK T. LAU; FRANK FLORES<br>                Plaintiffs,<br>vs.<br>LOU BLANAS, individually and in his official capacity as SHERIFF OF COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; COUNTY OF SACRAMENTO; BILL LOCKYER Attorney General, State of California; RANDI ROSSI, State Firearms Director and Custodian of Records.<br>                Defendants | CASE NO.: CIV S 03 2682 MCE/KJM<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND COUNTER MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 78-230(e)**<br><br>Date: November 16, 2007<br>Time: 9:00 a.m.<br>Ctrm: 3<br>Judge: Honorable Morrison C. England, Jr. |

## 1 NON-OPPOSITION ON ONE ISSUE

Plaintiffs dismiss, and do not oppose dismissal of the First Cause of Action for 42 U.S.C. § 1983 (Fourteenth Amendment- Equal Protection - Race and/or National Origin).

## 2 PRESERVATION OF RIGHT ON APPEAL

Though Plaintiffs strenuously argue that the law in the Ninth Circuit regarding the interpretation of the Second, Ninth and Fourteenth Amendment is flawed and needs to be overruled by the Supreme Court.[1] However, Plaintiffs also realize that this court is bound by

---

[1] Currently pending at the U.S. Supreme Court arising from the D.C. Circuit are two Second Amendment cases which are closely being watched by the Courts, and what influence *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), cert. denied, 536 U.S. 907 (2002) and the well reasoned dissents in *Silveira v.*

1.

Ninth Circuit precedent until such time that the Supreme Court decides to accept a Second/Ninth/Fourteenth Amendment case; therefore, as to the ***Fourth, Fifth, and Sixth*** Causes of Action that pertain to Second and Ninth Amendment Jurisprudence, Plaintiffs raised those actions for preservation for appeal, but argues than the law regarding the Privileges and Immunities Clause is unsettled, and argument is presented below on that point. Plaintiffs argue that they have a personal and individual right to keep and bear arms under the Second, Ninth and Fourteenth Amendments, including the Privileges or Immunities clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs further argue that their case is to be judged under strict scrutiny standards, including the CCW policies employed and the CCW statute itself.

### 3. COUNTER MOTION

In addition, Plaintiffs bring a **COUNTER MOTION PURSUANT TO RULE 78-230(e) FOR JUDGMENT ON THE PLEADINGS AS A MATTER OF LAW** on the **Second Cause of Action** in line with the holding in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.)(Reinhardt, J), rehearing en banc denied, 328 F.3d 567 (9th Cir. 2003)(six dissents). Both Penal Code Sections 12027, 12031(b), 12050-12054 and Defendants' "prima facie" good cause standard for CCW issuance are unconstitutional in that this CCW issuance scheme specifically exempts retired law enforcement personnel from those provisions and burdens which are held applicable to common good citizens, including Plaintiffs. The holding in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.)(Reinhardt, J), rehearing en banc denied, 328 F.3d 567 (9th Cir. 2003)(six dissents) mandates that these statutory and policy provisions be struck down under the Fourteenth Amendments Equal Protection clause, which was used to strike down an identical exemption in the State's Semi-Automatic Rifle's statute. Similarly, Penal Code 12050 is unconstitutional which makes exceptions in the statutory scheme for state and federal court judges as well.

Since moving Defendants are proper parties to be sued for an unconstitutional firearm

---

*Lockyer*, 328 F.3d 567 (9th Cir. 2003) and *Nordyke v. King*, 364 F.3d 1025 (9th 2004) will have on those cases. A very informative research cite on Second Amendment issues is located **at http://www1.law.ucla.edu/~volokh/2amteach/sources.htm#TOC9** which is the website for Prof. Eugene Volokh, UCLA School of Law.

statute, Plaintiffs counter motion must be granted.

A similar exemption for retired peace officers was struck down in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.)(Reinhardt, J), rehearing en banc denied, 328 F.3d 567 (9th Cir. 2003)(six dissents). Penal Code Sections 12027, 12031(b), 12050-12054 are unconstitutional in that this statutory scheme specifically exempts retired law enforcement personnel from those provisions and burdens which are held applicable to common good citizens, including Plaintiffs. The holding in Silveira v. Lockyer, 312 F.3d 1052 (9th Cir.)(Reinhardt, J), rehearing en banc denied, 328 F.3d 567 (9th Cir. 2003)(six dissents) mandates that this statutory provision be struck down under the Fourteenth Amendments Equal Protection clause, which was used to strike down an identical exemption in the State's Semi-Automatic Rifle's statute. Similarly, Penal Code 12050 is unconstitutional which makes exceptions in the statutory scheme for state and federal court judges as well.

