LAW OFFICES OF GARY W. GORSKI
8549 Nephi Way
Fair Oaks, CA 95628
Telephone: (916) 965-6800
Facsimile: (916) 965-6801
usrugby@pacbell.net
www.gwgorski.com
GARY W. GORSKI - CBN: 166526
Attorney for Plaintiff

Co-Counsel
DANIEL M. KARALASH - SBN: 176422
(916) 787-1234
(916) 787-0267

THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID K. MEHL; LOK T. LAU; FRANK FLORES<br>　　　　Plaintiffs,<br><br>vs.<br><br>LOU BLANAS, individually and in his official capacity as SHERIFF OF COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; COUNTY OF SACRAMENTO; BILL LOCKYER Attorney General, State of California; RANDI ROSSI, State Firearms Director and Custodian of Records.<br>　　　　Defendants. | CASE NO.: CIV S 03 2682 MCE/KJM<br><br>**DECLARATION OF LOK LAU** |

I, Lok Lau, declare as follows:

　　　　1. I am over the age of 18, and competent to testify as to the facts and opinions stated herein, and the information contained herein is of my own personal knowledge.

　　　　2. I am a plaintiff in the above entitled action.

　　　　3. Prior to applying for a CCW with Defendants, I was employed by the FBI as Counter-Intelligence agent working on matters of national security as well as public corruption. All of my work that I performed regarding national security, till this day, remains "classified" and "Sensitive Compartmentalized Information" (SCI) pertaining to my deep under-cover operations involving extremely well-funded and dangerous enemies of the United States of America.

　　　　4. Before and after each of my SCI missions, I was polygraphed, which is unusual

because typically polygraphing only takes place when coming back from an undercover operatrion to ensure that an agent is not compromised.

     5. Needless to say, throughout my FBI and CIA career, I have been subjected to the most sophisticated background and psychological testing provided to any law enforcement officer and intelligence agent in the history of the intelligence community, and I have never been observed or diagnosed regarding of C. Scott Harris purported observations as a chief in a local law enforcement agency attempts to portray.

     6. It is especially disturbing that C. Scott Harris states that I appeared nervous. To the contrary, it was C. Scott Harris that appeared unprepared and nervous since it was obvious he had not reviewed my appeal, and had no idea of my background and simply kept saying in a repetitive way that I must document threats.

     7. At the Declaration of C. Scott Harris marked as Exhibit A, page(s) 13 of 70, I noted at section 2, paragraph 9 that I was convicted of a petty theft while employed with the FBI, and it is well documented that this occurred immediately AFTER I returned from one of the deepest undercover assignments undertaken by any FBI agent, and that this "uncharacteristic" act (as that term was used by the FBI) was directly related to the stress of my assignment, which was a huge success. Even though this act was caused by my stressful undercover operation, at no time did the FBI ever restrict my access or use of firearms.

     8. In fact, till this day, there is nothing that happened during my FBI employment that prohibits me from carrying a concealed weapon. To the contrary, I'm highly trained for such use.

     9. Attached to the Declaration of C. Scott Harris marked as Exhibit A, page(s) 21, 23-25 of 70 was the only evidence provided with my application prior to my appeal explaining my just cause for issuance of a CCW, which said information is true and correct. My opening paragraph is an almost identical paraphrase of the prima-facie good cause policy for issuance of a CCW, as I took that verbiage directly from Defendants own CCW policy in place at the time as provided to me.

     10. Five separate administrative federal and state bodies ALL found that the FBI failed to

provide me with the proper support after my deep undercover operations, and this all lead to my disability/OWCP retirement which I am still receiving till this day.

11. The only reason I brought this information to Defendants attention, was to be up front and honest if they ever decided to contact my employer. <u>All the attachments and information</u> attached to the Declaration of C. Scott Harris marked as Exhibit B were presented AFTER the denial of my CCW application.

12. The only reason provided to me, to be raised on appeal, was that I did not provide "convincing evidence" of an "immediate danger". At no time was I ever informed that there were "too many issues", or for that matter, any other issue other than "immediate danger" being the thrust of the reason for denial.

13. Therefore, since I was informed in writing that my denial was based upon failure to show an "immediate" threat of danger, I provided what I could of declassified and public information regarding my top secret assignments that no one in the Defendant Department has the proper security clearance to even be privy to. I thought it was better to provide too much instead of too little information. That information is attached to the Declaration of C. Scott Harris marked as Exhibit B.

14. I have read paragraph 8 of C. Scott Harris' declaration and it is absolutely false.

15. During the appellate interview with C. Scott Harris, I was not nervous, nor was I drowsy. In fact, to think I was nervous applying for a CCW is really a far fetched lie; for my FBI training and experience required me to NEVER appear nervous in any undercover situation because it WILL compromise my cover and my existence. To believe that a highly successful deep undercover counter-intelligence agent would be nervous in a one-on-one interview for something as simple as a CCW would also mean that that same person's cover would have been blown with the ultimate penalty for appearing "nervous."

16. Contrary to what C. Scott Harris says, I was not nervous, but more indignant since I was well aware because of my work in the Sacramento Field office that CCWs were issued to political allies of the Sheriff. In fact, before I even went out on my first Sacramento FBI assignment, I was forewarned that the local Sheriff was corrupt and not to share government

corruption intelligence information with them and other sensitive information.

17. My work in the FBI exposed me to dangers C. Scott Harris could not even fathom, and he was completely aware of this because I made him aware of it at my interview. My operations were probably the most dangerous operations ever undertaken by ANY law enforcement agent in this country.

18. Most importantly, the only subject matter that came up in my interview with C. Scott Harris was that I did not show an "immediate" threat, he then went on further to coach me on how to create a paper-trail of "immediacy" by filing crime-reports. I took this as if he wanted me to file false crime reports.

19. At no time did he ever raise any other issue, especially including anything pertaining to my PTSD, and more importantly, nor was I ever informed that my application was denied for any other reason except for the fact that I had not established good cause since I did not provide sufficient evidence of an "immediate" threat of harm.

20. I was never requested to submit to psychological testing, and I would have gladly submitted to it had I been requested. However, there are only two medical professionals in the world with the security clearance to provide psychological testing to me.

21. I explained to Harris that there is no such thing in the intelligence community as "too long." I further explained that the danger to my life was real, and that the exact threat could not be disclosed to him or anyone else because I would then have committed crime by disclosing such information by breaching my security clearance.

22. In fact, Harris advised me to break the law by stating words to the effect that if I thought my life was in danger, it was better to get a misdemeanor conviction for carrying a concealed weapon than to end up dead. I'm willing to take a polygraph on this issue to if Mr. Harris is willing to do so as well.

23. The FBI DOES NOT issue CCWs to retired or former FBI agents, and it is left up to the complete discretion of local law enforcement as to which former FBI agent gets a CCW.

24. I volunteered to take a polygraph test with the FBI in this case if Defendant Blanas would also submit to polygraph to see which one of us is lying – Defendant Blanas refused, and

that is all that needs to be said on that subject matter.

I hereby affirm that the above information is true and correct under the penalty of perjury.

11/21/2007      /s/ Lok Lau (Original Signature on File with Attorney)
                Lok Lau