LAW OFFICES OF GARY W. GORSKI
8549 Nephi Way
Fair Oaks, CA 95628
Telephone: (916) 965-6800
Facsimile: (916) 965-6801
usrugby@pacbell.net
www.gwgorski.com
GARY W. GORSKI - CBN: 166526
Attorney for Plaintiff

Co-Counsel
DANIEL M. KARALASH - SBN: 176422
(916) 787-1234
(916) 787-0267

THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID K. MEHL; LOK T. LAU; FRANK FLORES<br>    Plaintiffs,<br>vs.<br>LOU BLANAS, individually and in his official capacity as SHERIFF OF COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; COUNTY OF SACRAMENTO; BILL LOCKYER Attorney General, State of California; RANDI ROSSI, State Firearms Director and Custodian of Records.<br>    Defendants | CASE NO.: CIV S 03 2682 MCE/KJM<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND COUNTER MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 78-230(e)**<br><br>Date: December 6, 2007<br>Time: 9:00 a.m.<br>Ctrm: 3<br>Judge: Honorable Morrison C. England, Jr. |

## STATEMENT OF FACTS

Plaintiffs have provided an Additional Statement of Material Facts, and those facts are incorporated herein *in toto*.

### 1 NON-OPPOSITION ON ONE ISSUE

Plaintiffs dismiss, and do not oppose dismissal of the First Cause of Action for 42 U.S.C. § 1983 (Fourteenth Amendment- Equal Protection - Race and/or National Origin).

### 2 PRESERVATION OF RIGHT ON APPEAL

However, Plaintiffs strenuously argue that the law in the Ninth Circuit regarding the interpretation of the Second, Ninth and Fourteenth Amendment is flawed and needs to be overruled by the Supreme Court, noting that the Supreme Court has now granted *certiori* on that

1.

very issue, with arguments sometime next year. Yet, Plaintiffs also realize that this court is bound by Ninth Circuit precedent until such time that the Supreme Court decides the first Second Amendment case in 70 years; therefore, as to the ***Fourth, Fifth, and Sixth*** Causes of Action that pertain to Second and Ninth Amendment Jurisprudence, Plaintiffs raised those actions for preservation for appeal, but argue that the law regarding the Privileges and Immunities Clause is unsettled, and argument is presented below on that point. Plaintiffs argue that they have a personal and individual right to keep and bear arms under the Second, Ninth and Fourteenth Amendments, including the Privileges or Immunities clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs further argue that their case is to be judged under strict scrutiny standards, including the CCW policies employed and the CCW statute itself.

### 3. COUNTER MOTION

In addition, Plaintiffs bring a **COUNTER MOTION PURSUANT TO RULE 78-230(e) FOR JUDGMENT ON THE PLEADINGS AS A MATTER OF LAW** on the **Second Cause of Action** in line with the holding in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.)(Reinhardt, J), rehearing en banc denied, 328 F.3d 567 (9th Cir. 2003)(six dissents). Both Penal Code Sections 12027, 12031(b), 12050-12054 and Defendants' "prima facie" good cause standard for CCW issuance are unconstitutional in that this CCW issuance scheme specifically exempts retired law enforcement personnel from those provisions and burdens which are held applicable to common good citizens, including Plaintiffs. The holding in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.)(Reinhardt, J), rehearing en banc denied, 328 F.3d 567 (9th Cir. 2003)(six dissents) mandates that these statutory and policy provisions be struck down under the Fourteenth Amendments Equal Protection clause, which was used to strike down an identical exemption in the State's Semi-Automatic Rifle's statute. Similarly, Penal Code 12050 is unconstitutional which makes exceptions in the statutory scheme for state and federal court judges as well.

Since moving Defendants are proper parties to be sued for an unconstitutional CCW policies, Plaintiffs counter motion must be granted as to the prima facie standard.

Plaintiffs can discern no legitimate state interest in permitting retired peace officers and

2.

judges to possess and enjoy for the increase it affords them regarding their personal safety concealed handguns. "Rather, the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." See *Silveira*.

Furthermore, the so-called "good cause" standard for Plaintiffs and other average citizens is addressed by the CCW application itself in the form of "investigator's interview notes", but information for the "prima facie" good cause standard for retired peace officers is not addressed in the application itself – even though the statute requires such. However, there is a block which separates judges from other members of the Bar and Plaintiffs.