Plaintiffs can discern no legitimate state interest in permitting retired peace officers and judges to possess and use for their personal pleasure concealed handguns. "Rather, the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." See *Silveira*.

Furthermore, the so-called "good cause" standard for Plaintiffs and other average citizens is addressed by the CCW application itself in the form of "investigator's interview notes", but information for the "prima facie" good cause standard for retired peace officers is not addressed in the application itself – even though the statute requires such. However, there is a block which separates judges from other members of the Bar and Plaintiffs.

## 4. OPPOSITION

**THERE IS TRIABLE ISSUE OF FACT AS TO THE SECOND AND THIRD CAUSE OF ACTION (2) 42 U.S.C. § 1983 (Fourteenth Amendment - Equal Protection - preferential treatment, including unconstitutional CCW statute and County policies on their face). (3) 42 U.S.C. § 1983 (First and Fourteenth Amendment- Political Association/Speech)**

In, *Village of Willowbrook v. Olech*, (2000) 120 S.Ct. 1073, 145 L.Ed.2d 1060, the United States Supreme Court unanimously held that denial of Equal Protection may occur in "class of one" situation where there was no rational basis for intentionally different treatment, which

3.

resulted in arbitrariness and capriciousness.

Although the Ninth Circuit held that there was no liberty or property right to a gun permit, if permit standards constitute a denial of equal protection, a cause of action under was stated. *Guillory v. County of Orange*, 731 F.2d 1379 (9th Cir. 1984). In *CBS v. Block* (1986) 42 Cal.3d 646, the "good cause data" is critical for the proper sorting out of equal protection violations.

A concealed weapons licensing program that is administered arbitrarily so as to unjustly discriminate between similarly situated people may deny equal protection. *Guillory v. County of Orange,* 731 F.2d 1379, 1383 (9th Cir.1984); see also, *Silveira,* Supra. Even the rational-basis test will not sustain government conduct that is malicious, irrational or plainly arbitrary. *Wedges / Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 67 (9th Cir.1994).

To sustain their burden, plaintiffs need only submit facts that others similarly situated generally have not been treated in a like manner; and second, that the denials of concealed weapons licenses to them were based on impermissible grounds. See *Kuzinich v. County of Santa Clara*, 689 F.2d 1345, 1349 (9th Cir.1983) (applying this test to a claim of "selective prosecution" in zoning- decision context).

Section 7 of the CCW application requests the "Details of Reason for Applicant desiring a CCW License". The reasons for an applicant desiring a CCW are known as the "good cause data" as to whether a CCW should be granted. The "good cause data" is known to be critical to sorting out equal protection violations (see *CBS vs. Block* (1986) 42 Cal.3d 646, 230 Cal. Rptr. 362).

Honorably Retired Peace officers are given preferential treatment in that they are entitled to a presumption of "good cause" for issuance, and it shows that they receive them automatically. This discriminatory impact of this exemption is reflected in how Plaintiff Mehl was treated.

### A. **The so-called "Good Cause" criteria.**

As Lt. Twomey (Ret.) states in his declaration, after reviewing thousands of pages of documents, including approved and denied CCW applications, and as comparison between Plaintiffs' Exhibits "D, E, F, and P" demonstrate, there is no continuity as to who is approved a

CCW and those denied. However, when compared with campaign contribution records (Exhibit O), the results are clear – the more money one gives, the greater the chance of obtaining a CCW. And, if you just happen to own a house with the Sheriff, Defendant Blanas will accept an oral application and bypass the normal protocols for issuance. See Additional Material Facts Nos. 1 through 127.

With regard to Mr. Lau, Defendants throw him under the bus. However, his rejection letter states clearly that a CCW was not issued because he did not show that his life was threatened, not because he was nervous, had employment issues with the FBI, or that he was on disability - non of those reasons were conveyed in his rejection letter nor are they a prohibition on firearm ownership or possession of a CCW.

Mr. Mehl was not even contacted on both his applications, though Mr. Gerber can just ask Defendant Blanas for a CCW.

There is no dispute that those with access and money easily obtain CCWs.

### FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983 (14th Amendment Privileges and Immunities)

Senator Howard, who introduced the Fourteenth Amendment for passage in the Senate, stated:

> "Such is the character of the privileges and immunities spoken of in the second section of the fourth article of the Constitution [the Senator had just read from the old opinion of Corfield v. Coryell, 6 Fed. Cas. 546 (No. 3,230) (E. D. Pa. 1825), also cited in n14 of Saenz v. Roe, 526 U.S. 489]. To these privileges and immunities, whatever they may be - for they are not and cannot be fully defined in their entire extent and precise nature - to these should be added the personal rights guarantied and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right appertaining to each and all the people; <u>the right to keep and to bear arms</u>; the right to be exempted from the quartering of soldiers in a house without the consent of the owner; the right to be exempt from unreasonable searches and seizures, and from any search or seizure except by virtue of a warrant issued upon a formal oath or affidavit; the right of an accused person to be informed of the nature of the accusation against him, and his right to be tried by an impartial jury of the vicinage; and also the right to be secure against excessive bail and against cruel and unusual punishments.
>
> "Now, sir, here is a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the Constitution, which I have recited, some by the first eight amendments of the Constitution; and it is a fact well worthy of attention that the course of decision of our courts and the present settled doctrine is, that all these immunities, privileges, rights, thus

> guarantied by the Constitution or recognized by it, are secured to the citizens solely as a citizen of the United States and as a party in their courts. They do not operate in the slightest degree as a restraint or prohibition upon State legislation. . . .
>
> ". . . The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees."

Cong. Globe, 39th Cong., 1st Sess., 2765-2766 (1866).

The Ninth Circuit acknowledged in *Silveira* that :

> *Fresno Rifle* itself relied on *United States v. Cruikshank*, 92 U.S. 542, 23 L. Ed. 588 (1876), and *Presser v. Illinois*, 116 U.S. 252, 29 L. Ed. 615, 6 S. Ct. 580 (1886), <u>decided before the Supreme Court held that the Bill of Rights is incorporated by the Fourteenth Amendment's **Due Process Clause**</u>. Following the now-rejected *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 8 L. Ed. 672 (1833) (holding that the Bill of Rights did not apply to the states), *Cruikshank* and *Presser* found that the Second Amendment restricted the activities of the federal government, but not those of the states. One point about which we are in agreement with the Fifth Circuit is that *Cruikshank* and *Presser* rest on a principle that is now thoroughly discredited. See *Emerson*, 270 F.3d at 221 n.13. Because we decide this case on the threshold issue of standing, however, we need not consider the question whether the Second Amendment presently enjoins any action on the part of the states.

This is important because all Ninth Circuit Second Amendment decisions have been approached through 1) and interpretation of the Second Amendment and whether it confers an individual or state right, and 2) whether it is incorporated through the Due Process Clause of the Fourteenth. The Fifth Cause of Action does not seek to define the Second Amendment; rather, it seeks to define the outer parameter of the Privileges and Immunities Clause of the Fourteenth Amendment, which has not been addressed in Defendants brief nor by any decision within this Circuit.

Pockets of bias against firearms are not unlike the all too frequent prejudice toward persons of color, women and sometimes men as a class, quirky religions, access to birth control, homosexual persons, and the next prejudice de jour. Broad bias typically persists because of misinformation and insufficient thoughtful study. The Bill of Rights and this Court are the citizens' protection from such bias. See Sandra Day O'Connor, *The Majesty of the Law* 59 (N.Y.: Random House 2003).

*Brown v. Board*, 347 U.S. 483 (1954) took pains to be unanimous and to overrule *Plessy*

*v. Ferguson*, 163 U.S. 537 (1896) after many hours of argument and reargument. The Court struggled with the issues leading up to *Brown* for what today seems to have been a very long time. See Del Dickson ed., *The Supreme Court in Conference* 635-671 (1940-1985)(N.Y.: Oxford 2001).

*Bradwell v. The State*, 83 U.S. 130 (1873) is now seen as a curiosity of condescending patriarchy. It follows the *Slaughter-House Cases*, 83 U.S. 36 (1873) that have been roundly criticized, but not yet finally put to rest, but the tide has changed recently. Categorical discrimination against women was not remedied by the Fourteenth Amendment. The government endorsed the irrational bias of sex discrimination even in the very hour when it was abolishing slavery and empowering freed-men-only to vote. Millions of qualified women were denied the right to vote from 1868 to 1920, and before.

After *Slaughter-House* and *Cruikshank*, the Congress was powerless to correct those judicial transgressions. The Court allowed Reconstruction to fail and abandoned the freedmen to an unkind fate. The Court from 1873 into the next century, perpetuated the same errors, often over the lone dissent of the first Justice Harlan, and sometimes Justice Field.