### 4. OPPOSITION

**THERE IS TRIABLE ISSUE OF FACT AS TO THE SECOND AND THIRD CAUSE OF ACTION (2) 42 U.S.C. § 1983 (Fourteenth Amendment - Equal Protection - preferential treatment, including unconstitutional CCW statute and County policies on their face). (3) 42 U.S.C. § 1983 (First and Fourteenth Amendment- Political Association/Speech)**

Defendant's gross long-term abuse of the CCW permits as a reward for campaign contributions has far reaching implications. In the short term, it appears distasteful and unfair that someone should be able to gain access and privileges from a powerful person such as the Sacramento Sheriff by giving them money. But, if one believes that there is sound reasoning behind why some should, and some should not, have a CCW permit, then issuing CCW permits to those who don't meet this criteria may even be dangerous. But please notice that these arguments focus on only the entitled upper-class who would have the money and influence to acquire (i.e. purchase) a CCW permit from Defendant if they wished to have one. A group of people whom, because of where they live, where they work, who they know, and what they do, probably have little need for the protection of a CCW permit.

What lies literally beneath (and hidden), the aforementioned circumstances are the poor. The uninfluential people of Sacramento County, whom, because they live and work in poorer higher-crime areas are generally more likely to have to face an immediate life-threatening situation; sometimes on a daily basis. Ironically, of course, this same group could never afford to donate a portion of their earnings toward a campaign contribution; they probably do not know anyone influential; and, thus, they could not meet the criteria required by Defendant to obtain a

CCW.

This is not just a hypothetical argument. This is really what happens. If while handing out CCW permits to campaign contributors and influential friends, Defendant had also been granting CCWs all the while to those who really needed them, then this entire situation might be less serious. But that is not the case.

While granting CCWs to his wealthy and influential contributors for the flimsiest of reasons, even in the face of written applications wherein the applicant admits he faces no threat, or wants to protect his property against vandalism, Defendant Blanas has allowed those on the CCW panel that approves or denies CCW permits to deny those who really require the ability to protect themselves; time, after time, after time. Twomey Decl. ¶s 82-306.

This idea that the Sheriff never gets involved with the issuance of CCWs, or that there is this strict procedure of review falls to the way side by simply reviewing Twomey Exhibit "G". Twomey Decl. ¶s 89-99.

At first glance, Mr. Mehl and Mr. Lau would seem to have little in common. Mr. Mehl is Caucasian while Mr. Lau is of Asian heritage. Mr. Mehl is an engineer in a not-uninteresting field, but certainly does not share the world of cloak-and-dagger with Mr. Lau. Even their CCW applications are starkly different from one another; almost like portraits.

Mr. Mehl's application is spare and tightly written; he carefully read and followed all of the instructions; to the point as an engineer would be. Mr. Lau's background as an agent-provocateur who collects and then disseminates information is belied by his bulging application; bulging with articles, letters, and information about his past which he has collected and is now providing to those who require information about him.

But for the purposes of a CCW application they both shared one important characteristic.

There was nothing in either of their backgrounds (or on their applications) which would have disqualified them from CCW approval. Neither of the Plaintiffs had a criminal history. Mr. Lau? Mr. Lau's petty theft conviction is insignificant; the reviewing panel certainly didn't think anything of it. Though they did make notations on Mr. Lau's application there is nothing regarding his voluntary divulgence of this incident, or regarding the incident itself. Both

4.

applicants checked off the appropriate yes and no questions. Thus, looking at only this much information, it is not yet possible to say that they should be approved for a CCW; however, it is also not possible to say that they should not be approved.

At this point, based upon the information he had provided, Mr. Mehl could not be denied a CCW; but neither could he be approved. The basic qualifications were there, but, according to the instructions, he had not supplied any justification for his request. Since there were no representatives to take his information, Mr. Mehl waited for the Department to contact him. This contact never came. Twice Mr. Mehl was denied in the same way based upon the same information.

The information in the standard Departmental denial letter is actually ironically 'accurate', but it is not true; in other words it is not honest. As the letter noted, Mr. Mehl had not provided any information which would indicate that he was under any immediate threat of danger. However, to be honest, the reason he had not provided this information is that he had been specifically instructed in writing not to provide it at that time; to wait until he was contacted by a law enforcement representative. The reviewers did not and still do not know what Mr. Mehl's justification for a CCW was and is.

In Mr. Lau's case, his need for a CCW simply cannot be denied and Defendants do not attempt to do so. Mr. Lau will be forever looking over his shoulder and watching people's hands as he moves through crowds. Any attempt to argue that he does not need a CCW or is not proficient enough in the use of a weapon is ludicrous.

No, in Mr. Lau's case the reviewer apparently could just tell that Mr.Lau had "too many issues". This cryptic notation is wide open to speculation and perhaps that is why the reviewer chose this inscrutable notation and how he wanted to keep it. However, it seems more likely that the reviewer simply did not want to take the time to read all of the materials Mr. Lau had provided in evidence for his justification — maybe even because they wished they lived Mr. Lau's life instead of their mundane arm-chair law enforcement activities.