The progression of decisions following the narrow *Slaughter-House* mode included *Presser v. Illinois*, 116 U.S. 252 (1886)(Woods, J), holding that the First and Second Amendments did not inhibit state action infringing the rights to assemble and to keep and bear arms without a discretionary permit from the Governor. *Presser* remains on the books. Lower State and federal courts follow *Presser* sporadically, but often decline to do so, or even apologize.

The right to keep and bear arms should further be considered a privilege or immunity protected by Section 1 of the Fourteenth Amendment. The right is express throughout the history of the Fourteenth. It is of stature similar to the travel right upheld in *Saenz v. Roe*, 526 U.S. 489 (1999), and earlier in *Doe v. Bolton*, 410 U.S. 179 (1973). See also *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)(applying the exclusionary rule to the States because "without that rule the freedom from state invasions of privacy would be so ephemeral . . . as [citation omitted] not to merit this Court's high regard as a freedom `implicit in the concept of ordered liberty'")

7.

Though *Mapp* Court applied the Due Process Clause, the Supreme Court has always held that "the full scope of the liberty guaranteed by the Due Process Clause . . . is not a series of isolated points. . . . It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints. . . ." *Poe v. Ullman*, 367 U.S. 497, 543 (1961) (dissenting opinion).  It is worthwhile to emphasize that the Fourth Amendment itself does not apply to state actors.  It is only because the Court has held that the privacy rights protected against federal invasion by that Amendment are implicit in the concept of ordered liberty protected by the Due Process Clause of the Fourteenth Amendment that the Fourth Amendment has any relevance in this case. Strictly speaking, Defendants argument is based entirely and exclusively on the Fourteenth Amendment's Due Process Clause.

Fundamentally important is the wording of the Fourteenth Amendment in relation to "due process" and "privileges or immunities."  Section One reads in part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This is a continuum of broadly enumerated rights by the mere fact that semicolons were used, and not periods, and this continuum of rights is consistent with the Supreme Court's jurisprudence on matters of fundamental liberty.

> "Due process [just like privileges or immunities] has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound.
>
> No formula could serve as a substitute, in this area, for judgment and restraint. ". . . [T]he full scope of the liberty guaranteed by the

> Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This `liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; <u>the right to keep and bear arms</u>; the freedom from unreasonable searches and seizures; and so on. <u>It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.</u>"
> Poe v. Ullman, supra, at 542-543 (dissenting opinion). [emphasis added]

*Moore v. East Cleveland*, 431 U.S. 494, 501-2 (1977); see also, *Roe v. Wade*, 410 U.S. 113, 169 (1973).

At least three generations of law students and constitutional lawyers have understood that the *Slaughter-House Cases*, 83 U.S. 36 (1873)(5-4), and *United States v. Cruikshank*, 92 U.S. 542 (1876), were not well considered. Many of the Justices of that era chose to disregard the historical circumstances, legislative debates, and plain purposes of the Fourteenth Amendment and related legislation. Justice Black has leveled that specific criticism against them:

"[P]revious decisions of this Court … however, had not appraised the historical evidence on that subject." *Adamson v. California*, 332 U.S. 46, 74 (1947)(separate opinion).

It is no coincidence that *Slaughter-House* in the U.S. Reports is followed immediately by *Bradwell v. The State*, 83 U.S. 130 (1873), another legacy of the then judicial disregard for the Fourteenth Amendment and individual rights. Adherence to *Slaughter-House* and *Cruikshank* can only provoke continued solid criticism and frustration with the system of justice. The evidence of past error is too strong and widely known.

Justice Noah Swayne observed in *Slaughter-House* that the majority turned "what was meant for bread into a stone." 83 U.S. at 129. One need not be a constitutional scholar to shudder at the reasoning and brutal reality of *Slaughter-House* and *Cruikshank* as they attempted to gutt the Fourteenth Amendment, leaving next to no protection for the lives and liberty of freedmen, freedwomen, and those who supported their cause.

*Cruikshank* did so following the murderous "Colfax massacre" in Louisiana of freedmen. Federal prosecutors charged Klansmen with conspiracy to prevent blacks from exercising civil

rights, including the rights to vote and to bear arms for community defense. The *Cruikshank* Court freed the Klansmen to ride again and again, with no reference to the massacre, without any mention of the refusal of Louisiana to enforce its laws, or the complicity of state and local officials in the massacre. The Colfax incident today fits the pattern of a mass crime against humanity, of the kind perpetrated by past despotic regimes in Germany, Iraq, and Bosnia.