Mr. Mehl and Mr. Lau share a final set of characteristics. Since these characteristics can all be seen as "lacking" characteristics they should be described moreover as "deficiencies".

The first deficient characteristic is that neither Mr. Mehl nor Mr. Lau are retired law enforcement officers. (It should be noted that even a retired federal law enforcement officer must still rely upon the good judgment of the local sheriff in order to obtain a CCW; there is no federal mandate that allows CCWs for retired federal officers.) If either of them had been retired law enforcement then their applications would have been mere formalities.

The second deficient characteristic is more galling. Neither of these men is influential in social or political circles, nor do they know anyone else who is. Heck, they don't even know Sheriff Blanas personally. Examples within the approved CCW applications are replete with those who were privileged and influential enough to know campaign contributors, or be associated with their large businesses, enough so that they required little in the way of justification to receive a CCW. The applicants know the Sheriff was doing them a favor, and he knew that they knew it; wink, wink.

Finally, neither Mr. Mehl nor Mr. Lau had the foresight to contribute a substantial sum to Defendant's campaign. It wouldn't have required too much. Particularly in the case of Mr. Lau because he had such a strong justification that, well, the Sheriff wasn't doing him that big a favor, was he? In Mr. Mehl's case, we cannot judge for no one yet knows what his justification was and is. In cases like these it is just so hard to know how much to give; but that is because this type of exchange is foreign to most of the county citizenry. The average person would be as comfortable trying to determine how much to contribute in order to get a CCW as he would be trying to determine how much to offer the nice officer in return for not giving him a speeding ticket; those are the sorts of things you better get right the first time.

However, both men would have been wise to have made at least a couple of donations in the $250 plus range. Following the other successful CCW application/campaign contributor's examples, large donations are perfectly acceptable of course, but several smaller donations seem very appropriate; they don't arouse suspicion at first glance, yet they are also likely to get the necessary attention from the Sheriff without having to actually go up to him and point it out.

Take for instance, Jim Rothery, an attorney, who applied no less than three times, exercised the appellate review twice, only be denied each and every time – at total of five times.

Rother Declaration.  Mr. Lau, a former FBI agent on disability, and since the FBI does not issue CCWs, he is stuck with the local Sheriff determining whether he has a need for a CCW.  Lau Declaration.  Mr. Mehl, well, they never even attempted to complete his application per the written instructions. Mehl Declaration.  All three of these individuals applies in different ways, all unique, but yet common – common in that none of them knew Defendant Blanas.

Compare this to obvious friends of Defendant Blanas like Jack Kimmel, Mike Koewler, Ed Gerber, Ernest Martini, Ben Upton, Jim Anderson, Richard Hill, Bob and Patrick Frink, and the list just goes on.  Twomey Decl. ¶s 186, 197-256.  After reviewing this evidence, the favoritism becomes glaringly obvious.

Why would Dave Mehl have fared any better?  The idea that he would have had a "fair" chance at obtaining a CCW is ridiculous.  He had never contributed to the Sheriff, and, either because of this, or in addition to this, he was never contacted by the Sheriff or anyone else in order to provide his justification.  Flipping a coin would give the average county citizen like the 'Dave Mehls' a better chance to receive a CCW than they actually face when they approach the Sacramento Sheriff's department in the form of Defendant Blanas' money-making casino.  However, if you are a campaign contributor and influential you get to see and then bet with a double-sided coin.

In, *Village of Willowbrook v. Olech*, (2000) 120 S.Ct. 1073, 145 L.Ed.2d 1060, the United States Supreme Court unanimously held that denial of Equal Protection may occur in "class of one" situation where there was no rational basis for intentionally different treatment, which resulted in arbitrariness and capriciousness.

Although the Ninth Circuit held that there was no liberty or property right to a gun permit, if permit standards constitute a denial of equal protection, a cause of action under was stated. *Guillory v. County of Orange*, 731 F.2d 1379 (9th Cir. 1984).  In *CBS v. Block* (1986) 42 Cal.3d 646, the "good cause data" is critical for the proper sorting out of equal protection violations.

A concealed weapons licensing program that is administered arbitrarily so as to unjustly discriminate between similarly situated people may deny equal protection. *Guillory v. County of*

*Orange,* 731 F.2d 1379, 1383 (9th Cir.1984); see also, *Silveira,* Supra. Even the rational-basis test will not sustain government conduct that is malicious, irrational or plainly arbitrary. *Wedges / Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 67 (9th Cir.1994).