*Slaughterhouse* and *Cruikshank* may be precedent on the books, but they are not entitled to controlling recognition any more than *Bradwell* or *Plessy*. The Courts today have far better insights and knowledge of the documented events leading up to the Fourteenth Amendment.

As historian Flack noted, "the decisions in the above cases have given to the Fourteenth Amendment a meaning quite different from that which many of those who participated in its drafting and ratification intended it to have." Flack, *The Adoption of the Fourteenth Amendment* 7 (Johns Hopkins 1908).

Professor Antieau is even more blunt about the *Slaughter-House* majority opinion:

> Of the outrageous decision, a contemporary scholar wrote: 'Ninety-nine out of every hundred educated men, upon reading this (Privileges and Immunities) section over, would at first say that it forbade a state to make or enforce a law which abridged any Privilege or Immunity whatever of one who was a citizen of the United States.'

Antieau, *The Intended Significance of the Fourteenth Amendment* (Wm. Hein, Buffalo, N.Y. 1997), citing Royall, *The Fourteenth Amendment: The Slaughter House Cases*, 4 So. L. Rev. (N.S.) 558, 563 (1879). All of the authorities from varying venues cited in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), cert. denied, 536 U.S. 907 (2002), *Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) and *Nordyke v. King*, 364 F.3d 1025 (9th 2004) agree, and explain themselves well, as do Story, Blackstone, Rawle, and many others.

Akhil Reed Amar of Yale writes:

> [T]he framers of the Fourteenth Amendment strongly believed in an individual's right to own and keep guns for self-protection. Blacks and Unionists down South could not always count on the local police to keep white night-riders at bay. When guns were outlawed, only Klansmen would have guns. Thus, the Reconstruction Congress made quite clear that a right to keep a gun at home for self-protection was indeed a constitutional right -- a true 'privilege' or 'immunity' of citizens.

The post-Civil War Freedmen's Bureau Act attempted to protect newly freed men in their

10.

personal "constitutional right to bear arms." 14 Stat. 173, 176 (1866). That Act of Congress has enormous significance for interpreting the Fourteenth Amendment as protecting the right to arms for family and community defense against official and Klan violence, or contemporary gangs. The same Congress drafted and passed both overwhelmingly.

The *Cruikshank* Court, however, restored the Klan and supporting reactionary officialdom to power. The Supreme Court has never undone that wrong. The evil of the Klan persists today, as we were recently reminded in *Virginia v. Black*, 538 U.S. 343 (2003):

> [A]cts of violence included bombings, beatings, shootings, stabbings, and mutilations. … Members of the Klan burned crosses on the lawns of those associated with the civil rights movement, assaulted the Freedom Riders, bombed churches, and murdered blacks as well as whites whom the Klan viewed as sympathetic toward the civil rights movement.

*Id.* at 355.

State and local lawmen all too often have been supportive of the Klan with pervasive state inaction: refusal to provide protection, refusal to prosecute, tacit cooperation, and obstruction of justice at every level.

The disarmament of blacks via the Black Codes and oppressive state gun control legislation left the power of firearms in the hands of the Klan, gangs, and looters. The Fourteenth Amendment was intended in part to redress that imbalance and provide means of self defense to law abiding citizens, black and white. Again, a single handgun would mean the difference between life or death from an assault by a truckload of Klansmen.

**CONCLUSION**

Plaintiffs have clearly established a triable issue of fact in that CCW are issued arbitrarily, and the only common denominator as to who gets one is those who pay money to the Sheriff for political reasons. Defendants motion must be denied.

If this Court is not persuaded, to accept Plaintiffs proposition in the Fifth Cause of Action (i.e. that the 14th Amendment's Privileges or Immunities Clause confers an individual right to keep and bear arms), Plaintiffs then urge this Court to certify for interlocutory appeal this Court's ruling on that single issue only ---- a ruling that nobody could not imagine will be open to serious question -- as well as in these circumstances, and by the standards that govern here, the more

straightforward course appears to be a certification pursuant to 28 U.S.C. § 1292(b).

DATED: November 3, 2007

Respectfully submitted,
LAW OFFICES OF GARY W. GORSKI

 /s/ Gary W. Gorski
GARY W. GORSKI,
Attorney for Plaintiffs