To sustain their burden, Plaintiffs need only submit facts that others similarly situated generally have not been treated in a like manner; and second, that the denials of concealed weapons licenses to them were based on impermissible grounds. See *Kuzinich v. County of Santa Clara*, 689 F.2d 1345, 1349 (9th Cir.1983) (applying this test to a claim of "selective prosecution" in zoning- decision context).

Section 7 of the CCW application requests the "Details of Reason for Applicant desiring a CCW License". The reasons for an applicant desiring a CCW are known as the "good cause data" as to whether a CCW should be granted. The "good cause data" is known to be critical to sorting out equal protection violations (see *CBS vs. Block* (1986) 42 Cal.3d 646, 230 Cal. Rptr. 362).

Honorably Retired Peace officers are given preferential treatment in that they are entitled to a presumption of "good cause" for issuance, and it shows that they receive them automatically. This discriminatory impact of this exemption is reflected in how Plaintiff Mehl was treated.

A. **The so-called "Good Cause" criteria.**

As Lt. Twomey (Ret.) states in his declaration, after reviewing thousands of pages of documents, including approved and denied CCW applications, and as comparison between Plaintiffs' Exhibits "D, E, F, and P" demonstrate, there is no continuity as to who is approved a CCW and who is denied. However, when the applications are compared after adding information from campaign contribution records (Exhibit O), the results are clear – the more money a CCW applicant gives, the greater the chance of an applicant obtaining a CCW. And, if you just happen to own a house with the Sheriff, Defendant Blanas will accept an oral application and bypass the normal protocols for issuance. See Additional Material Facts Nos. 1 through 127.

**PLAINTIFF DAVID MEHL**

Mr. Mehl applied for a CCW; an engineer by trade, he dutifully and carefully followed the written instructions for completing his application. However, Mr. Mehl shares with most of

8.

the public, a common set of apparent "deficiencies"; deficiencies clearly visible to the political appointees on the panel reviewing CCWs across the hall from the Sheriff's office; but deficiencies which become apparent to the majority of county residents *only* if they happen to apply for a CCW; Mr. Mehl is not a campaign contributor, nor was he a retired law enforcement officer, nor a person who knew the Sheriff personally. These circumstances, these "deficiencies", in and of themselves, were an immediate and serious impediment to any possibility that Mr. Mehl's application might be approved.

Mr. Mehl was unsurprisingly, and unremarkably denied a CCW because of these aforementioned deficiencies. This is *inarguable*; they are the "prerequisites" to obtaining a CCW in Sacramento County. It is inarguable not only because there were no comments made by the lone denying official, Chief David Lind; comments which might refute Mr. Mehl's assertion. (It should be noted that the cover sheet and alleged procedure requires the decisions and signatures of three officials, not one.) But inarguable because Chief Lind had *no idea* whether Mr. Mehl's reasoning for a CCW was compelling or not; whether Mr. Mehl's reasoning and justification met the county CCW policy standard, or didn't. For Mr. Mehl had followed the written instructions on the form, wherein on page 2 it states that Section 7 "must be completed in the presence of an official of the licensing agency" and that, the applicant "be prepared to answer these questions [in Section 7] *orally*". And, Section 7 specifically denotes the "details of reason for Applicant desiring a CCW license". Mr. Mehl was waiting to be contacted by the Department, and had not filled out this information.

Without the information in this section, Chief Lind had no idea why Mr. Mehl was seeking a CCW. Since, Mr. Mehl had, at this point, in *no way disqualified himself with the other information* he had supplied on his application, at least to those of us who are unaware of the aforementioned "prerequisites", there was no basis by which Chief Lind might approve *or* deny the application. That is, unless one is aware of an applicant's failure to provide the prerequisite campaign contributions to Defendant Blanas.

On March 4, 2004, Mr. Mehl, who, according to written instruction, had been waiting for a Department representative to contact him in order that he might provide his reasoning for a

9.

CCW, instead received a form letter. This letter informed him that his application had been denied. The reason for his denial was that he "did not provide convincing evidence that [he] or family members are in any immediate danger associated with everyday course of living as to justify the need to carry a concealed weapon." Incredibly there were additional instructions informing him that if his "circumstances change" he could re-apply after one year.

Now aware of his "deficiencies, Mr. Mehl believes that this letter might be a solicitation for the "prerequisite" campaign contribution. Enlightened and with the eyes to see and evaluate himself as the Sheriff and his representatives see him, as sorely lacking in the most basic prerequisites and unworthy of a CCW without them, Mr. Mehl is considering whether it might be worthwhile, as the letter suggests, to "change" his "circumstances", fix one or more of his deficiencies, and re-apply in a year.

**PLAINTIFF LOK LAU**

With regard to Mr. Lau, Defendants' assertions after-the-fact throw him under the bus, but are not compelling and should not be given any weight. Declarations have been created by Defendant Blanas and his representatives which portend to clarify and explain why they denied Mr. Lau a CCW. But these Declarations are not compelling.

Declarations such as these do not clarify, or more adequately explain anything. There is the obvious argument that since these statements were *not created contemporaneously from any notes* but rely solely on the memory of those writing them they will not be as accurate as the original documentation. But moreover, these Declarations are certainly not objective reports, as they might have been at the time of the incident they describe, but are a belated attempt to explain decisions or actions which are now being closely scrutinized; decisions and actions which now hold consequences for those who made them in such a cavalier fashion at the time. Declarations created long after-the-fact, and created for the express purpose of justifying actions that are under scrutiny, created in response to a query from a higher authority with the ability to render punitive measures, are not compelling.

For the purposes of determining what happened and why, the weight of the evidence should lie in the documentation and notations made *contemporaneously* with Mr. Lau's

application and evaluation. Mr. Lau's rejection letter states clearly that his CCW was denied because he did not show that his life was in any immediate danger, not because he was nervous, had employment issues with the FBI, or that he was on disability - none of those reasons were noted anywhere in Mr. Lau's CCW application or package by any of the reviewers - and none of those reasons were conveyed in his rejection letter - *nor are these reasons a prohibition on firearm ownership or the possession of a CCW permit*. **pyche eval.

Is it the case that the Defendant may simply keep raising a new reason to deny a person their rights after the previous reason has been defeated? These piece-meal obstacles to a person's rights would effectively raise an immovable obstacle; immovable and insurmountable over time.

Significantly, the *only* explanatory documentation or notations made by the Defendant's evaluators *contemporaneous to Mr. Lau's application and evaluation* is an underlined three-word handwritten notation on the evaluation sheet; *"TOO MANY ISSUES"*. This cryptic notation was presumably made in order to document and/or remind someone of something. But it should most importantly be noted that *the notation does not address the heart of the required justification for a CCW*; the notation does not address whether the applicant showed that his life was in any immediate danger or did not.

On the basis of whether Mr. Lau's life was, and still is, in immediate danger, one would have to grant him an *emergency* CCW; the basis for this statement being a comparison of Mr. Lau's justification with those of all other CCWs granted on an emergency basis. There has been no argument made that Mr. Lau fabricated or embellished any of the information he provided. Mr. Lau clearly expresses on the first page of Attachment 1, "my life is presently in great danger and I fear for my life every waking minute"; and he then proceeds to provide a literal volume of information explaining the *why*. Mr. Lau's life is a literal spy novel in which he plays an all too real part.

However, since the three reviewing Department officials could clearly see that Mr. Lau shared the same glaring "deficiencies" of Mr. Mehl (i.e. no campaign contributions, not a retired law enforcement officer, and no personal relationship with Defendant Blanas), his CCW application had to be denied, and was.

In stark contrast to Mr. Mehl's application, Mr. Lau chose to provide Departmental reviewers with a large stack of documents. Documentation such as this is enough to answer most questions one might have regarding any aspect of Mr. Lau's life; both personal and professional. The breadth of this documentation actually *leaves no issues unanswered* about Mr. Lau. Perhaps "TOO MANY ISSUES" meant that the Departmental reviewer had too many issues of his own and wouldn't have enough time to read Mr. Lau's entire application. But the reviewers realize that *their* work product may be reviewed and it is their *intent* to be cryptic; they know that what they are doing goes beyond policy and practice, so it's better to explain later if that ever becomes necessary.

The long-after-the-fact Declarations of the reviewers would have us believe *now* that they felt *then* that Mr. Lau himself had "too many issues"; that, well *you know*, they could *sense* that there was something psychologically wrong with him; cops are *able* to do that, aren't they? Based upon their training and experience, they can *just tell* when someone has some psychological or emotional "issues", or is about to commit a crime, or just shouldn't be able to have a gun; and certainly should not be able to have a CCW; it being common knowledge that law enforcement training and experience, such as theirs, is only one rung on the ladder down from a certified psychologist. And they are even able to do it without actually meeting the person. The problem with this concept is that even if one accepts this rather novel idea of the experienced-law-enforcement-officer-as-psychologist, the reviewers did not further document their unique perceptions anywhere on the application; so we are left to speculate. Moreover, the reviewer's far-fetched abilities to discern-the-problems-via-documentation has nothing to do with the established criteria regarding whether or not a person can be denied or approved for a CCW.

On the form letter Mr. Lau received denying his application for a CCW, he too was advised that, "If your circumstances change and you wish to re-apply you may do so after one year from the date of denial". If Mr. Lau had ever been informed by those reviewing his application that there were "too many issues", perhaps he could be working on these issues in order to get them rectified.

Though contrasting in one aspect, Mr. Lau's application did share something with Mr.

12.

Mehl's application; there was nothing written on the application that disqualified him from being approved for a CCW. The applicant clearance questions in Section 2 are answered in a manner similar to everyone who has been granted a CCW permit in Sacramento County.

In sum, there is a triable issue of fact, requiring the case to go before a jury.

## FIFTH CAUSE OF ACTION
## 42 U.S.C. § 1983 (14th Amendment Privileges and Immunities)

Senator Howard, who introduced the Fourteenth Amendment for passage in the Senate, stated:

> "Such is the character of the privileges and immunities spoken of in the second section of the fourth article of the Constitution [the Senator had just read from the old opinion of Corfield v. Coryell, 6 Fed. Cas. 546 (No. 3,230) (E. D. Pa. 1825), also cited in n14 of Saenz v. Roe, 526 U.S. 489]. To these privileges and immunities, whatever they may be - for they are not and cannot be fully defined in their entire extent and precise nature - to these should be added the personal rights guarantied and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right appertaining to each and all the people; <u>the right to keep and to bear arms</u>; the right to be exempted from the quartering of soldiers in a house without the consent of the owner; the right to be exempt from unreasonable searches and seizures, and from any search or seizure except by virtue of a warrant issued upon a formal oath or affidavit; the right of an accused person to be informed of the nature of the accusation against him, and his right to be tried by an impartial jury of the vicinage; and also the right to be secure against excessive bail and against cruel and unusual punishments.
>
> "Now, sir, here is a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the Constitution, which I have recited, some by the first eight amendments of the Constitution; and it is a fact well worthy of attention that the course of decision of our courts and the present settled doctrine is, that all these immunities, privileges, rights, thus guarantied by the Constitution or recognized by it, are secured to the citizens solely as a citizen of the United States and as a party in their courts. They do not operate in the slightest degree as a restraint or prohibition upon State legislation. . . .
>
> ". . . The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees."

Cong. Globe, 39th Cong., 1st Sess., 2765-2766 (1866).

The Ninth Circuit acknowledged in *Silveira* that :

> *Fresno Rifle* itself relied on *United States v. Cruikshank*, 92 U.S. 542, 23 L. Ed. 588 (1876), and *Presser v. Illinois*, 116 U.S. 252, 29 L. Ed. 615, 6 S. Ct. 580 (1886), <u>decided before the Supreme Court held that the Bill of Rights is incorporated by the Fourteenth Amendment's **Due Process Clause**</u>. Following the now-rejected

> *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 8 L. Ed. 672 (1833)
> (holding that the Bill of Rights did not apply to the states),
> *Cruikshank* and *Presser* found that the Second Amendment
> restricted the activities of the federal government, but not those of
> the states. One point about which we are in agreement with the
> Fifth Circuit is that *Cruikshank* and *Presser* rest on a principle that
> is now thoroughly discredited. See *Emerson*, 270 F.3d at 221 n.13.
> Because we decide this case on the threshold issue of standing,
> however, we need not consider the question whether the Second
> Amendment presently enjoins any action on the part of the states.

This is important because all Ninth Circuit Second Amendment decisions have been approached through 1) and interpretation of the Second Amendment and whether it confers an individual or state right, and 2) whether it is incorporated through the Due Process Clause of the Fourteenth. The Fifth Cause of Action does not seek to define the Second Amendment; rather, it seeks to define the outer parameter of the Privileges and Immunities Clause of the Fourteenth Amendment, which has not been addressed in Defendants brief nor by any decision within this Circuit.

Pockets of bias against firearms are not unlike the all too frequent prejudice toward persons of color, women and sometimes men as a class, quirky religions, access to birth control, homosexual persons, and the next prejudice de jour. Broad bias typically persists because of misinformation and insufficient thoughtful study. The Bill of Rights and this Court are the citizens' protection from such bias. See Sandra Day O'Connor, *The Majesty of the Law* 59 (N.Y.: Random House 2003).

*Brown v. Board*, 347 U.S. 483 (1954) took pains to be unanimous and to overrule *Plessy v. Ferguson*, 163 U.S. 537 (1896) after many hours of argument and reargument. The Court struggled with the issues leading up to *Brown* for what today seems to have been a very long time. See Del Dickson ed., *The Supreme Court in Conference* 635-671 (1940-1985)(N.Y.: Oxford 2001).

*Bradwell v. The State*, 83 U.S. 130 (1873) is now seen as a curiosity of condescending patriarchy. It follows the *Slaughter-House Cases*, 83 U.S. 36 (1873) that have been roundly criticized, but not yet finally put to rest, but the tide has changed recently. Categorical discrimination against women was not remedied by the Fourteenth Amendment. The government endorsed the irrational bias of sex discrimination even in the very hour when it was abolishing

14.

slavery and empowering freed-men-only to vote. Millions of qualified women were denied the right to vote from 1868 to 1920, and before.

After *Slaughter-House* and *Cruikshank*, the Congress was powerless to correct those judicial transgressions. The Court allowed Reconstruction to fail and abandoned the freedmen to an unkind fate. The Court from 1873 into the next century, perpetuated the same errors, often over the lone dissent of the first Justice Harlan, and sometimes Justice Field.

The progression of decisions following the narrow *Slaughter-House* mode included *Presser v. Illinois*, 116 U.S. 252 (1886)(Woods, J), holding that the First and Second Amendments did not inhibit state action infringing the rights to assemble and to keep and bear arms without a discretionary permit from the Governor. *Presser* remains on the books. Lower State and federal courts follow *Presser* sporadically, but often decline to do so, or even apologize.

The right to keep and bear arms should further be considered a privilege or immunity protected by Section 1 of the Fourteenth Amendment. The right is express throughout the history of the Fourteenth. It is of stature similar to the travel right upheld in *Saenz v. Roe*, 526 U.S. 489 (1999), and earlier in *Doe v. Bolton*, 410 U.S. 179 (1973). See also *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)(applying the exclusionary rule to the States because "without that rule the freedom from state invasions of privacy would be so ephemeral . . . as [citation omitted] not to merit this Court's high regard as a freedom `implicit in the concept of ordered liberty'")

Though *Mapp* Court applied the Due Process Clause, the Supreme Court has always held that "the full scope of the liberty guaranteed by the Due Process Clause . . . is not a series of isolated points. . . . It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints. . . ." *Poe v. Ullman*, 367 U.S. 497, 543 (1961) (dissenting opinion). It is worthwhile to emphasize that the Fourth Amendment itself does not apply to state actors. It is only because the Court has held that the privacy rights protected against federal invasion by that Amendment are implicit in the concept of ordered liberty protected by the Due Process Clause of the Fourteenth Amendment that the Fourth Amendment has any relevance in this case. Strictly speaking, Defendants argument is based

15.

entirely and exclusively on the Fourteenth Amendment's Due Process Clause.

Fundamentally important is the wording of the Fourteenth Amendment in relation to "due process" and "privileges or immunities." Section One reads in part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This is a continuum of broadly enumerated rights by the mere fact that semicolons were used, and not periods, and this continuum of rights is consistent with the Supreme Court's jurisprudence on matters of fundamental liberty.

> "Due process [just like privileges or immunities] has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound.
>
> No formula could serve as a substitute, in this area, for judgment and restraint. ". . . [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This `liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; <u>the right to keep and bear arms</u>; the freedom from unreasonable searches and seizures; and so on. <u>It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.</u>" Poe v. Ullman, supra, at 542-543 (dissenting opinion). [emphasis added]

*Moore v. East Cleveland*, 431 U.S. 494, 501-2 (1977); see also, *Roe v. Wade*, 410 U.S. 113, 169 (1973).

At least three generations of law students and constitutional lawyers have understood that the *Slaughter-House Cases*, 83 U.S. 36 (1873)(5-4), and *United States v. Cruikshank*, 92 U.S. 542 (1876), were not well considered. Many of the Justices of that era chose to disregard the historical circumstances, legislative debates, and plain purposes of the Fourteenth Amendment and related legislation. Justice Black has leveled that specific criticism against them:

"[P]revious decisions of this Court … however, had not appraised the historical evidence on that subject." *Adamson v. California*, 332 U.S. 46, 74 (1947)(separate opinion).

It is no coincidence that *Slaughter-House* in the U.S. Reports is followed immediately by *Bradwell v. The State*, 83 U.S. 130 (1873), another legacy of the then judicial disregard for the Fourteenth Amendment and individual rights. Adherence to *Slaughter-House* and *Cruikshank* can only provoke continued solid criticism and frustration with the system of justice. The evidence of past error is too strong and widely known.

Justice Noah Swayne observed in *Slaughter-House* that the majority turned "what was meant for bread into a stone." 83 U.S. at 129. One need not be a constitutional scholar to shudder at the reasoning and brutal reality of *Slaughter-House* and *Cruikshank* as they attempted to gut the Fourteenth Amendment, leaving next to no protection for the lives and liberty of freedmen, freedwomen, and those who supported their cause.

*Cruikshank* did so following the murderous "Colfax massacre" in Louisiana of freedmen. Federal prosecutors charged Klansmen with conspiracy to prevent blacks from exercising civil rights, including the rights to vote and to bear arms for community defense. The *Cruikshank* Court freed the Klansmen to ride again and again, with no reference to the massacre, without any mention of the refusal of Louisiana to enforce its laws, or the complicity of state and local officials in the massacre. The Colfax incident today fits the pattern of a mass crime against humanity, of the kind perpetrated by past despotic regimes in Germany, Iraq, and Bosnia.

*Slaughterhouse* and *Cruikshank* may be precedent on the books, but they are not entitled to controlling recognition any more than *Bradwell* or *Plessy*. The Courts today have far better insights and knowledge of the documented events leading up to the Fourteenth Amendment.

As historian Flack noted, "the decisions in the above cases have given to the Fourteenth

Amendment a meaning quite different from that which many of those who participated in its drafting and ratification intended it to have." Flack, *The Adoption of the Fourteenth Amendment* 7 (Johns Hopkins 1908).

Professor Antieau is even more blunt about the *Slaughter-House* majority opinion:

> Of the outrageous decision, a contemporary scholar wrote: 'Ninety-nine out of every hundred educated men, upon reading this (Privileges and Immunities) section over, would at first say that it forbade a state to make or enforce a law which abridged any Privilege or Immunity whatever of one who was a citizen of the United States.'

Antieau, *The Intended Significance of the Fourteenth Amendment* (Wm. Hein, Buffalo, N.Y. 1997), citing Royall, *The Fourteenth Amendment: The Slaughter House Cases*, 4 So. L. Rev. (N.S.) 558, 563 (1879). All of the authorities from varying venues cited in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), cert. denied, 536 U.S. 907 (2002), *Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) and *Nordyke v. King*, 364 F.3d 1025 (9th 2004) agree, and explain themselves well, as do Story, Blackstone, Rawle, and many others.

Akhil Reed Amar of Yale writes:

> [T]he framers of the Fourteenth Amendment strongly believed in an individual's right to own and keep guns for self-protection. Blacks and Unionists down South could not always count on the local police to keep white night-riders at bay. When guns were outlawed, only Klansmen would have guns. Thus, the Reconstruction Congress made quite clear that a right to keep a gun at home for self-protection was indeed a constitutional right -- a true 'privilege' or 'immunity' of citizens.

The post-Civil War Freedmen's Bureau Act attempted to protect newly freed men in their personal "constitutional right to bear arms." 14 Stat. 173, 176 (1866). That Act of Congress has enormous significance for interpreting the Fourteenth Amendment as protecting the right to arms for family and community defense against official and Klan violence, or contemporary gangs. The same Congress drafted and passed both overwhelmingly.

The *Cruikshank* Court, however, restored the Klan and supporting reactionary officialdom to power. The Supreme Court has never undone that wrong. The evil of the Klan persists today, as we were recently reminded in *Virginia v. Black*, 538 U.S. 343 (2003):

> [A]cts of violence included bombings, beatings, shootings, stabbings, and mutilations. … Members of the Klan burned crosses on the lawns of those associated with the civil rights

movement, assaulted the Freedom Riders, bombed churches, and murdered blacks as well as whites whom the Klan viewed as sympathetic toward the civil rights movement.

*Id.* at 355.

State and local lawmen all too often have been supportive of the Klan with pervasive state inaction: refusal to provide protection, refusal to prosecute, tacit cooperation, and obstruction of justice at every level.

The disarmament of blacks via the Black Codes and oppressive state gun control legislation left the power of firearms in the hands of the Klan, gangs, and looters. The Fourteenth Amendment was intended in part to redress that imbalance and provide means of self defense to law abiding citizens, black and white. Again, a single handgun would mean the difference between life or death from an assault by a truckload of Klansmen.

## **CONCLUSION**

Plaintiffs have clearly established a triable issue of fact in that CCW are issued arbitrarily, and the only common denominator as to who gets one is those who pay money to the Sheriff for political reasons. Defendants motion must be denied.

If this Court is not persuaded, to accept Plaintiffs proposition in the Fifth Cause of Action (i.e. that the 14th Amendment's Privileges or Immunities Clause confers an individual right to keep and bear arms), Plaintiffs then urge this Court to certify for interlocutory appeal this Court's ruling on that single issue only ---- a ruling that nobody could not imagine will be open to serious question -- as well as in these circumstances, and by the standards that govern here, the more straightforward course appears to be a certification pursuant to 28 U.S.C. § 1292(b).

DATED: November 21, 2007          Respectfully submitted,
                                  LAW OFFICES OF GARY W. GORSKI

                                   /s/ Gary W. Gorski
                                  GARY W. GORSKI,
                                  Attorney for Plaintiffs